**ORIGINAL**

407.423.9900
Fax 407.841.2779
Toll Free 855-MYDEPOS

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

1  UNITED STATES DISTRICT COURT

2  MIDDLE DISTRICT OF FLORIDA

3  ORLANDO DIVISION

4

5  JEAN DECARLO 22-CV-1596-RMN

6  MYRNA PINEIRO 22-CV-1574-RMN

7  KIMBERLY GOUDE 22-CV-1511-RMN, ET AL,

8  PLAINTIFF,

9

10 V.

11

12 EMERGE HEALTHCARE GROUP, LLC

13 FCID MEDICAL, INC.

14 FIRST CHOICE MEDICAL GROUP OF BREVARD, LLC

15 FIRST CHOICE HEALTHCARE SOLUTIONS, INC. AND

16 LANCE FRIEDMAN, INDIVIDUALLY,

17 DEFENDANT.

18 _____/

19 VIDEOCONFERENCE DEPOSITION OF LANCE FRIEDMAN, EMERGE

20 HEALTHCARE GROUP, LLC

21 DATE:      JUNE 13, 2023

22 REPORTER:  JESSICA ETHRIDGE

23 PLACE:     ALL PARTIES TO APPEAR VIA VIDEOCONFERENCE

24

25

400 North Ashley Drive, Suite 2600        100 East Pine Street, Suite 308        4651 Salisbury Road, 4th Floor
TAMPA, FL 33602                          ORLANDO, FL 32801                      JACKSONVILLE, FL 32256
                                          CORPORATE

```
 1                        APPEARANCES

 2   ON BEHALF OF THE PLAINTIFFS, JEAN DECARLO, MYRNA
     PINEIRO, KIMBERLY GOUDE, ET AL:
 3   Joseph C. Wood, Esquire
     Mauricio Arcadier, Esquire
 4   Arcadier, Biggie & Wood, PLLC
     2815 West New Haven Avenue
 5   Suite 304
     Melbourne, Florida 32904
 6   Telephone No.: (321) 953-5998
     Facsimile No.: (321) 953-6075
 7   E-mail: wood@abwlegal.com
     arcadier@melbournelegalteam.com
 8   (Appeared via videoconference)

 9   ON BEHALF OF THE DEFENDANTS, EMERGE HEALTHCARE GROUP,
     LLC, ET AL:
10   James D. Henderson, Esquire
     Frese Whitehead
11   2200 Front Street
     Suite 301
12   Melbourne, Florida 32901
     Telephone No.: (321) 984-3300
13   Facsimile No.: (321) 951-3741
     E-mail: jhenderson@fresewhitehead.com
14   (Appeared via videoconference)

15

16

17

18

19

20

21

22

23

24

25
```



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

```
 1                        INDEX
                                           Page
 2  PROCEEDINGS                              5
    DIRECT EXAMINATION BY MR. WOOD           6
 3
                        EXHIBITS
 4  Exhibit                                 Page
     1 - Application for Registration of
 5        Fictious Name                      25
     2  Twenty-nine pages of E-mails         34
 6   3 - E-mails dated July 29th             36
     5 - Amended Notice of Taking Deposition 42
 7   4 - E-mails dated August 26th           44
     6 - Defendants Response to First Set of
 8        Interrogatories                    68
     7 - Interrogatories Sent to Mr. Friedman 69
 9   8 - Company Leadership                  73
     9 - Bankruptcy Report                   78
10  10 - Consolidate Tax Returns            84
    11 - First Choice Healthcare Solutions
11        Investor Presentation             87
    12 - Florida Blue Large Group Employer
12        Application                       113
    13 - United Healthcare Plan Application 115
13  14 - Twelve Pages of E-mails Between
          Penny Roberge and Gillian Lee     119
14  15 - Damages sent May 11, 2023          123

15

16

17

18

19

20

21

22

23

24

25
```



**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1                      STIPULATION

 2

 3   The Rule 30(b)(6) videoconference deposition of Lance

 4   Friedman, Corporate Representative of Emerge Healthcare

 5   Group, taken remotely on Tuesday the 13th day of June

 6   2023 at approximately 10:02 a.m.; said deposition was

 7   taken pursuant to Rule 30(b)(6) of the Federal Rules of

 8   Civil Procedure.

 9

10   It is agreed that Jessica Ethridge, being a Notary

11   Public and Court Reporter for the State of Florida, may

12   swear the witness and that the reading and signing of

13   the completed transcript by the witness is not waived.

14

15

16

17

18

19

20

21

22

23

24

25
```



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

```
 1                PROCEEDINGS
 2        THE REPORTER:  Okay.  We're now on record. Will
 3   all parties except for the witness, please state
 4   your name, your appearance, and your location
 5   starting with Plaintiff's Counsel?
 6        MR. WOOD:  Joseph Wood on behalf of the
 7   plaintiffs.
 8        MR. HENDERSON:  James Henderson here on behalf
 9   of the defendants.
10        MR. WOOD:  And I've got Mauricio Arcadier here
11   with me.  He's on mute at the moment, but he's my
12   partner, head attorney for Evelyn Bonilla.  We had
13   changed the notice to remove her as one of the
14   noticing parties, but he's here to observe.
15        THE REPORTER:  Okay.  Thank you so much.  And
16   Mr. Friedman, would you please state your full name
17   for the record and hold your ID up to the camera?
18        THE WITNESS:  Lance Friedman.
19        THE REPORTER:  Would you -- would you mind
20   putting it back up?  I'm sorry.  It just -- it had a
21   little bit of a glare, so I didn't see your name.
22   Thank you.  Do both parties agree that the witness
23   is in fact Lance Friedman?
24        MR. WOOD:  It appears that way.
25        MR. HENDERSON:  Agreed.
```

**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

```
 1        THE REPORTER:  All right.  Thank you so much.

 2     Mr. Friedman, would you please raise your right

 3     hand? Do you solemnly swear or affirm that the

 4     testimony you're about to give will be the truth,

 5     the whole truth, and nothing but the truth?

 6        THE WITNESS:  Yes.

 7        THE REPORTER:  All right.  You may begin.

 8              DIRECT EXAMINATION

 9        BY MR. WOOD:

10     Q.   Mr. Friedman, good morning.  My name is Joseph

11  Wood.  I represent a number of employees who previously

12  worked for First Choice Healthcare Group, now Emerge

13  Healthcare companies that you run.  They filed lawsuits

14  against the company and yourself for unpaid wages as

15  well as issues regarding the ERISA, FLSA, Fair Minimum

16  Wage Act.  Before I get into the depo, I typically over

17  some -- go over some instructions.  Am I right, you are

18  a -- an attorney?

19     A.   I'm not a practicing attorney.  I'm no longer

20  a member of the bar because I haven't done my CLE

21  credits.

22     Q.   Okay.  You -- in the past, have you gone

23  through depositions?

24     A.   Sure.

25     Q.   Okay.  As you know, I'm going to ask you some
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Case 6:23-cv-00558-PGB-RMN Document 49-15 Filed 05/03/24 Page 7 of 142 PageID 1336
6:23-cv-00558-PGB-RMN Document 49-15 Filed 05/03/24 Page 7 of 142 PageID 933
071542 Friedman Bank - 06-19 2023

1  questions about the lawsuits.  We need a clean record,

2  so we'll try not to speak over each other.  If you don't

3  understand a question that I've got, if I've asked you,

4  please let me know.  If you don't hear something, let me

5  know, I will repeat it.  If you need a break, please let

6  me know.  We'll try to get breaks in about every hour if

7  we need it.  And that's about it.  Do you understand the

8  instructions so far?

9      A.  Yes.

10      Q.  All right.  Before we get into the nuts and

11  bolts, can you give me a little bit of your background?

12      A.  My background is that I've typically worked

13  for investment firms, family offices and ran investment

14  banking departments for various broker dealers and

15  firms.  And halfway through my career, I basically go

16  into trouble companies and I work primarily on success

17  fees to take them through reorganizations, help them

18  raise capital and try to resurrect their business plan.

19      Q.  And as far as the companies that are at issue

20  in this lawsuit, are you under a success fee arrangement

21  with those?

22      A.  I am not a shareholder.  I'm uncompensated and

23  until we are able to file an S1 registration statement,

24  which would be commonly be called, you know, for people

25  layman, and you know, an IPO while this company is a



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1  public company before reporting public company and later

2  was a pink sheet company, non-reporting other than some

3  OTC disclosures.  We have not for various reasons, been

4  able to file an S1 registration statement, but

5  anticipate doing so in the next 20 to 30 days.  So the

6  answer is that -- that is the answer.

7       Q.   Now, you mentioned that you're uncompensated;

8  is that correct?

9       A.   That is correct.

10      Q.   Have you not received any pay from the

11  defendants?

12      A.   I have not received pay in terms of

13  compensation.  I have received on loans from time to

14  time.  I've helped the company with I've gotten

15  repayment on some of them.  I think currently, even

16  under my contract, I'm owed some eight, $900,000.

17      Q.   And did you receive repayment of these loans

18  during the bankruptcy proceedings?

19      A.   No.

20      Q.   And did you receive pay after the bankruptcy

21  proceedings?

22      A.   No, I'm owed 800,000 and change.

23      Q.   What other companies are you associated with

24  other than the defendants?

25      A.   Many companies.  I'm a shareholder, and I -- I

**MILESTONE** | **REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1  don't have a list of them.
 2       Q.   All right.  Do you own yourself own any other
 3  companies?
 4       A.   Individually?
 5       Q.   Yeah.
 6       A.   I just have a consulting arm that I use.
 7       Q.   Is that Blackstone Capital Advisors?
 8       A.   Yes.
 9       Q.   And have the defendants paid Blackstone
10  Capital Advisors in any way?
11       A.   No.  Blackstone has loaned considerable money
12  to the company and has paid some of it, but not all of
13  it back post-bankruptcy.
14       Q.   All right.  Let's go through the companies and
15            I'm going to go through some of the
16  allegations and the complaints.  Before we go there, let
17  me know: Have you reviewed the complaints that have been
18  filed in these cases?
19       A.   Cursory, not very much.
20       Q.   Okay.  There was an answer that was filed on
21  behalf of the companies and yourself.  Did you
22  participate in the answering of that complaint or filing
23  of that answer?
24       A.   I reviewed them back, you know, way back when.
25       Q.   Okay.  And you agreed with the admissions or
```



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

 1  denials at that time?

 2      A.   I don't recollect any of them now, but --

 3          MR. HENDERSON:  I just want to pose an

 4      objection, attorney-client privilege.  But if you

 5      can answer without divulging any information or

 6      conversations that you've had with your attorney,

 7      you can go ahead and try to do so, Mr. Friedman.

 8      A.   I -- I -- yeah, I -- I don't recollect --

 9          BY MR. WOOD:

10      Q.   Okay.

11      A.   -- the answers -- the answer to the complaint

12  right now and I don't -- I don't remember what I may or

13  may not have commented on to the defendant's attorneys.

14      Q.   Okay.  And we previously discussed that you

15  were an attorney at least.  What states are you licensed

16  in?

17      A.   I'm not licensed.  I passed the Florida Bar in

18  the '80s, I guess, or early '90s.  And for a very short

19  time before I went in-house on a banking deal was

20  associated with a firm.

21      Q.   Okay.  And you've not practiced law since the

22  '90s?

23      A.   No.

24      Q.   And when you did practice, what was your area

25  of practice?



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

 1        A.    Securities and corporate transactions.

 2        Q.    Okay.  Let's go through the defendants' First

 3   Choice Healthcare Solutions Incorporated.  They are a

 4   Delaware none -- or Delaware for-profit company,

 5   correct?

 6        A.    Correct.

 7        Q.    And where is the principal address of the

 8   company?

 9        A.    Currently, it's 95 Bulldog Boulevard, Suite

10   202, Melbourne, Florida 32901.

11        Q.    And what is your role at First Choice

12   Healthcare Solutions Incorporated?

13        A.    I was employed by the shareholder by the board

14   through the shareholders to assist the company through a

15   bankruptcy and a reorganization as well as to try to

16   resurrect the company's operations, help raise capital

17   and re-list the company on -- on NASDAQ as some other

18   exchange.

19        Q.    You're the CEO of the company, right?

20        A.    That's correct.

21        Q.    And as CEO, what are your duties?

22        A.    To raise capital.  My -- my -- my specific CEO

23   duties were to raise capital and reorganize the company

24   and to resurrect operations.

25        Q.    Okay.  And in order to resurrect operations,



**MILESTONE** | **REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

1  what did you do?

2      A.   We raised capital.

3      Q.   Okay.  Are those two of the same things then?

4  You mentioned raising capital was one duty and

5  resurrecting the operations?

6      A.   Well, that was done through reorganization

7  under Subchapter, pursuant to Subchapter 5, Chapter 11.

8  Without doing that, it was impossible to resurrect any

9  operations.

10     Q.   Okay.

11     A.   Because they went into a free fall, the

12  company had prior to the Chris Romandetti incident, had

13  34, $35 million of revenue, and it came right down to,

14  you know, a million-and-a-half dollars with a massive

15  infrastructure.

16     Q.   And the Chris Romandetti issue discussed, he

17  was the prior CEO who was charged with securities fraud,

18  correct?

19     A.   He was the prior CEO and founder and principal

20  shareholder, yes.

21     Q.   And he's been sentenced to charges related to

22  securities fraud with -- as it pertains to this company,

23  right?

24     A.   Six months.

25     Q.   Yeah.  What does First Choice Healthcare



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  Solutions do?

2      A.   Now it does basically nothing other than some

3  minor PT operations.

4      Q.   Okay.  The lawsuits that we've brought pertain

5  to employees, primarily the timeframe we're focused on

6  is November of 2021 through the end of their tenures,

7  which changes.  During that timeframe, what was First

8  Choice Healthcare Solutions doing?  What did it do?

9      A.   We were doing various aspects of orthopedics.

10 We did hire a lot of surgeons and other doctors to do

11 surgeries, interventional care, physical therapy,

12 occupational therapy, pain management, and the like,

13 which was to generate revenues to employ the ancillary

14 employees that supported that orthopedic infrastructure,

15 service infrastructure.

16     Q.   Okay.  But First Choice Healthcare Solutions

17 did not directly employ these people; is that right?

18     A.   Well, that's a holding company.  It's First

19 Choice Medical Group -- First Choice Medical Group of

20 Brevard, LLC.

21     Q.   Okay.  So First Choice --

22     A.   And I -- and -- and I think, although I don't

23 know who it would be, I think there are some FCID, Inc.

24         employees, I think it was split between those

25 two companies.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   And we're going to get into those as well.

2 But the operations of First Choice Healthcare Solutions,

3 it's done through its subsidiaries, correct?

4    A.   My understanding is it is, although I -- I --

5 I'm not sure.  It might be something that the CFO is --

6 is better educated than I am on it, exactly -- exactly

7 how those things are operated through its structure.

8    Q.   And FCID Medical Incorporated, that's a

9 Florida for-profit company, correct?

10    A.   To the best of my knowledge, I've never

11 checked.

12    Q.   And the principle list of business is the same

13 as Health -- sorry, First Choice Healthcare Solutions at

14 95 Bulldog?

15    A.   I don't know.  I don't know what its business

16 function is.  I think it holds some assets and some

17 employees, but specifically, I have no idea.

18    Q.   Okay.  Sitting here today, does FCID Medical

19 do anything?

20    A.   I -- I don't know.

21    Q.   Okay.  Now FCID Medical is wholly owned by

22 First Choice Healthcare Solutions, right?

23    A.   That's correct.

24    Q.   It's a subsidiary --

25    A.   That's correct.



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

1    Q.   And therefore it's an asset of the company,

2  right?

3         MR. HENDERSON:  Objection.  Form.  Answer it

4     again.

5    A.   I don't know what value FCID has at all at

6  this time.

7         BY MR. WOOD:

8    Q.   Okay.  Sitting here today, does it have any

9  employees?

10   A.   I don't think so.  No.

11   Q.   Any revenues?

12   A.   No, not that I'm aware of.

13   Q.   Do you know what -- I didn't mean to cut you

14 off.  Sorry.

15   A.   No, not that I'm aware of.  I believe there

16 are no employees at the -- the company at this time.

17   Q.   Okay.  During your --

18   A.   Yeah.

19   Q.   -- tenure with the companies here, did at one

20 point FCID have employees?

21   A.   I believe so, yes.

22   Q.   Okay.  And there became a point where those

23 employees transitioned to one of the other subsidiaries

24 of First Choice?

25   A.   I don't know.  I'm not aware.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

1    Q.   Okay.  And what is your role at FCID Medical?

2    A.   I don't believe I have any other than trying

3 to, as I mentioned, list First Choice Healthcare

4 Solutions on a fully reporting nationally listed

5 exchange and to acquire businesses that would help

6 shareholder value and -- and -- and -- and try to move

7 the company forward in a positive direction.

8    Q.   We had briefly discussed First Choice Medical

9 Group of Brevard, that is an LLC out of Delaware,

10 correct?

11    A.   I don't know.  It -- it may be.  I think it

12 might be a Florida LLC.

13    Q.   Okay.  And the Medical Group of Brevard, that

14 is wholly owned by FCID, correct?

15    A.   That's correct.

16    Q.   Okay.  And FC -- the medical group does

17 operate, correct?

18    A.   Well, the medical group at this time, its only

19 operation is through to 1099 part-time physical

20 therapists.

21    Q.   And the revenues that those therapists

22 produce, does that flow through FCID and then up into

23 First Choice Healthcare Solutions?

24    A.   Yeah, I -- I don't know.  I'm not aware.  I

25 don't handle any of the financial aspects of the

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  company, how they book revenue, where they send it and

2  how it's collected.  My -- my understanding would be

3  since insurance pays, it would probably be First Choice

4  Medical Group of Brevard would actually be the payee and

5  from where the money goes from there, I have no idea.

6      Q.   Okay.  And you are the managing member of that

7  LLC, correct?

8      A.   I'm a sole member representative for that

9  company, yes.  I'm not the managing member.  I think I'm

10  the managing -- I'm the manager so that, you know,

11  corporate actions can be directed from there.

12     Q.   There's no other members, though?

13     A.   Not that I'm aware of.

14     Q.   And back in 2020 First Choice, FCID, the

15  Medical Group, they filed Chapter 11 bankruptcy,

16  correct?

17     A.   I believe in June 15th of 2020, the prior

18  board and interim CEO filed a bankruptcy action through

19  Subchapter 5, Chapter 11, yes.

20     Q.   Okay.  And those bankruptcy proceedings were

21  jointly administered, right?

22     A.   Yes.

23     Q.   Do you know why?

24     A.   Yes.  Revenues -- they couldn't meet their

25  obligations.  Their revenues had decreased from 34

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

 1  million rapidly down to minimal revenue.

 2      Q.   And I understand maybe that might be the

 3  reason why they filed bankruptcy, but I'm asking why

 4  they -- why the actions were jointly administered?

 5          MR. HENDERSON:  Objection.  Form.

 6      A.   I have no idea about the action.  I don't know

 7  what the strategic thinking is.

 8          BY MR. WOOD:

 9      Q.   And they had a joint plan of reorganization,

10  correct?

11      A.   Yes.

12      Q.   And that was confirmed back in February of

13  '21?

14      A.   The plan was confirmed February 22 of '21.

15  And the actual exit I believe was, like, April 22nd of

16  '22.

17      Q.   Were you involved with these companies at that

18  time?

19      A.   Not at the time of the filing.  I only helped

20  to get through the reorganization after it was filed.

21  And the shareholder action through a 13-D action gave

22  shareholders control, prior board resigned, a new board

23  was elected, and I was appointed CEO.

24      Q.   And so you were CEO prior to the confirmation

25  in February of '21?

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.    That's correct.

2      Q.    Okay.  And after the reorganization plan was

3 confirmed, the entities decided to rebrand as Emerge

4 Healthcare; is that right?

5      A.    As -- as a name, yes, Emerge Healthcare.

6 That's right.

7      Q.    Okay.  And so all of the facts to give rise to

8 the lawsuits we're talking about today, they take place

9 after the confirmation of the bankruptcy petitions.  Is

10 that your understanding?

11     A.    Yes.

12     Q.    Okay.  And so all of the actions that -- at

13 issue here really are during a time where the companies

14 had rebranded as Emerge Healthcare; would you agree?

15     A.    The actions -- all these actions to the best

16 of my knowledge without any investigation, I believe

17 have taken place from a timeline post -- post-

18 confirmation - post-exit approval of the plan in April

19 22, 2022.

20     Q.    And at that time, the entities were doing

21 business as Emerge Healthcare?

22     A.    No.  I mean, it was a trade name for marketing

23 purposes only.  The companies were still doing business

24 under First Choice Healthcare Solutions, First Choice

25 Medical Group of Brevard.  We never changed any of those



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  corporate entities names.  I know they filed for an LLC,

2  but the LLC never had a bank account, was never used.  I

3  don't believe I'm even -- I -- I -- I -- I wouldn't

4  know.  I -- I -- I -- I never signed anything to be a

5  member of it, but the intention was just to use it as a

6  -- a branding name to try to get away from obviously the

7  bankruptcy and the criminal conduct of the prior founder

8  and CEO who was also a principal shareholder.

9      Q.   Okay.  And there is an Emerge Healthcare Group

10  LLC, which is a formed Florida limited liability

11  company.  Do you agree with me?

12      A.   I have -- I've never looked it up.  I -- I --

13  I've seen and heard that there is, but I'd didn't form

14  it, and it was as far as I know, simply to be a branding

15  name, not an entity for any use.  To the best of my

16  knowledge, the entity has never been used, has no bank

17  accounts, has no operations, has no assets, has nothing.

18      Q.   Okay.  If you didn't form the LLC, who

19  would've done that?

20      A.   I don't know.  It could have been -- it could

21  have been, you know, any of people on my team to try to

22  secure a name or URL.  It doesn't take very much as you

23  are aware as an attorney to form a company.

24      Q.   Sure.  There's also a fictitious name, Emerge

25  Healthcare Group LLC; are you aware of that?

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**       **www.MILESTONEREPORTING.com**       Toll Free 855-MYDEPOS

1    A.   Yeah.  I mean, that's all I anticipated that
2  they would go get.
3    Q.   Okay. So sitting here today, is it your
4  testimony that Emerge Healthcare Group LLC has no
5  assets?
6    A.   That's correct.
7    Q.   No bank accounts?
8    A.   That's correct.
9    Q.   It is a non-functioning entity?
10       MR. HENDERSON:  Objection.  Form.
11   A.   It's no -- it has no operations.
12       BY MR. WOOD:
13   Q.   Okay.  All right.  First Choice is the parent
14  company of the remaining defendants; is that right?
15   A.   That's correct.
16   Q.   And First Choice does business and operates
17  through its subsidiaries, right?
18   A.   That's correct.
19   Q.   And you are the CEO of First Choice FCID,
20  right?
21   A.   No, I'm -- I'm not a CEO, to my knowledge of
22  FCID.  Well --
23   Q.   Okay.
24   A.   -- I might be of FCID.  I -- I'd have to look
25  at that in the corporate documents, but certainly a



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  First Choice Healthcare Solutions.  FCID I guess is a

2  corporation, and I'm a manager of Brevard Group --

3  Medical Group of Brevard LLC.  And I believe Marina

4  Towers, which held a master lease at one time is now

5  been dissolved, it's no longer in existence.

6      Q.   Now Marina Towers, that was a subsidiary of

7  First Choice --

8      A.   Healthcare Solutions, yes.

9      Q.   Yes.  And when I say, "First Choice," I'm

10 really referring to the parent, medical group --

11     A.   Yeah, I -- I understand.

12     Q.   Okay.  Okay.  And so that subsidiary that --

13 the purpose of Marina Towers was to rent space from

14 another entity and then rent it out to its subs, right?

15     A.   That's correct.

16     Q.   Okay.  Other than the rent that it collected

17 from its subs, did it have any revenue independent from

18 that?

19     A.   Not that I believe so, no.

20     Q.   Okay.  And is it your understanding that

21 medical group actually owns the fictitious name, Emerge

22 Healthcare Group, LLC?

23     A.   I -- I don't know.  Maybe you didn't hear.  I

24 -- I -- I -- I do not know.

25     Q.   No, I -- no, I heard, I'm sorry.  I -- so as



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

```
 1  we go through this deposition, I'm going to be showing
 2  you some documents and going over those documents, and I
 3  just need to find them every so often.  So I'm going to
 4  be sharing my screen with you, and I hope that you can
 5  review that.  There we go.
 6       A.   Okay.
 7       Q.   And this is a document that I pulled from the
 8  Secretary of State for Florida, which is the Application
 9  for the Registration of the Fictitious Name, Emerge
10  Healthcare Group, LLC.  Do you see that on the top?
11       A.   Yes, I do.
12       Q.   And the owner at the -- in the middle it says,
13  "First Choice Medical Group of Brevard LLC?"
14       A.   Yes.
15       Q.   And at the bottom, there's an electronic
16  signature, which states your name in June of 2022.  Do
17  you see that?
18       A.   Uh-huh.
19       Q.   Did you file this?
20       A.   No.
21       Q.   Who would've signed your name on your behalf?
22       A.   Well, he might've asked me.  I -- I have --
23  could -- it could be Julie Hardesty or Gillian Lee,
24  probably Gillian Lee.
25       Q.   Okay.
```

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    A.   I mean, the idea was to rebrand and so she

2    would, you know, if I said, you know, we -- we -- we

3    decided at a group meeting, okay, Emerge sounds like a

4    great name.  She would apply for a fictitious name and

5    signed my name.

6    Q.   Okay.  Now with the bond, it does mention that

7    you're stating that the information is true and accurate

8    and you're certifying that it's been registered.  Did

9    you at least review this document before it was filed?

10    A.   No.

11    Q.   Okay.

12    A.   It seems pretty self-explanatory.  They

13    applied for a fictitious name.  I just didn't know if it

14    was under First Choice Healthcare Solutions or First

15    Choice Medical Group or FCID.  You know, makes sense I

16    guess, since prior to recent events, the medical

17    operations are at the Medical Group of Brevard LLC, and

18    the idea was to rebrand.  So I don't think it -- it's

19    pretty perfunctory.

20    Q.   Now looking at this document, you don't

21    dispute that First Choice Medical Group owns this name,

22    right?

23    A.   No.

24         MR. WOOD: Okay. And this will be marked

25    Plaintiff's 1.

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1          (EXHIBIT 1 MARKED FOR IDENTIFICATION)

 2          BY MR. WOOD:

 3     Q.   Now I'm sure you're aware I represent a number

 4 of former employees, and we are going through the

 5 complaints, which are pretty much the same.  Throughout

 6 discovery we have or throughout this case, we have

 7 requested certain documents from the defendants,

 8 including paychecks.  Some of those paychecks were

 9 turned over, some of them were turned over prior to

10 filing suit, and I appreciate that, but there were a

11 number of paychecks that were not turned over.  For

12 instance, those in the November, October time frame

13 through, I believe June of 2022.  So I don't have

14 documents to go over at the moment, and your attorney

15 and I have discussed that recently, and we've reserved

16 the right to continue this deposition at a time once we

17 get those documents.  But I would like to cover a bit of

18 the information, even though we don't have the documents

19 now.  So we've made the allegations that a number of

20 these employees were receiving paychecks from FCID until

21 April 3 of 2022.  Have you heard that allegation at the

22 very least?

23     A.   No.

24     Q.   Okay.  And that is in the complaint?

25     A.   Yes, but without reviewing the complaint, but
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  I would have no knowledge of that.  I -- I don't make

2  determinations upon who's being paid out of what. That's

3  -- that's not what I do.

4     Q.   Okay.  But --

5     A.   And I would have no knowledge of that.

6     Q.   If there were paychecks that were from FCID to

7  these employees, would you dispute their accuracy?

8     A.   I'd have to review them.  I -- how can I -- I

9  -- I -- how can I admit or deny something I haven't

10  reviewed?

11     Q.   Okay.  Well, we have asked for paychecks from

12  FCID and nothing was turned over.  Have you at least

13  directed somebody within your organization to go review

14  obtain those paychecks?

15     A.   I've -- I've asked my CFO to aggregate the --

16  the required discovery to satisfy the obligation.

17  Gillian Lee, who used to do much -- much of that has

18  taken another job and she does sort of on a consulting

19  hourly basis assist with that. I'm not aware that we

20  haven't met, it sounds like from your description, all

21  of the discovery requests and I'll go back and -- and

22  ask. It could be. Well, I don't want to speculate. I

23  mean, paychecks, we didn't print paychecks normally.

24  Paychex printed them, or we went to a PEO in TriNet.

25  They became employees of TriNet, you know? So I -- I

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  don't really know.  I -- I -- I'd have to investigate.  I

2  don't -- I have no idea why things changed or didn't

3  change or who's being paid where, who's paying?  I have

4  no idea what employees get paid from each of the

5  entities.

6      Q.   Okay.  What's TriNet?

7      A.   A PEO.

8      Q.   And what do they do?

9      A.   They, I think essentially hire employees and

10 lease them back to companies, essentially.

11     Q.   Okay.

12     A.   They take full responsibility for the

13 employees.

14     Q.   Now in April of 2022, there was a change in

15 your healthcare, correct?

16     A.   There was several different healthcare plans,

17 because I think we lost one of them through bankruptcy,

18 a renewal, but I don't know the exact timing or the

19 date.

20     Q.   Okay.  Now the paychecks that you did turn

21 over, they come from the medical group, right?

22     A.   I don't know.  I've not reviewed that.

23     Q.   And are you aware of the fact that no payroll

24 has been issued to, generally speaking, to these

25 employees after -- for any time worked after June 13 of

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  2022?

2          MR. HENDERSON:  Objection.  Form.

3      A.   I don't know the exact date. I know we've paid

4  the DOL some amount to -- to various payroll obligations

5  that were met. And I -- I don't know, but there has been

6  payments made. I don't know what amounts outside of DOL

7  to, you know, some -- some employees that had left, but

8  I -- I -- I -- I just don't know who they are and in

9  what amounts.

10          BY MR. WOOD:

11     Q.   And the Department of Labor did an

12  investigation of the unpaid wages that are at issue

13  here, correct?

14     A.   That's my understanding. I've never talked to

15  them myself personally.

16     Q.   Who spoke with the DOL?

17     A.   I believe Phil Keller, CFO.

18     Q.   And have you spoken with Mr. Keller about

19  those interactions?

20     A.   He just told me that they're very cooperative

21  and, you know, we -- and we need to just pay this --

22  this amount to the DOL. And -- and I -- and we -- we

23  have done that.

24     Q.   Did they issue any kind of a finding?

25     A.   No, not that I'm aware of.



**MILESTONE** | **REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          Toll Free **855-MYDEPOS**

1     Q.   And do you know how the amounts that you paid

2 to the DOL were calculated?

3     A.   No, I do not.

4     Q.   There's a number of e-mails that were cited in

5 the complaints that were sent by you.  Do you recall

6 reviewing those citations?

7     A.   Yeah. Those were just -- those were e-mails,

8 you know, to inform people. Everybody knew we were

9 coming out of bankruptcy, had no capital.  That

10 essentially the revenue-producing employees, which were

11 generally speaking the doctors and surgeons, had failed

12 miserably. And that we were out of capital, and we were

13 trying to go to our investors, and other investors to

14 raise enough capital to pay people. And there -- there

15 were updates regarding what those -- what we were being

16 told, and where we were with respect to incoming

17 investment capital.

18     Q.   These investors, where are they located?

19     A.   I don't know. They -- they're all over the

20 country. Don't know.

21     Q.   Okay. And you would speak with these investors

22 on a daily or weekly basis?

23     A.   No. In other words, they would come through

24 one of the banks we hired to raise capital or brokers.

25 And, generally speaking, I might not have ever spoke to



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1  them.

2    Q.  And the bank that you hired, who were they?

3    A.  Spartan Capital Securities.

4    Q.  And where are they located?

5    A.  New York.

6    Q.  And you would deal primarily with them? Is

7  that what you're saying?

8    A.  In some cases. In some cases, other brokers

9  from other places. The principal business of Spartan

10  Capital Securities was to uplift us onto the NASDAQ and

11  do the public raise. Although they did introduce us to a

12  -- an entity that is non-domestic that provides

13  financing for, let's say pre-IPO type companies, and a

14  couple of other investors that they introduced us to.

15    Q.  Okay. And so these entities that are outside

16  of the United States, they've invested some kind of

17  money into the companies?

18    A.  Yes.

19    Q.  And those investments, are those in the parent

20  company?

21    A.  Yes.

22    Q.  Okay. And the funds that would be going into

23  the parent company, would they then be transferred to

24  these subsidiaries to operate?

25    A.  That's correct.

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   Okay. And the negotiations that you had with

2    these foreign entities, would it -- would you and Mr.

3    Keller be the ones doing those negotiations or

4    communications?

5    A.   No. It would generally be me and the broker or

6    bank. But there was no negotiations, we put out a term

7    sheet, and people would invest or not invest.

8    Q.   Okay. And this term sheet, would that be

9    listed somewhere?

10   A.   No.

11   Q.   Okay. How would an investor find this term

12   sheet?

13   A.   Typically they would sign, potentially an NDA.

14   They would request it either through a broker or a bank,

15   or on an e-mail with myself. And we would send out the

16   -- or a -- you know, our -- our securities counsel. And

17   we'd send out an e-mail with the term sheet and any

18   other documents that, you know, made up the investment,

19   depending on what instrument was being offered at that

20   time.

21   Q.   And I believe that you discussed during these

22   e-mails, that there were -- there were potential for

23   investments. I believe you even had some smaller amounts

24   come in; is that true?

25   A.   That is true. And as they came in, we paid



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1   payroll.

2       Q.   Okay. So as the money would come in, it would

3   go into First Choice, it would then trickle down into

4   the subsidiaries, and then the money would go out to the

5   employees?

6       A.   Yes.

7       Q.   Okay. Other revenues from your operations

8   would have come through insurance companies as well; am

9   I right?

10      A.   There would be revenues from insurance

11  companies, yes.

12      Q.   Okay. And what about Medicare?

13      A.   Yeah, Medicare as well.

14      Q.   Okay. And did you have a staff or division who

15  would -- whose primary job would be to deal with these

16  healthcare companies or insurance companies?

17      A.   Yes. Small -- small group of people. A couple

18  of people.

19      Q.   Two or more?

20      A.   I think there's two.

21      Q.   Okay. And who are their name -- what's their

22  names?

23      A.   I don't really know. There's a Debbie and -- I

24  -- I don't know.

25      Q.   Okay. And am I right to say that their job



**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  would be to call these insurance companies and work

2  through billing?

3       A.   Yeah. There's a -- a Shelly, now that you've

4  jogged my manager --

5       Q.   Shelly.

6       A.   -- that made the calls. But the incoming

7  payments, because of the loss of revenue, you know, I

8  told the employees that, you know, we're probably losing

9  25,000 a day. They were insufficient to meet any

10 obligations.

11      Q.   Okay. So these -- this division that dealt

12 with the billing, they would place calls to the

13 insurance companies, they would presumably e-mail the

14 insurance companies?

15      A.   I -- I don't know. I don't know how they

16 collected.  Or if they made any calls or some calls, I

17 -- I don't know.

18      Q.   Okay. You've reviewed the financials of the

19 companies, right?

20      A.   Uh-huh.

21      Q.   Okay. And through reviewing those financials,

22 would you see the streams of revenue?

23      A.   Yes.

24      Q.   And where would the revenue be coming from?

25      A.   They were coming from PT, medical -- other



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  medical services, pain management, interventional care.

2  We no longer have those today. So collections, daily

3  collections, I guess are about $150 to $300 a day now

4  that are receivables or primarily expended now.

5      Q.   And you accepted Medicare. Do you accept

6  Medicaid?

7      A.   I believe we did. I don't know if we're still

8  compliant with Medicaid.

9      Q.   And what is required to -- what is required to

10 comply with Medicaid?

11     A.   I don't know.

12         MR. WOOD: Now let me share my screen again.

13     These are e-mails that were -- sorry. Share. There

14     we go. We'll mark this as Plaintiff's 2.

15         (EXHIBIT 2 MARKED FOR IDENTIFICATION)

16         BY MR. WOOD:

17     Q.   These are e-mails, a lot of which we've cited

18 throughout the complaints. There's 29 pages. I can

19 scroll through them briefly, but I just want to know if

20 you dispute the -- that these are accurate depictions of

21 e-mails or memos that were sent out either by you or by

22 Ms. Lee on your behalf?

23     A.   Well, I have to read -- I -- I'm happy to go

24 through them and read them.

25     Q.   Okay.

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    A.   "I'm substantially relying on their -- " you

2  got to leave them up there so I could see. Okay. So the

3  one you have up is accurate, and that's the truth.

4    Q.   Okay. And that's dated July 18. Here's an e-

5  mail, June 16, 2022, from Gillian Lee. Would you work

6  with Ms. Lee to have communications from you sent out to

7  the employees?

8    A.   Yeah, with Gillian and Phil, based upon what

9  we know related to investors.

10    Q.   Okay. I might need to expand that. So June 16,

11  internal memo, if you could -- can you read that?

12    A.   It is -- if you can just expand the Zoom a

13  little bit.  Okay.

14    Q.   There we go.

15    A.   Okay.

16    Q.   Okay. Do you recall sending this out?

17    A.   I don't recall that -- this particular e-mail,

18  but it sounds accurate.

19    Q.   Okay. And here you talked about working with

20  investors.

21    A.   Uh-huh.

22    Q.   And is -- that's what you were primarily doing

23  at this time?

24    A.   That's what I've always been doing.

25    Q.   Okay. Did you ever complete this funding?



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1    A.   We -- we -- we -- we did get funding in here

2  and there from different people. But I'm not sure what

3  -- which -- who this is referring to or what groups.

4    Q.   Okay. Let me -- few others. You recall that

5  payroll was not distributed in June or July of 2022,

6  correct?

7    A.   I -- I am aware that payrolls might not have

8  been distributed at certain times. I am not aware or

9  have knowledge of the exact dates at this time. I don't

10 have -- I don't remember it and I don't recollect

11 exactly the dates when.

12     MR. WOOD:  Okay.  And we'll have the last group

13     of e-mails will be Plaintiff's 2.  I have another

14     one here, July 29, that'll be Plaintiff's 3.

15          (EXHIBIT 3 MARKED FOR IDENTIFICATION)

16          BY MR. WOOD:

17    Q.   Let me share my screen real quick. All right,

18 this is two pages. The first page -- second page is just

19 redacted. This is from Ms. Lee. You're CC'd on it along

20 with Mr. Keller. And it's signed with your name.

21    A.   Uh-huh.

22    Q.   You can take a minute to review it and let me

23 know if you remember this.

24    A.   Okay.

25    Q.   Do you recall this e-mail or memo?



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.    No.

2      Q.    Did Ms. Lee often send out memos that you

3  hadn't reviewed and that were signed by you?

4      A.    Well, not that necessarily that weren't

5  reviewed, that we discussed and she put into writing.

6  But --

7      Q.    And I've seen e-mails between you and Ms. Lee

8  where she would send you a memo and you would approve of

9  it, and then it would be sent out. Is that typically --

10     A.    Yes, that's typically what -- what would

11 happen. And sent -- she'd send it to Phil as well, you

12 know. But these are -- we -- we were trying to be,

13 because people asked, transparent with what it was on

14 the ground. The thing that -- that everybody knew at the

15 time was that the company had lost all the invested

16 capital, because the physicians that really provided the

17 jobs for your plaintiff clients burned through all the

18 capital, and there was no ability to continue

19 operations.

20     Q.    Okay. In this memo it does say, "You'll be

21 paid all payroll and expenses that are due." Do you see

22 that?

23     A.    Uh-huh.

24     Q.    Do you stand by that statement?

25         MR. HENDERSON: Objection.  Form.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.   Yeah. I -- I mean, I think what we're doing

2  is, our intention is to continue the company, take it in

3  a different direction. Its value is the public company,

4  which you could put any business into. And as a

5  liability, the company intends on paying those -- those

6  remaining amounts that might be due. I don't know what

7  the amounts the DOL are going to apply towards your

8  client's payrolls, but that is the intention. And

9  whenever we got funding, we continued making payments.

10 So --

11          BY MR. WOOD:

12     Q.   At the end here, it mentions that there's an

13 amount in arrears with UnitedHealthcare and Florida

14 Blue; do you see that?

15     A.   Uh-huh.  Yes, I do.

16     Q.   And we're going to get further into that.  But

17 these were the healthcare plans that were provided to

18 employees as part of their employment, right?

19     A.   That's correct.

20     Q.   Okay.  And those plans were canceled because

21 of a lack of payment, right?

22     A.   Yes, there were no funds that were able to be

23 pulled from our accounts where they would normally do

24 deductions.  They -- there was no money in the company.

25 So most of the time, and at times when investor funds

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  came in, they went out to payroll.  So that would be

2  correct.  And -- and -- and I would just add that, in

3  the case of Florida Blue, during bankruptcy payments are

4  stayed.  So the amount of Florida Blue -- the amount of

5  Florida Blue, I guess arrearages, I don't know, was

6  significant.  And they didn't want to continue with us

7  as well, so -- you know, post-bankruptcy, so -- which is

8  why we ended up with UnitedHealthcare.  Which I think --

9  I think came through.  The PEO TriNet that -- a few

10 payrolls, I -- I believe were met.  And then they

11 terminated their agreement with us because of our

12 financial problems.  And we -- we attempted to continue

13 with United, but we -- we could not.

14      Q.   Do you recall, the Florida Blue, the last plan

15 that was in place was supposed to last through, I

16 believe July of '22?

17      A.   I don't recall.  I -- I didn't do any -- you

18 know, HR functions would normally be between the HR

19 people and Phil Keller, so I -- I wouldn't know.

20      Q.   As the CEO, you have the final say in the

21 business operations, right?

22           MR. HENDERSON:  Objection to form.

23      A.   As the CEO, you decide what your style is in

24 -- style is.  I'm -- I focus on what I know, I don't

25 focus on what I don't know.  So if I have team members

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  that are capable of, you know, making decisions about

2  certain things, I let them make those determinations.

3  And you know, in this case, I never dealt with Florida

4  Blue, I never dealt with UnitedHealthcare.  And I don't

5  know any of the facts and circumstances regarding that,

6  other than high level descriptions that I've been able

7  to provide to you today.

8         BY MR. WOOD:

9         Q.   I'm going to show you another document.  This

10  is from August of '22.  And this is also two pages.  The

11  first page is really just the individuals who received

12  it.  It's dated August 26, 2022.  And I'll go to the

13  second page where there's the bulk of this, and let you

14  read that.

15        A.   Okay.  What would you like to ask me?

16        Q.   Do you recall sending out this memo?

17        A.   Not at this time, no.

18        Q.   Do you dispute that it was e-mailed to the

19  individuals that were listed?

20        A.   No.

21        Q.   Okay.  And here it does mention money coming

22  in.  And actually there's a comment here that something

23  was personally guaranteed by you.  Have you --

24        A.   There was no -- there was no ability.  That's

25  some of the loans I talked about, that I've made.  That

**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  I've been able to pull money from what they call MCA

2  lenders for different things like that, where I could

3  personally guarantee them.  And I provided financing on

4  several occasions -- several occasions to, you know,

5  help make payroll to ease some of the employees', I

6  guess, problems.  There were other shareholders who

7  worried we would liquidate and refile.  And said, "Look,

8  if you -- if you want me to loan it to you, so you can

9  loan it to the company, I'll do that."  And things like

10  that.  So you know, many times those things had

11  occurred.  And we've -- we, you know -- based on the

12  dates, I -- I don't know what payroll that is or when,

13  but that's all accurate, yes.

14       Q.   Okay.

15       A.   And -- and I -- I did that because I still

16  think, in the future, the company has an opportunity.

17  And I did that out of the silliness of my heart, not

18  because I'm an owner, not because I'm a -- I have a

19  stake in this company right now until future success. So

20  -- but I -- I decided to do it, so that's that.

21       Q.   Okay.  We're getting close to an hour in and

22  we're about to change topics, so let's take a ten or --

23  ten-minute break.  Is that all right?

24       A.   Uh-huh.  That works.

25            MR. WOOD:  I have 10:52.  So let's shoot for,

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1     let's say 11:05.

2          THE REPORTER:  Sounds good.  All right, I'll

3     take us off the record real quick.

4         (OFF THE RECORD)

5          THE REPORTER:  Back on record.

6          MR. WOOD:  All right, Mr. Friedman, we are back

7     from a short break.  And I'm going to share my

8     screen again with you.  This will be marked as

9     Plaintiff's 5. This is the Amended Notice for Taking

10    the Deposition for today.

11        (EXHIBIT 5 MARKED FOR IDENTIFICATION)

12        THE WITNESS:  Yeah.

13        MR. WOOD:  Yeah.  And James, you should have --

14    your office received this, I believe yesterday.

15    And, like I said, we removed the Evelyn Bonilla as a

16    noticing party.

17        BY MR. WOOD:

18    Q.   Prior to today's deposition, Mr. Friedman, you

19 reviewed this or something very similar to this notice?

20    A.   I -- I -- I might have a while ago, yes.

21    Q.   Okay.  And in this notice we are -- we noticed

22 this as a corporate representative deposition.

23    A.   Right.

24    Q.   Okay.  And we listed a number of issues within

25 the exhibit to the notice as to what we would be

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**      **www.MILESTONEREPORTING.com**      **Toll Free 855-MYDEPOS**

1   inquiring about.  Did you review these issues?

2        A.   Yes.

3        Q.   Okay.  And are you the individual who would

4   bind the company?

5        A.   Am I the individual --

6        Q.   Are you the individual who can bind the

7   company with your testimony?

8        A.   Myself -- the only two officers are myself and

9   Mr. Keller.

10        Q.   Okay.  Are there any other individuals who are

11   going to be testifying on behalf of the defendants?

12            MR. HENDERSON:  Objection to form.  Answer if

13        you can.

14        A.   I -- I -- I don't know.  I mean, I -- I --

15   that would be in consultation with my -- with the

16   Counsel.

17            BY MR. WOOD:

18        Q.   Okay.

19        A.   I -- I don't know.

20        Q.   Are there any other individuals who are going

21   to be testifying today on behalf of the company?

22        A.   Not that I'm aware of.

23        Q.   Okay -- okay.

24            MR. HENDERSON:  Joseph, one second.

25            MR. WOOD:  Yep.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1       MR. HENDERSON:  You've indicated this was

2    Exhibit 5.  What was Exhibit 4?

3       MR. WOOD:  Let me see.  There was an August

4    26th e-mail, I think.  Let's see.

5       THE REPORTER:  I'm sorry, this is the Court

6    Reporter.  I don't -- I don't think that you marked

7    those as an exhibit, but --

8       MR. WOOD:  I think I skipped -- no, here's --

9    okay, I have -- here's what I've got.  The

10    fictitious name was number 1.  The e-mails, a group

11    of e-mails, I think it was 29 documents, was 2.  A

12    July 29 e-mail was 3.  August 26th was 4.  And the

13    notice was 5.

14       (EXHIBIT 4 MARKED FOR IDENTIFICATION)

15       MR. WOOD:  Okay.  Are we good?

16       MR. HENDERSON:  Yes.  I just wanted to clear

17    that up for the record.  I just don't know if you

18    put it on the record that Exhibit 4 was going to be

19    that August 26th.

20       MR. WOOD:  Got it.  Got it.  Thank you.

21       BY MR. WOOD:

22    Q.  Let's go through these issues real quick and

23  just make sure that you're the one that's going to bind

24  the company on these issues.  The first one is all the

25  facts alleged in the -- in the plaintiff's Complaints.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1   Is there anyone else going to be testifying on the --

2   those issues?

3       A.   Not that I'm aware of.

4       Q.   Okay.  And then the defendant's answers,

5   denials, affirmative defenses?

6       A.   Today I was -- you know, for today's

7   deposition, I was appointed the corporate rep.

8       Q.   Okay.

9       A.   If I'm not sufficient, the only other

10  potential corporate rep is Phil Keller.

11      Q.   Okay.  And the financials of the company,

12  you're here to testify about that?

13      A.   Yes, I can testify about that.

14      Q.   Okay.  The corporate structure, the officers,

15  their duties, responsibilities, right?

16      A.   Uh-huh.

17      Q.   Okay.

18          MR. HENDERSON:  You have to say yes or no,

19      Lance?

20      A.   Yes.

21          BY MR. WOOD:

22      Q.   Okay.  And number 7 is all of the payment of

23  wages, basically for the -- for January '22 through the

24  present.  You're able to bind the company on that issue?

25      A.   Only as to the facts I know.



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1        Q.   And you're here to testify as to the decision
 2   not to compensate the employees the wages --
 3        A.   Nobody made that decision.
 4             MR. HENDERSON:  Objection to form as well.
 5             BY MR. WOOD:
 6        Q.   Did the employees have personnel files?
 7        A.   I assume so.
 8        Q.   Okay.  And are they maintained by the
 9   company's -- company's someone?
10        A.   That would normally be maintained by a former
11   employee, Ruby Rosado and -- and/or Gillian Lee.
12        Q.   Okay.  And --
13        A.   Also a former employee.
14        Q.   Did any of those employees take company
15   documents with them when they left?
16        A.   Not that I'm aware of.
17        Q.   Okay.  And you're here to testify on the
18   employment practices, policies that were in place at the
19   time?
20        A.   To the best of my knowledge, yes.
21        Q.   And the health insurance program that was in
22   place?
23        A.   To the best of my knowledge, yes.
24        Q.   Okay.  As we scroll through these issues, is
25   there anything on this list that you are not appointed
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

```
 1   to testify on?

 2        A.   I was asked to testify as the corporate

 3   representative.

 4        Q.   Okay.

 5        A.   The level of knowledge I have about these

 6   things is going to vary.

 7        Q.   Okay.  And here, number 19, we're talking

 8   about the premiums that were deducted from paychecks.

 9   You understand that that is the insurance deductions?

10        A.   Yes.

11        Q.   Okay.  And you are able to testify on that

12   issue also, right?

13        A.   To the best of my knowledge.

14        Q.   Okay.  As the CEO or member of these entities,

15   you have the ability to hire and fire employees,

16   correct?

17        A.   I -- I do.

18        Q.   Okay.  And ultimately set schedules of the

19   employees?

20        A.   Yes.

21        Q.   And you control the financials and the

22   operations of these entities also, right?

23        A.   No.

24        Q.   As CEO you don't control the finances?

25        A.   No.
```

**MILESTONE** | **REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
1        Q.   You don't control the operations?
2        A.   I -- I don't control the operations to the
3   extent that I make decisions on day-to-day matters.  I'm
4   just providing a vision, and help develop a business
5   plan so that the company can improve operations and move
6   forward.
7        Q.   Who would have been the individual in charge
8   of managing all of these employees?
9        A.   It would be different.  I'd have to look at an
10  org chart.  It depends.  For example, the doctors who
11  are no longer there, there would be a medical director.
12  At that time, based upon the doctors in this one case I
13  hired, I only was very involved in hiring of surgical
14  practice doctors and other medical -- you know, other
15  doctors, physicians.  I'm not involved in hiring and
16  firing anybody else.  They would come to me and say,
17  "We've decided, based on this conduct or lack of use,
18  that person is fired."  And, you know, I'd go, "Okay,
19  you know better than me."  But as far as those employee
20  matters, I was only involved in those type of employee
21  hirings and firings.
22       Q.   So before these individuals would take action
23  such as a termination of an employee, they would come to
24  you, report that to you, and you would sign off on it
25  essentially?
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

 1        A.    No -- no.  They would tell me they were doing

 2   it.

 3        Q.    Okay.

 4        A.    And why.  And I would -- wouldn't sign off on

 5   anything.  I would -- it -- it was a done deal.  As I

 6   told you, everybody has a different management style.  I

 7   might be viewed like you as Tom Brady, but I'm not

 8   teaching Gillian Lee how to block for me.

 9        Q.    Okay.

10        A.    You know, if she's blocking, she's blocking

11        Q.    Your job was to run the company, and you --

12   are you saying that you tried to stay out of the minute-

13   to- minute issues?

14        A.    Because that's not my --

15              MR. HENDERSON:  Objection to form.

16        A.    Yes.  That's not my skillset.  They would, you

17   know, tell me what's going on and I understand what's

18   going on.  My -- my being there was very focused on

19   creating a business plan to raise capital and improve

20   shareholder equity.  And the potential for safety, if

21   you will, going forward for employees who existed there

22   at the time, by helping to create a viable entity.  That

23   viable entity was only going to be created through an S1

24   filing, acquisitions, because of the destruction of the

25   company and its infrastructure.  The hiring and trying

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1   to rebuild the surgical practice that fed all of the

2   employees and the ancillary services that they provided

3   failed.  They -- they -- I think they, in one year,

4   burnt $6.7 million and put in 300 -- brought 300,000

5   some -- three to 400,000 collectible revenue.  I think

6   the number is 353,000.  So that was unsustainable.  So

7   they were either fired, they were let go, they left

8   themselves because they knew it was a situation that

9   couldn't continue.  And then people around them were let

10  go over time for lack of -- lack of -- you know, we --

11  we had nothing to employ them for.  And then other

12  people left on their own because, you know, the -- the

13  situation of the company was not a secret.  So we were

14  transparent and people knew what the risks are.  We're

15  still trying to proceed.  And we're -- we're, you know,

16  we're trying to deal with  -- outside of employee

17  issues, there's lots of liabilities at the company.  You

18  know, we have settlements outside of the bankruptcy, as

19  part of the bankruptcy that need to be paid.  And so

20  that's what we -- we try to do every day.

21          BY MR. WOOD:

22      Q.   Now the bankruptcy didn't preclude the

23  entities from paying wages to their employees, right?

24      A.   No, they were paid during bankruptcy.

25      Q.   Okay.  And after the confirmation, the

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  bankruptcy didn't prevent, specifically prevent, the

2  company from paying those wages, right?

3       A.   Well, prevented the -- the company from paying

4  -- from paying wages was not because the company made

5  any decision not to, but the entities or vendors that

6  paid employees could not draft requisite funds to

7  release payroll.  And that was the primary reason to do

8  that.  They made the decision to do it.  They were

9  afraid to either front any money or take a risk on

10 continuing to employ employees that they were not

11 confident they would get paid on as in TriNet on the

12 lease arrangement.  And -- and you know, that was the

13 reason.  The primary reason for that was that the

14 operations of the company at that time failed and

15 continued to fail, because there was no revenue being

16 generated by employees that, you know, seven employees

17 that burnt up 95 percent of the dollars.  It's that

18 simple.  Which is why we're attempting to go in a

19 different direction now.

20      Q.   Now to be clear, most, if not all, of the

21 unpaid wages that are at issue here, you don't dispute

22 that they weren't paid those wages, right?

23      A.   I don't know the exact amounts that remain

24 unpaid, but I don't dispute that there are unpaid wages

25 at this time.

**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   Okay.  And during the -- a number of the

2  plaintiff's employments, they had deductions from their

3  paychecks for insurance premiums and those -- there were

4  deductions that were made during times where those

5  employees were not covered by insurance, correct?

6         MR. HENDERSON:  Objection.  Form.

7    A.   I'm aware that insurance, that there were

8  deductions from their paychecks as normal for benefits

9  that they were to receive that ultimately resulted in

10  cancellation of a policy.

11         BY MR. WOOD:

12    Q.   Okay.  In 2021, what were the gross revenues

13  of First Choice, the parent?

14    A.   I wouldn't -- I wouldn't know that.

15    Q.   How about 2022?

16    A.   2022, probably three million.

17    Q.   Okay.  And those revenues would have been

18  generated from its subsidiaries, right?

19    A.   From -- principally from First Choice Medical

20  Group of Brevard, I would say, yeah.  And in -- in '23,

21  I don't expect more than a million dollars in revenue.  I

22  don't even expect a million dollars in revenue,

23  actually.

24    Q.   Okay.  And FCID in 2021, do you know the gross

25  revenues?

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1    A.    No.

2    Q.    How about 2022?

3    A.    No, I -- I -- I look at everything on a

4 consolidated basis.

5    Q.    Can you explain that, the consolidated basis?

6    A.    Just the total revenues that are going to --

7 that are reported through First Choice Healthcare

8 Solutions, Inc.

9    Q.    Okay.  So when you're looking at the

10 financials of this enterprise, you're looking at

11 everybody's revenues together and not by the specific

12 entity?

13   A.    That's right.  That's correct.  I'm looking at

14 a balance sheet.  I'm looking at, you know, the P&L

15 through -- through consolidation.  Yes.

16   Q.    Okay.  You're aware that the Florida Blue

17 policy was canceled effective November 30, 2021, right?

18   A.    I know it was canceled.  I'm not aware of the

19 exact date.

20   Q.    Okay.  And after the cancellation, insurance

21 premiums were -- continued to be deducted from certain

22 employees' paychecks?

23   A.    I believe they -- I -- I believe they segued

24 into the change to PEO, which provided UnitedHealthcare

25 or through one of their third-party vendors,

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  UnitedHealthcare.

2      Q.   And do you recall that UnitedHealthcare began

3  in April of 2022?

4      A.   I -- I don't recall.  Obviously, if it's that

5  big a gap, I -- I -- I don't recall.  No.

6      Q.   Did you receive health insurance through First

7  Choice?

8      A.   I think so under Florida Blue at -- at some --

9  I -- I think -- I think at some point, I -- I had

10 Florida Blue.  I don't think I had United.  I went on my

11 own policy at that time.

12     Q.   And why did you make the decision to go on

13 your own?

14     A.   There was no money.  I didn't want to -- there

15 was no money.  It was -- it was part of a success

16 contract, if I wanted to opt into a healthcare.  And it

17 would've been after the plan, so after February of '21.

18 But I didn't continue it.  I'm on my own policies.

19     Q.   Okay.  The employees that worked, they had

20 certain benefits.  We talked about insurance, right?

21     A.   Yeah.

22     Q.   If they -- if they opted for it.  The

23 employees also had paid time off, correct?

24     A.   Yes.

25     Q.   Okay.  And there was paid holidays as well,



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  correct?

2      A.   Yes.

3      Q.   And July 4th was a paid holiday for these

4  employees?

5      A.   I assume so, yes.

6      Q.   Okay.  And each of the plaintiffs that we're

7  talking about today, they were all hourly employees,

8  right?

9      A.   I'm not aware of that.  There might be one.

10 That one -- one -- I'd have to look at the style again.

11 There might be one that's not

12     Q.   Sure.  And I'll -- I think that you're

13 thinking of the plaintiff represented by a different

14 attorney who you have other issues with.

15     A.   No, I was looking at -- is Keith Nyberg

16 (phonetic) -- I -- I might be wrong.  He might be

17 hourly.

18     Q.   Well, we could look at the paychecks, right?

19 And they would show you what the rates of pay were for

20 these employees?

21     A.   Right.

22     Q.   Okay.

23     A.   Okay.

24     Q.   Ultimately, the employees weren't paid because

25 you didn't have the funding; is that right?

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    A.   Employees ultimately were not paid because

2  there was no revenues to support operations at the

3  company and investor capital was not adequate and timely

4  to continue regular payrolls.

5    Q.   I'm going to share my screen.  And this is

6  going to be Plaintiff's 6.  These -- so you may recall

7  that we sent out quite a bit of discovery to you

8  personally and to the companies.  We are still waiting

9  on verification of these answers, but you provided

10  answers as part of the discovery process.  We're looking

11  here over Ms. Yolanda Berkshee (phonetic), the First

12  Choice Healthcare Solutions response to the first of

13  interrogatories.  Do you recall going through these

14  interrogatories and providing responses?

15    A.   I -- I believe so.  I -- I think it was

16  handled.  I -- I did review it, and I think the initial

17  -- a lot of the interrogatories and information was

18  provided through -- through the firm and in consultation

19  with Phil and Gillian and -- and the others, so.

20    Q.   Okay.  I want to go over number 2.  It says,

21  "Explain in detail the reason Plaintiff was not paid all

22  over her wages from June '22 through the end of her

23  employment."

24    A.   Uh-huh.

25    Q.   I'd like to kind of expand this question to go



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  for everybody, but I think the answer is probably the

2  same.  The answer here is, "The company lacked adequate

3  funding to pay Plaintiff's wages during that time

4  period."  Is that correct?

5      A.   It -- it not only lacked the adequate -- yeah,

6  adequate funding through collections and investor --

7  investment capital.

8      Q.   Okay.  In number 3, we asked to identify the

9  individuals who made the decision not to compensate the

10 plaintiff all of the wages.  And again --

11     A.   I -- I'm disputing that in my verification.

12     Q.   Okay.

13     A.   I don't know who -- I -- I, you know, put me

14 there, but I didn't make any decision not to compensate.

15 It was made by the third parties that paid them.  They

16 -- they didn't -- they weren't able to draft the money

17 and they refused to issue payroll.  That is not --

18     Q.   They -- to be clear, the individuals that

19 you're now saying made the decision, they needed funding

20 from your companies in order to make --

21     A.   They're not my companies.  I'm not a

22 shareholder.

23     Q.   You -- you're here as the representative of

24 the companies.  So when I say, "your company --"

25     A.   I am a contracted officer for the company to



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1   provide certain services to that company, and I am not
 2   an owner.
 3        Q.   But you are an officer?
 4        A.   I am an officer.
 5        Q.   Okay.  And it sounds like you're saying that
 6   you contracted to have a payroll company pay the
 7   employees --
 8        A.   That has historically been the way that
 9   employees have been paid at the company.  And -- but I
10   didn't make any conscious decision or direct -- I didn't
11   direct anybody not to pay it.  They would issue payroll
12   checks or payroll.  And if they couldn't pull the money,
13   they didn't pay it.
14        Q.   When you say, "pull the money," what's that
15   mean?
16        A.   They have to pull it from your -- from your
17   accounts.
18        Q.   Okay.  So these payroll companies would make a
19   deduction from one of the defendant's payroll or bank
20   accounts and use those funds to pay the payroll; is that
21   right?
22        A.   Say it again.
23        Q.   The payroll companies would make a debit.
24   They would debit money from your bank accounts, the
25   defendant's bank accounts and use those funds to pay the
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  payroll of the employees, right?

2      A.   Yes.  That's what would happen.  They would --

3  they would calculate payroll, produce the checks they

4  had, in some cases direct deposit information for these

5  employees.  And if they would pull the money, if it

6  would -- you know, they would pay them.

7      Q.   Okay.  And if the money wasn't there, the

8  payroll wasn't paid, right?

9      A.   I -- I would assume so.  Yes.  They would not

10  fund it.

11      Q.   Who set the pay periods?

12      A.   It -- it -- it -- it -- it was set way before

13  my tenure.  I assume it was set by the founder and CEO,

14  Chris Romandetti when he started it.

15      Q.   Okay.  And the employees were generally -- the

16  hourly employees were paid biweekly, right?

17      A.   I think everybody was.

18      Q.   Okay.  And for the hourly employees, who

19  maintained the time sheets for those employees?

20      A.   I would assume their managers and would

21  present them to Ruby Rosado.  I know Gillian Lee was

22  part of human resources, so they would verify it or

23  however they would process it.

24      Q.   Okay.  And the hours would then be sent over

25  to these payroll companies?



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1    A.   I would assume so, yes.

2    Q.   Okay.  The payroll companies that we're

3 discussing, where are they located?

4    A.   I don't know.

5    Q.   Do you know if they're Florida entities?

6    A.   I don't know.

7    Q.   Were W-2s issued for any of the employees, any

8 of the plaintiffs?

9    A.   I believe historically they've been supplied

10 to, you know, former employees.  There are no current

11 employees really right now, but -- and I think those are

12 up-to-date.  They've all been supplied, to the best of

13 my knowledge.

14   Q.   Who issued those W-2s?

15   A.   Normally Paychex would or TriNet would.  I

16 think in some cases when they terminated our contracts,

17 we calculated things internally and -- and issued them

18 internally.

19   Q.   Okay.  The employer on those W-2s, who would

20 they be?

21   A.   It would be whatever entity they worked for.

22 They would be First Choice.  Most of them would be, I

23 assume, First Choice Medical Group of Brevard, LLC or

24 FCID, LLC.  I just don't know who that would apply to.

25   Q.   When these payroll companies would issue these



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1   W-2s on your behalf, they wouldn't be listed as the

2   employer on the top of the W-2, though, correct?

3       A.   They would in the case of the PEO.

4       Q.   Can you expand on that?

5       A.   Well, the idea of a PEO is they take over your

6   entire workforce and then sort of lease you back the

7   people at some upcharge.  So we only lasted with them a

8   month or two, because it was just getting untenable and

9   financially.  And they released us and -- and -- and,

10   you know, very quickly because they take on financial

11   responsibility for those employees.

12       Q.   Moving on to number -- go ahead.

13       A.   So what would happen is, I believe, Pat, you

14   know, they would have to issue a W-2 for those

15   employees, even for the one or two payrolls they -- they

16   -- they got ahold of.

17       Q.   Were the employees informed of their -- of an

18   alleged termination prior to moving over to this new

19   entity?

20       A.   Well, I assume they were informed that TriNet

21   was terminated.  Yeah.

22       Q.   No, I mean, prior to TriNet, they were

23   employed by an entity, correct?  Under one of the

24   defendants.

25       A.   Yes.



**MILESTONE** | **REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1    Q.   And you're saying that TriNet came in and they

2 transferred as employment from one of the defendants

3 over to TriNet, right?

4    A.   Yeah, it lasted about a month.  Yeah.

5    Q.   Okay.  Was anybody inform -- any of the

6 employees informed of this change in their employment?

7    A.   Yeah, I believe they had a HR meeting and let

8 everybody know we were moving to a PEO and what that

9 meant.

10    Q.   And were I-9s filled out by all these

11 employees, do you know?

12    A.   I don't know.  They -- they had a portal that

13 they went into and filled everything out themselves.  I

14 would assume so.

15    Q.   And medical benefits, who were they provided

16 through?

17    A.   I believe they were -- initially, they were

18 provided, which is what you referred to as

19 UnitedHealthcare, they were provided through a third

20 party, a partner vendor of TriNet.

21    Q.   As part of the First Choice Group, right?

22    A.   Yeah.  As part of what the PEO offered.  PEOs

23 generally offer one-stop-shop for employees, so all HR

24 is handled through them, all the benefits, you know,

25 401ks, all those things.



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          **www.MILESTONEREPORTING.com**          Toll Free 855-MYDEPOS

```
 1      Q.   And this fell -- this relationship, I believe

 2   you're referring to the April timeframe of 2022, right?

 3      A.   I don't remember the exact dates, but it would

 4   be sometime in '22.

 5      Q.   And it fell apart because there was no payment

 6   made to this third party?

 7      A.   We -- we -- we became -- we -- we were, and it

 8   -- it became worse, financially incapable of being

 9   relied upon.

10      Q.   On number 4 of the interrogatories, we asked

11   about the Florida Blue Group Plan and why it was

12   canceled.  The response here, basically it states that

13   you didn't have the funds and there was an issue with

14   some certain financial obligations imposed by the

15   bankruptcy court.  Can you expand on that?

16      A.   No, I'm -- I'm not -- I'm not aware.  I mean,

17   we -- obviously, we had certain -- the way bankruptcy

18   works is that you substantially complete your

19   obligations prior to exiting.  And that substantial

20   completion is discretionary to the bankruptcy judge. And

21   so what went into getting the decision and order from

22   that judge is subjective to her in our case.  I don't

23   know what amounts or obligations were not paid to

24   Florida Blue that were required under the plan.  So --

25   so, you know -- you know, if they weren't made,
```

**MILESTONE** | **REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

 1   obviously Florida Blue would cancel.  My -- my

 2   understanding is Florida Blue wouldn't renew us anyway,

 3   and -- but I don't know what's due and owing to Florida

 4   Blue now.

 5       Q.   All right.  At the end of this response, it

 6   states that the policy was terminated as of November 30

 7   of 2021.  Do you see that?

 8       A.   Yes.

 9       Q.   Okay.  Does that refresh your memory as to

10   when it was terminated?

11       A.   No, but I don't dispute that.  It sounds

12   reasonable.

13       Q.   Okay.  And at that time, were any of the

14   employees informed that the -- their health insurance

15   was terminated?

16       A.   I believe so.

17       Q.   And do you maintain those notices?

18       A.   The company maintains them.  I -- I would

19   assume they're in files, yes.

20       Q.   Do you know if they are or --

21       A.   I would assume so.  I mean, we -- we -- we put

22   things in files, like any other company, you know,

23   maintain records.

24       Q.   Okay.  Now I think there was internal

25   communications talking about the termination of the

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 Florida Blue and that the employees found out that they

2 didn't have health insurance when their claims were

3 denied.  Do you recall having those discussions with

4 your other officers or health -- human resources?

5     A.   We -- we probably had discussions about it,

6 because at the time, you know, typically what happens

7 is, in many ways, you -- you don't even get noticed and

8 -- because they retroactively deny claims.  And we may

9 have initially found out that someone's claim was

10 denied.  And then we -- and we were keeping in touch,

11 because we were making, if I remember, some partial

12 payments.  And then somebody's -- and then when we

13 called them up, they, you know, they -- and -- and I

14 wouldn't have been the one to call them up.  It -- it

15 either would've been, you know, probably Phil Keller or

16 somebody would've called them up, potentially Julie

17 Hardesty.  And they would've said, "Well, we -- we

18 canceled your policy for non-payment."  Because paying

19 things not in full -- paying things not in full

20 sometimes will get you canceled if full payment is

21 required, whether that's an acceleration on a car loan

22 or a mortgage or something else.  So it was, you know --

23 ultimately that's what happened.

24     Q.   Have you reviewed any notices to employees

25 informing them that the healthcare was terminated as of

**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**  **www.MILESTONEREPORTING.com**  Toll Free **855-MYDEPOS**

 1 | November 30, 2021?

 2 |     A.   I don't recall.

 3 |     Q.   Okay.  Number 5, we talked about the

 4 | UnitedHealthcare Plan.  And here you mentioned that it

 5 | started in April '22 in conjunction with a new payroll

 6 | company, TriNet HR Solutions.

 7 |     A.   Uh-huh.

 8 |     Q.   Do you agree with that?

 9 |     A.   Yes.

10 |     Q.   Okay.  It states here that the relationship

11 | with TriNet failed resulting in the premium never being

12 | paid and the policy lapsing as if it had never existed.

13 | Can you explain what that is saying?

14 |     A.   Well, I'm assuming TriNet didn't pay the

15 | policy.  And whatever money they had collected from us

16 | during the two payrolls might have been insufficient for

17 | taxes and other things.  It might have been net payroll.

18 | It could have been anything, but the total amounts,

19 | including their fees, they never collected.  So they

20 | elected not to pay the health insurance and to close out

21 | the other liabilities.

22 |     Q.   They -- your understanding is they didn't pay

23 | it because you didn't provide them with funds to pay it,

24 | correct?

25 |     A.   Sufficient funds for all of the obligations

**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    that TriNet had requested us to pay.

2        Q.   You also state here that the company was never

3    able to recover after the Court imposed the bankruptcy

4    payments, and UnitedHealthcare terminated the policy.

5        A.   Correct.

6        Q.   Are you saying that after you left bankruptcy,

7    you were not able to meet your financial obligations

8    moving forward?

9        A.   Well, we were not due to the non-performance

10   of the physicians we brought in at that time.

11       Q.   Now obviously you had an issue with meeting

12   your financial obligations with Florida Blue back in

13   2021.

14       A.   Uh-huh.

15       Q.   Who made the decision to continue to provide

16   healthcare or insurance to the employees after that

17   issue, despite the fact that you didn't have the money

18   to cover those benefits?

19       A.   Well, I think at that time we were -- we

20   didn't -- at that time that you're asking, we -- we

21   weren't completely missing for periods of time payroll.

22   We might have been three days late or a week late as

23   well as paying the health insurance.  It wasn't until

24   much later when everybody either was terminated or left

25   that we, you know -- which we are now, we don't offer

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  any benefits and we don't hire any employees.  They're

2  all 1099 on hourly basis.  We -- we -- I don't think --

3  I don't think anybody consciously made that decision

4  until I would say a complete, you know, collapse of the

5  company operationally.

6       Q.   In number 6, we talked about -- we asked about

7  the deductions that were made from these paychecks in

8  '21 and '22.  You discuss negotiations with these

9  insurance companies, anticipating that the retroactive

10 premiums would be due once you've reached an agreement,

11 right?

12           (EXHIBIT 6 MARKED FOR IDENTIFICATION)

13      A.   We never were able to get an agreement with

14 United, principally because of our current state of

15 operations and financial capabilities.  But we continued

16 to negotiate with them to try to get a payment plan

17 going where, you know, we were unable to pay whatever

18 arrearages and forward payments they wanted, but if they

19 would take a current payment and pay off the balance

20 due.  And we were never able -- through months of

21 negotiations, we couldn't get there.

22           BY MR. WOOD:

23      Q.   Okay.  And when you couldn't reach an

24 agreement, you had this money that you deducted from

25 these employees paychecks as insurance premiums.  Those



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          Toll Free **855-MYDEPOS**

```
 1    are still owed back to these employees, right?

 2          A.   If that's the law, I assume so.

 3          Q.   Well, you collected money from these employees

 4    under the representation that it be used to pay

 5    insurance premiums.  Do you agree?

 6               MR. HENDERSON:  Objection.  Form.  You can

 7          answer if you can, Lance.

 8          A.   My understanding is that there were deductions

 9    of wages for amounts for certain benefits that were

10    either canceled at some point in time.  And I assume

11    under the law that we're responsible to pay those back.

12    The company is responsible to pay those back.

13               BY MR. WOOD:

14          Q.   In number 7, you explained that those

15    deductions went into a general business account for

16    regular operating expenses.  Do you see that?

17               (EXHIBIT 7 MARKED FOR IDENTIFICATION)

18          A.   Yes.

19               BY MR. WOOD:

20          Q.   Okay.  Do you know what account that these

21    would've gone into?

22          A.   No.  I assume they stayed where the payroll

23    persons are, but the CFO manages the bank accounts.  I

24    -- I -- I don't manage any of the finances of the

25    company hands-on where I move money or do any of those
```

**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

1  things. I never have from the date of my appointment as

2  CEO. I don't do that, never have done it.

3      Q.   You take a look at number 9, we asked to

4  identify individuals who have the authority to do

5  certain things like set, change compensation, hiring,

6  establishing employees' terms and conditions of

7  employment. The answer provided here is you and Phil

8  Keller. Do you see that?

9      A.   Yeah, ultimately that's accurate.

10      Q.   Okay. And at the very end, we asked for you

11  to calculate the amount of wages that the company

12  believed to be owed to this -- in this one, a specific

13  plaintiff. Who would've done the calculation of these

14  owed wages?

15      A.   Probably Phil Keller.

16      Q.   Okay. And you don't dispute the calculation,

17  do you?

18      A.   No.

19      Q.   Okay. And it's the company's position, at the

20  very least for this individual, that she is owed wages,

21  right?

22      A.   The company's position is that after review of

23  whatever the DOL is holding and any other payments that

24  may have been made outside of litigation, that the

25  calculation is accurate. There may be a revision for



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1   the calculation based upon certain payments that may or

2   may not be made to your client.

3       Q.   The DOL, you made payments to the DOL.

4       A.   Uh-huh.

5       Q.   And it's your position that those payments

6   should go to the plaintiffs and you should receive a

7   credit for the amount of that payment, correct?

8       A.   That's correct.

9       Q.   Okay.  This is Plaintiff 7.  This is

10  interrogatories that were sent to you.

11      A.   Uh-huh.

12      Q.   They're somewhat different than the ones we

13  just went over.  Here, we ask for each defendant in the

14  case, "Please explain whether you have the authority to,

15  again, set, change compensation, hire, fire, establish

16  employees' terms and conditions."  And the response

17  provided states that you have the authority for all of

18  the defendants to do these things.  Do you agree with

19  that?

20      A.   I have the authority, although I've never

21  engaged in any of those, other than the physicians.

22      Q.   You have the authority, but you haven't

23  exercised the authority generally speaking?

24      A.   I haven't exercised it, other than with

25  physicians that were hired.



**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      MR. WOOD:  And let's go through number 10. This

2    is discussing the corporate structure.  First Choice

3    Incorporated is a publicly held parent company. Do

4    you agree with that?

5    A.   Yes.

6         BY MR. WOOD:

7    Q.   Okay.  And then it wholly owns FCID Medical,

8  right?

9    A.   Uh-huh.

10   Q.   And FCID Medical wholly owns First Choice

11  Medical Group of Brevard, LLC, right?

12   A.   Yep.

13   Q.   And then you have Emerge Healthcare Group, LLC

14  was formed for the purpose of a DBA to give the company

15  a fresh start after bankruptcy, right?

16   A.   No.  I don't know who decided that -- that was

17  a good legal strategy.  You don't need to do that, to

18  form an entity.  It's stupid, but --

19   Q.   Okay.

20   A.   -- it was done.

21   Q.   So the intent really was to operate the First

22  Choice Medical Group doing business as Emerge Healthcare

23  Group, right?

24   A.   That's right.

25   Q.   Okay.  And then here you were asked to

**MILESTONE** | **REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1  calculate the wages that you believe were owed.  Did

 2  this calculation come from Phil Keller or did you do it?

 3      A.   I -- it came from Phil Keller.

 4           MR. WOOD:  Okay -- okay.  This is Plaintiff's

 5      8.  And this is a document that was produced in

 6      discovery.  It's Bates number 292.

 7           (EXHIBIT 8 MARKED FOR IDENTIFICATION)

 8      A.   Yeah.

 9           BY MR. WOOD:

10      Q.   Do you recognize this document?

11      A.   Yep.

12      Q.   Okay.  Who created it?

13      A.   I don't know.

14      Q.   Okay.  The information in this document, which

15  shows the companies, the FEINs, the address, the

16  locations.  Is everything in here accurate?

17      A.   Yes.

18      Q.   Okay.  And it looks like this is saying that

19  you came on to -- you were appointed as CEO or director

20  of these entities in June of 2020; is that --

21      A.   That's correct.

22      Q.   Okay.  And this was while they were in

23  bankruptcy, but pre-confirmation of the plan?

24      A.   That's correct.

25      Q.   Okay.  Now on here, the one entity not listed
```



**MILESTONE** | **REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  was the Emerge Healthcare Group, LLC.  Is that because

2  you don't consider that to be really an entity, but more

3  of a DBA?

4       A.   No.  I mean, when you file for an entity, as

5  you know, as an attorney, it's an entity, whether I

6  decide to use it or not, the reality is it may have been

7  administratively dissolved already.  I don't know.  I

8  haven't checked.

9       Q.   Okay.

10      A.   But we've never used it.  We never opened a

11  bank account.  I don't even think there's an EIN number

12  or anything like that.  So that would be my only

13  thinking why they did not include that.

14      Q.   Okay.

15      A.   It may be administratively dissolved.  I mean,

16  if you notice they did not list Marina Towers because,

17  there's no use for it.  And it was -- I know that was

18  administratively dissolved by now.

19      Q.   Well, Marina Towers also is not a defendant in

20  this case.  And I believe this was asked --

21      A.   Well, that's true.  You're right, yes.  But I

22  was just making the analogy of why.

23      Q.   Sure.  Okay.  How many employees does First

24  Choice have?

25      A.   When?

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1     Q.   Between 2021 and 2022?

2     A.   Somewhere between 40 and 60.

3     Q.   And are you including the plaintiffs in that

4 figure?

5     A.   Yes.

6     Q.   Okay.  And First Choice, the -- its purpose is

7 to own the subsidiaries which generate the revenue on

8 its behalf, right?

9     A.   That's correct.

10    Q.   These subsidiaries, do they do anything else

11 other than work on behalf of First Choice Healthcare

12 Solutions?

13    A.   No, not that I'm aware of.

14    Q.   They don't provide services to other

15 companies, right?

16    A.   Not that I'm aware of.

17    Q.   And the subsidiaries, do they have their own

18 assets?

19    A.   That would be an accounting question.  I think

20 most of the assets are held at the FCID level, but there

21 are certain assets at the FCMG level, and there might be

22 one or two assets at the First Choice parent company

23 level.  And that had to do with some equipment leases

24 before me that may have occurred in the past

25    Q.   And these assets that would be held by these



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

 1  other companies, they would be used by the other

 2  subsidiaries to generate revenue; is that right?

 3       A.   That's right.

 4       Q.   The companies filed consolidated tax returns;

 5  is that right?

 6       A.   That's right.

 7       Q.   When was the last time -- strike that.  The

 8  consolidated tax returns were filed by First Choice, the

 9  parent?

10       A.   Yes.

11       Q.   And when was the last time you filed a return

12  on behalf of the parent company?

13       A.   I think '21.

14       Q.   You believe you filed for '21?

15       A.   Yes.

16       Q.   Okay.  What about '22?

17       A.   No, we have not been able to pay the

18  accounting firm to do that yet, although it'll be a

19  requirement to get through the S -- SEC process to do

20  so.

21       Q.   And you mentioned that you want to have

22  something happen next what 20, 30 days; is that right?

23       A.   Yeah.  The -- the tax return won't take very

24  much.  We -- we -- we're -- we -- we're in discussions

25  with them, but to get it released, we're going to have

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  to pay, you know, 10, $12,000.  So we -- we'll make, you

2  know, arrangements for it.

3      Q.   Okay.  Now FCID Medical, we've gone over it

4  before, but you just mentioned that it probably holds a

5  lot of the assets for this enterprise.  Other than

6  holding the assets, what does it do?

7          MR. HENDERSON:  Object to form.

8          BY MR. WOOD:

9      Q.   What is its purpose?

10     A.   I -- I -- I don't -- I don't know.  It does

11  not have a real operational purpose.

12     Q.   Okay.  And does it have its own books or are

13  is everything consolidated underneath?

14     A.   Everything is consolidated.  It's not like,

15  you know -- listen, inside the system, like QuickBooks,

16  each company has its own -- its own, let's say, place or

17  a general ledger.  But the reality is that all of the

18  revenue or nearly all revenue is generated from FCMG and

19  the taxes are prepared.  And the company, the revenues

20  are prepared in a manner in which F -- FCHS, the parent

21  company, files the tax returns, you know, has the audits

22  committed for an SEC filing, and it's -- it's viewed on

23  a consolidated basis.

24          MR. WOOD:  Okay.  This is -- let's see,

25      Plaintiff's 9.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1              (EXHIBIT 9 MARKED FOR IDENTIFICATION)

 2       A.    Uh-huh.

 3             BY MR. WOOD:

 4       Q.    This is a 42-page document.  I'm not going to

 5   go through everything on this, but what this is a docket

 6   entry 507 --

 7       A.    Uh-huh.

 8       Q.    -- from case number 620BK03355-GER.  This is

 9   the -- a document filed in the jointly administered

10   bankruptcy.

11       A.    Uh-huh.

12       Q.    Do you recognize this document or at least

13   what it might be?

14       A.    Yes.

15       Q.    Okay.  What is this?

16       A.    Generally in bankruptcy you have quarterly

17   operating reports showing assets, liabilities, cash in

18   and out for the business until the time you exit.

19       Q.    And we're looking at page 3, it shows income

20   for the period, and there is a quarterly, which is the

21   fourth quarter of 2021.  And then you have post-

22   confirmation total, which is February of '21 through

23   December -- the end of December of '21.

24       A.    Uh-huh.

25       Q.    On this document, it's showing $1.4 million in
```



**MILESTONE** | **REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

1   receipts during the fourth quarter of '21; is that

2   accurate?

3        A.   I assume it's accurate.  It was prepared by

4   our CFO.

5        Q.   Okay.  And then the post-confirmation 6.1,

6   which represents approximately three quarters of the

7   year?

8        A.   Yeah, it might be accurate in '21.

9        Q.   Okay.  Now on page 7, looks like this is -- it

10  says, "Cash debit check disbursement details."  What is

11  this?

12       A.   Those are checks that went out.

13       Q.   Okay.  And on here, the very first item, for

14  instance is your name for $16,000.

15       A.   Uh-huh.

16       Q.   You see that?

17       A.   Uh-huh.

18       Q.   What is this payment?

19       A.   Probably money -- it's money I loaned to the

20  business, or I laid out to the business to pay who knows

21  what.

22       Q.   Okay.  Do you recall how much money you

23  received from the business in the fourth quarter of '21?

24       A.   No.  I don't know how much money I put in.

25  Like, sometimes I put in 100 -- I know, back then I

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  might have put in 300 grand in that short time period.

2      Q.   Okay.

3      A.   And -- and I invested in certain of the rounds

4  with other investors as well, but I wouldn't have gotten

5  paid back from that.

6      Q.   And in here, there's also intercompany

7  transfers.  For instance, the very first one I see here

8  is FCID Medical Incorporated.  It says, "intercompany

9  transfer, $200,000."  That's money going from the parent

10 company to FCID, correct?

11     A.   Yes.

12     Q.   Do you know what this $200,000 would've been

13 for in --

14     A.   No.

15     Q.   -- October of '21?

16     A.   I -- I -- I would not know that without having

17 to investigate it.  I would've no idea.

18     Q.   And down here we have a Blackstone Capital

19 Advisors.  This is your company, right?

20     A.   Uh-huh.

21     Q.   Yes?  Is that yes?

22     A.   Yes -- yes, sir.

23     Q.   Thank you.  What was this 500 -- or sorry,

24 what was this $5,000 for?

25     A.   To my knowledge, any operating expense would



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  be a repayment of a loan, and in some cases to the

2  physicians, they wanted in advance.  So they needed

3  money and I paid physicians directly and I got money

4  back as money came in.

5      Q.   Are you saying that you paid employees

6  directly out of your personal expenses?

7      A.   Yes.

8      Q.   Why would you do that?

9      A.   Because they whine loud enough, and it was

10  only physicians.

11      Q.   Okay.

12      A.   You know, I have -- I have seven classic cars

13  and it cost me a lot to move them down and blah, blah.

14  You know, because they all got sign-on bonuses and

15  things like that.  And, you know, they got half and half

16  and they were complaining we were late on the second

17  half.  So you know, I didn't want them distracted

18  because the company relied on them and things like that.

19      Q.   What's Mr. Advance?

20      A.   Those are loans, you know, loans, certain

21  types of merchant cash advances that I knew people in

22  the business that could bring capital into the company

23  so long as I personally guaranteed it.  So those are

24  daily polls to repay those loans.

25      Q.   Now I went through the items here in the



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  document and it looks like you paid -- you were paid

2  just over $127,000 during this fourth quarter.

3      A.   Hence why I owed $800,000.

4      Q.   Now at the same time, the company was having

5  financial issues and unable to pay obligations such as

6  insurance, right?

7      A.   I have no idea.  I don't maintain the

8  payables. I get a report, but I don't make decisions on

9  what we're paying.

10     Q.   Well, we know that Florida Blue was canceled

11 effective as of --

12     A.   The issue is I said, "If you want me to pay

13 this, then I need the money back.  I'm not being

14 compensated for this."  So they said, "Yes, can you

15 please pay it?  We'll pay you back."  And -- and they

16 paid me back as a percentage.  Unfortunately, I'm still

17 owed $800,000 as well as I have other issues with

18 personal guarantees that I'm paying off personally now.

19 And while I understand what you're trying to get at, I'm

20 just an employee like they are.  I'm not an owner.  I

21 have no benefits right now in being employed.

22     Q.   Do you recall how much you received, say,

23 first quarter of '22?

24     A.   No.  I would suggest I was putting money in

25 and not getting anything back only because our financial

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  status became worse and worse because we were no longer

2  providing medical services that feed the ancillary

3  services.  That was beginning to go down.

4      Q.  Now, you would agree that the plaintiff says

5  employees were also putting into this company in this

6  form of working for them, right?

7        MR. HENDERSON:  Object to the form.

8      A.  I would agree.  Like myself, we were all

9  trying to succeed so that there was a future at the

10 company for everyone that wanted to stay there.  And in

11 that regard, they invested.

12       BY MR. WOOD:

13     Q.  Are you -- are you -- is it your position that

14 the employees were investors as opposed to --

15       THE WITNESS:  No --

16       BY MR. WOOD:

17     Q.  -- employees?

18     A.  -- you said that, not me.

19     Q.  Well, you said that they invested.

20     A.  Well, no.  In that regard, based upon your

21 leading question, yes.  They became short-term

22 investors.  But they're -- they're not investors.

23 They're owed wages and, you know, I don't know the

24 amounts of them, but they're obligations of the company.

25       MR. WOOD:  I -- I'm sharing what we're marking

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

```
 1    Plaintiff's 10.

 2            (EXHIBIT 10 MARKED FOR IDENTIFICATION)

 3            BY MR. WOOD:

 4      Q.    Plaintiff's 9 was the Bankruptcy Report.  This

 5  is an eight-page document here.  When I asked for the

 6  financials of the companies, this is -- I received eight

 7  pages.

 8      A.    Uh-huh.

 9      Q.    Is it safe to assume that these companies have

10  more than eight pages of financials for the 2021, 2022

11  periods?

12      A.    I -- I don't know what they have.  They would

13  have tax returns, which will probably I would assume

14  more than eight pages.

15      Q.    Okay.  And here is an application for an

16  extension of the I believe '21 and '22 returns.  Do you

17  recognize these documents?

18      A.    No.

19      Q.    Okay.  We were also provided with this

20  Consolidated Unaudited Statement of Operations.  Do you

21  recognize this document?

22      A.    Yes.

23      Q.    And this would've been comparing looks like

24  2021 with 2020?

25      A.    Correct.
```



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      Q.   And it shows the total revenues in '21 of $1.7
2  million.
3      A.   Uh-huh.
4      Q.   Now these are net revenues, right?
5      A.   That's correct.
6      Q.   Is there a document, for instance, like a
7  profit and loss, which would show the gross revenues?
8      A.   No, because the way medical is done, which
9  I've come to learn, if you are going to collect a $100,
10  you bill $400.  That's the practice because they set the
11  rates from the -- the gross billing.  It's not
12  considered revenue.
13      Q.   So the --
14      A.   It's unique to the healthcare service
15  industry.
16      Q.   The net patient service revenue, would this be
17  the money actually received by the entity?
18      A.   The money that's been agreed to get paid out,
19  received or still uncollected --
20      Q.   Okay.
21      A.   -- to be received.
22      Q.   This rental revenue.  What is this?
23      A.   That was at the time we had subleases at our
24  prior location and that was rental income we collected.
25      Q.   And you would agree that the revenues for this

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

```
 1  period were over $500,000, right?

 2       A.   Say it again.

 3       Q.   You would agree that the revenues during this

 4  timeframe were greater than $500,000?

 5       A.   Well, yes, it's 1,700,000.

 6            MR. WOOD:  Let's take ten minutes.

 7            THE WITNESS:  Sounds good.

 8            MR. WOOD:  12:15.

 9            THE WITNESS:  Okay.

10            MR. WOOD:  12:20.  You have a preference?

11            THE WITNESS:  No, what everybody wants.

12            MR. HENDERSON:  Yeah.  It's up to you, Joseph.

13            MR. WOOD:  Let's do 12:15.

14            MR. HENDERSON:  All right.

15            THE REPORTER:  All right.  Give me.  One

16       second.  I'll take us off record.

17            (OFF THE RECORD)

18            THE REPORTER:  Okay.  Back on record.

19            MR. WOOD:  All right.  Thank you.  We are back

20       after a brief break, and I'm going to show you what

21       we're marking as Plaintiff's 10.

22            THE REPORTER:  I think this is 11.  I'm sorry.

23            THE WITNESS:  Yeah.  Can you hold one second?

24       One second.

25            MR. WOOD:  You are right.  It's 11.  Thank you.
```



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1            THE WITNESS:  Apologies.  Okay.
 2            MR. WOOD:  All right.  We'll start -- try this
 3       again.  I am showing you what's marked as
 4       Plaintiff's 11.
 5            (EXHIBIT 11 MARKED FOR IDENTIFICATION)
 6       A.    Uh-huh.
 7            BY MR. WOOD:
 8       Q.    This is an investor presentation for the first
 9   quarter of '22.  Do you recognize this?
10       A.    Yes.
11       Q.    And this would've been something that was put
12   out during your tenure with the company, right?
13       A.    Yes.
14       Q.    Did you put this together?
15       A.    We put it together with bankers,
16   professionals, people at the company like Phil Keller,
17   myself.
18       Q.    Okay.
19       A.    So yeah.
20       Q.    And through here they talk about the
21   structure. It says that the First Choice is integrated
22   orthopedic surgery, sports medicine, conventional pain
23   rehab, diagnostic imaging.  This is what the business
24   was in '21 and '22, right?
25       A.    No.
```

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1     Q.    No?

2     A.    This is what -- if you read there's -- let's

3 go to the -- this slide before.  "This presentation

4 includes forward-looking statements and projections

5 which involve numerous risks and uncertainties."  That's

6 what we want it to be.  And for most of it, we did hire

7 the orthopedic surgeons.  One was a sports medicine

8 surgeon.  And I would say through -- through some of

9 that portion, we achieved many of those things that you

10 see there --

11    Q.    Okay.

12    A.    -- for a -- a very limited period of time.

13    Q.    Now you're saying that this is a forward-

14 looking statement.  This is what you want to be.

15    A.    The answer was yes, at this time.

16    Q.    Okay.

17    A.    And that we did achieve nearly all of those,

18 if not all of those for a very limited amount of time.

19    Q.    I guess my confusion is: Why does it say that

20 it is this as opposed to it strives to be something like

21 that?

22    A.    Well, that's what we were -- that's -- that

23 was the business plan.  So we did hire, as I said, all

24 of the orthopedic surgeons.  One was a sports medicine

25 surgeon.  We do -- did in -- interventional care and



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          Toll Free **855-MYDEPOS**

 1  pain.  We had physical therapy.  At that time, we had an

 2  MRI and other ancillary services.  We did do some

 3  regenerative services.  We had an occupational health

 4  doctor, and we opened the ortho walk-in clinic and

 5  closed it pretty rapidly because we didn't have the

 6  funds.

 7      Q.   Okay.  And here on the next page, we -- kind

 8  of says the same thing.  It says in third quarter of

 9  '21, you added the regenerative services, occupational

10  health and ortho injury --

11      A.   Yep.

12      Q.   -- walk-in clinic.  It talks about your six

13  main sources of future revenues.  At the time that this

14  was put out in the first quarter of '22, how many of

15  these were your actual sources of revenue?

16      A.   We had just began.  And as I mentioned in

17  physicians, they -- the physicians we brought in to

18  probably deliver 90 -- 80 percent of the revenue.  They

19  burned through seven million in cash and brought 300,000

20  in.  So --

21      Q.   When you say, "burned through seven million in

22  cash," how did they do that?

23      A.   The way physicians are paid is they develop a

24  practice.  They set their own draw.  Most of the draws

25  were in the four, $450,000 range.  Then they surround



**MILESTONE** | **REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 themselves and pick what type of surgical implants,

2 different things they want as part of their practice.

3 They could use more expensive or less expensive.  And

4 they also picked who they have around them in terms of,

5 you know, an MA or other support people in their

6 practice.  Once that is done, they -- let's say they're

7 taking 450.  It might cost to operate that practice 650

8 to $700,000.  And the deal is that once you get past the

9 $700,000, you go to negotiate the deal.  Could be 50/50,

10 55-45, depending on the doctor on the balance of the

11 revenue once we recapture the money, and if we don't

12 recapture the money and they stay, we can take the 450

13 and knock it down to 200 grand and start paying

14 ourselves back 200 grand to -- to recapture money

15 because he didn't meet goals or criteria in that first

16 year.  And so the problem is that nobody wanted to repay

17 and nobody was going to stay.  And they essentially, you

18 know, if you -- if you add up seven surgeons that are

19 burning, you know, without overhead -- without overhead,

20 $7 million, six, $7 million, you know, $6 million, $7

21 million and then attribute the overhead to it, they ate

22 up -- they ate up most of the money.

23        Q.   Okay.  On the next page, there's a timeline.

24 This states that in September of '21, you close in your

25 first acquisition of Emerge Pharmacy.

MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1        A.    Uh-huh.

 2        Q.    And it mentioned 5.1 million in capital

 3   raised. What's that?

 4        A.    That's capital raised.

 5        Q.    Okay.  So you were -- did First Choice

 6   purchase a pharmacy?

 7        A.    We did, and we liquidated it.  We purchased it

 8   for 150,000 and we liquidated that.

 9        Q.    When was that liquidated?

10        A.    A year or two ago.  Very quickly.

11        Q.    Okay.  And this public offering in March of

12   '22, that has not happened?

13        A.    That was the goal.  And that was basically

14   held up due to audits, and we had to hire a whole new

15   auditor to do it again.  Those financials are complete

16   now, and we did a -- a business plan change essentially

17   to primary care, small little primary care clinic.  So

18   we have a -- we had a -- an acquisition for this, which

19   was related to us.  We've let go of that acquisition.

20   We're doing a different acquisition, a completely

21   different area of medical where we don't even really

22   hire any physicians.  They're all physician's

23   assistants.  It's primary care with a focus on weight

24   loss, anti-aging, and things like that.  It's basically

25   a retail approach to medical service -- you know,
```



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1   services where we -- we are going to be offering very

2   high -- high-end, anti- aging, hormonal replacement, and

3   other types of therapies where the margins are double of

4   what we were getting.  And that particular business

5   comes with two fully developed, if you know what the

6   difference is, closed door, compounding pharmacies,

7   which can manufacture their own drugs.

8        Q.   And the idea is --

9        A.   So for example, they can -- they can

10  manufacture Semaglutide under their own brand.  And --

11  and you know, it's a different formulation, but using

12  Semaglutide is a -- an active ingredient for weight loss

13  as opposed to Ozempic, which has a specific formulation

14  offered by, you know, a -- whoever makes that.

15       Q.   And because you have previously been a

16  publicly traded company, that's why there's some value

17  in this entity for you to --

18       A.   Exactly.  Because we'll be able to go into the

19  market based not on our business, on another business

20  that's doing very well and raise capital, you know,

21  merge them in, and, you know, go with that business plan

22  forward.

23       Q.   Okay.

24       A.   The business plan we're looking at now no

25  longer exists.  There's no orthopedics that will be



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

```
 1  performed.

 2       Q.   Now the statement here at the very least where

 3  it says, "Post-reorganization, we are rebranding

 4  ourselves Emerge Healthcare."  That was true at the

 5  time, right?

 6       A.   At the time.  It's not true now.  We're not

 7  going to be using that.

 8       Q.   There's a chart here that says the, "payor

 9  mix."  Was this accurate as to the payors at the time

10  this was put out in the first quarter of '22?

11       A.   Yes -- yes.

12       Q.   Okay.  And you were receiving money from -- we

13  went over Medicaid.  Medicare was a very large --

14       A.   For Medicare.  I know for a time we applied

15  for a bond to do Medicaid, but when we stopped doing

16  real medical services, I don't think we maintained that

17  anymore.  We don't do any Medicaid.

18       Q.   And you did business with Aetna, Health

19  First --

20            THE WITNESS:  Uh-huh.

21            BY MR. WOOD:

22       Q.   -- Tricare.  Tricare is for military personnel

23  and their families; is that right?

24       A.   I believe so.

25       Q.   Cigna, United Health.  There's also a mention
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  of veterans under here.  Is this VA care?

2      A.   Yeah, I would assume so.

3      Q.   And BCBS; that's Blue Cross Blue Shield?

4      A.   Yes.

5      Q.   Okay.  What is the contracted commercial?

6      A.   I don't know.  That could be where we had,

7  like, an occupational health contract, for example, with

8  L3Harris to do ergonomics and different studies for

9  their warehousing personnel.  So we had some contracts

10 like that, or we had contracts with Carnival Cruise

11 Lines at one time that we were doing PT for the

12 personnel on a ship when they came to shore, there's two

13 or three -- 2,000 employees on the ship and things like

14 that.  We're no longer doing those.

15     Q.   I want to get into the cruises in just a

16 second.  But here it talks about Coastal Pain

17 Acquisition.  There's a LOI in place.  So that --

18     A.   Terminated -- terminated.

19     Q.   And you were credentialed to accept Medicaid.

20 We discussed that.

21     A.   Uh-huh.

22     Q.   And you had durable medical equipment

23 distribution.  Can you explain that?

24     A.   Yeah.  If somebody came in and needed their

25 knee splinted, we'd -- we'd -- we'd sell them crutches

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    as part of the treatment.

2         Q.   And where did the crutches come from?

3         A.   Could have come from Henry Schein or some

4    other vendors.

5         Q.   Okay.  And Henry Schein, that's a New York

6    company --

7         A.   Yeah.

8         Q.   -- right?

9         A.   No, I -- I guess.  I don't know their

10   incorporation.

11        Q.   How many employees did you have within the

12   durable medical equipment --

13        A.   None.

14        Q.   -- division?

15        A.   None.

16        Q.   Excuse me?

17        A.   I don't believe any.  It was just something we

18   ordered and kept.  It -- it -- it didn't require a

19   person to be a gatekeeper.

20        Q.   Okay.  Was there somebody who was selling

21   these products, though?

22        A.   Yeah, doctor.  A doctor would prescribe it.

23   You have a broken leg, here's the cast, you need

24   crutches.

25        Q.   And --



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

1    A.    You go in the back and get the crutches.

2    Q.    Do you know how many doctors would've been

3  doing this during this timeframe?

4    A.    Unfortunately, I would think none of them or

5  very few of them because they didn't generate any

6  revenue.

7    Q.    Okay.  How many doctors did you have working

8  for you at the time?

9    A.    I think at our peak, we had seven.

10    Q.    And in the end of '21 --

11    A.    Just to give you an order of magnitude, seven

12  doctors should do somewhere around, even taking, you

13  know, some higher-income areas, should have done 14

14  million in revenue.  And aggregately, they did 353,000,

15  roughly.

16    Q.    That's gross revenues?

17    A.    Yeah.  That's -- no, actually, that should

18  have been collected revenues.

19    Q.    Okay.

20    A.    That's collected.

21    Q.    And the crutches, the splints, for instance,

22  those would've been under the orthopedic?

23    A.    Yeah, that would be under, yeah, orthopedics,

24  sure, care.

25    Q.    How many orthopedic doctors did you have



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  working for you at the time?

2       A.   That did some form of orthopedics, seven.

3       Q.   Seven.  Okay.  And as part of their practice,

4  they would've utilized x-ray machines, MRI machines; is

5  that right?

6       A.   Uh-huh.

7       Q.   Yes?

8       A.   Yes.

9       Q.   Okay.  And did First Choice have their own

10 equipment to do those types of procedures --

11      A.   At that time they did, yes.

12      Q.   Do you recall the company that manufactured

13 the x-ray machines?

14      A.   I think it was GE.

15      Q.   Okay.  And what about the MRI machine?

16      A.   I think that might have been GE also.

17      Q.   And you would've had x-ray technicians to

18 perform those services, right?

19      A.   Yes.

20      Q.   And those were -- those techs were employed by

21 First Choice, right?

22      A.   I believe they were probably employed by First

23 Choice Medical Group of Brevard or FCID.  I -- I don't

24 know which one.

25      Q.   And the pictures that would be produced by



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 these machines, were they actual film, or were they a

2 digital picture that was processed?

3     A.   I assume they were digital pictures that went

4 into a PACS system that was read by a contracted doctor,

5 not included in that seven-doctor group I gave you.

6     Q.   Okay.

7     A.   He was not an employee.  He was paid for -- as

8 a radiologist for reading each, you know, x-ray or MRI

9 or whatever we'd have.

10     Q.   And this contracted doctor, how would he

11 receive the pictures?

12     A.   They -- I -- I don't know.  He'd come in and

13 read them, come physically into the -- the clinic and --

14 and read them.

15     Q.   He didn't do this remotely?

16     A.   No, I don't believe so.

17     Q.   Okay.  The -- you mentioned that you launched

18 cash pay resources for patients.  Can you explain that?

19     A.   We launched that.  That was more of the stem

20 cell and regenerative medicines that we were doing as

21 well as, you know, some diet plans and different things

22 like that.

23     Q.   And this would've been a way for the patients

24 to pay for those services?

25     A.   It was cash -- well, yeah.  I mean, they could



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 pay cash.  We didn't really accept cash except for our

2 copays.  And these were cash-based services that we were

3 providing, but we only provided them for a very short

4 time.

5     Q.   And did they have the option to pay online?

6     A.   I don't think we had that kind of capability

7 yet in our website.

8     Q.   Now here you mentioned the cruise line

9 partnerships that we briefly touched on.  Can you

10 explain what those services were?

11     A.   They were utilizing physical therapy services.

12 So you know, Royal Caribbean docks at Cape Canaveral,

13 passengers disembark.  The -- it's going to be there a

14 few days.  The captain, people, different people, I have

15 a tweaked back.  I twisted my ankle.  They would come

16 for physical therapy services.

17     Q.   So these would've been employees on the ships

18 that were --

19     A.   Uh-huh.

20     Q.   -- docking at Port Canaveral, right?

21     A.   That's right.

22     Q.   Okay.  And they would come in -- you had a

23 contract with the --

24     A.   The cruise line.

25     Q.   -- the cruise line itself to treat their



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

```
 1   employees while they're at dock?

 2       A.   Uh-huh.

 3       Q.   -- at port?  Okay.  And let's see, Royal

 4   Caribbean, Norwegian Carnival, and MSC, did you have

 5   contracts with each of those?

 6       A.   I'd have to double-check that, but if we wrote

 7   it, that means we did.

 8       Q.   Okay.  You mentioned, you know, Brevard County

 9   Schools, Satellite Beach Fire Department.  Did you have

10   similar types of contracts with these entities?

11       A.   Yes.

12       Q.   So for Brevard County Schools, did you have a

13   -- an agreement with the school board to treat teachers

14   or employees?

15       A.   I don't know if it was an actual contract or

16   some sort of letter agreement where -- or they asked.

17   I'd have to double-check that.  I'm not sure.

18       Q.   Some of the plaintiffs worked jobs like the

19   front desk, correct?

20       A.   I don't know who they are, but I know we had

21   front desk people.

22       Q.   Okay.  The employees, were they issued e-mail

23   addresses?

24       A.   I believe so, if they were employees.

25       Q.   Okay.  And they would've utilized that to
```



**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  communicate internally with other employees of the -- of

2  First Choice, right?

3      A.   On business, they -- yeah.  They would use

4  their e-mail for business purposes to communicate with

5  other employees.

6      Q.   And for instance, buying medical supplies from

7  Henry Schein, who would've been involved with that?

8      A.   We had an employee at that time named Kim

9  Bean, who my understanding, lives off the grid at the

10 top of Michigan in a tiny home with no services.  She

11 used to handle all that, including the credential,

12 managing the clinic, and maintaining all the

13 relationships with -- with DME and the like.

14     Q.   So is it Beam, B-E-A-M?

15     A.   I think it may be B-E-A-N.

16     Q.   N.  Okay.  Bean.  So Ms. Bean lived in

17 Michigan?

18     A.   No, she lived -- when she was with us, she

19 lived, I think, in the Melbourne area.

20     Q.   Okay.

21     A.   Now my understanding is, not to over-

22 exaggerate, but she literally lives like Grizzly Adams

23 somewhere in an undeveloped area of Michigan.  You could

24 laugh, but I'm telling you I --

25     Q.   No, I know.



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1       A.   It -- it is --

 2       Q.   Sounds like one of those TV shows.

 3       A.   It's like, yeah, her husband wanted to live --

 4  my understanding is -- she was very capable.  Her

 5  husband wanted to live off the grid because she left a

 6  long time ago, and -- and probably we were just -- you

 7  know, and -- and -- and services ended up ending anyway.

 8  But her husband wanted to, like, eat off the land and

 9  live off the grid with, like, a coal stove and all this.

10  And they found some crazy place like on the Canadian

11  border in the middle of nowhere.  It has, like, snow

12  until June.  It's just some crazy place.  And, you know,

13  to each his own.

14       Q.   Okay.  So she would've been the purchase --

15  person to purchase the --

16       A.   Yeah.

17       Q.   -- supplies?

18       A.   She -- she used to do a lot of very important

19  functions, like credentialing doctors, you know, led

20  that charge.  She used to develop the relationships,

21  where to find these physicians and doctors.  And same

22  thing with, like, durable medical equipment, there was

23  distributors, different people, brokers.  And she used

24  to help order those things as well as other types of,

25  you know, drugs that we may have used on -- on site, for
```



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 example, you know, simple injections, things like that.

2 You know, spine injections, you need certain types of

3 injectables and -- and -- and things like that.

4     Q.   The credentialing, can you explain that, what

5 that process is?

6     A.   Well, doctors can't be billed, and you can't

7 collect for their services unless they're approved and

8 credentialed with the state and -- and then with -- on

9 surgeries, with other surgical providers.  They have to

10 be credentialed and approved by, let's say Steward

11 Health, who's local in the area, or Health -- Health

12 First or the surgical center down the block.

13     Q.   And the doctors that you'd --

14     A.   They need privileges, you know.  They got to

15 be credentialed to get privileges.

16     Q.   The doctors that you would find, where would

17 you find these physicians?

18     A.   One was a known local physician.  The rest

19 came through recruiters and outside the area.  Some of

20 them were already Florida based.  Many of them had a --

21 Florida licenses, despite the fact they didn't live in

22 Florida --

23     Q.   Okay.

24     A.   -- and were going to move down.

25     Q.   So you would be negotiating with these doctors



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  that were outside the states to come into Florida?

2      A.   In some cases, they -- they were going to move

3  there and be full-time employees.

4      Q.   Okay.

5      A.   You know, during COVID, many of them decided

6  to get out of places like New York and some of the

7  Northeast and countries, Midwest, things like that.

8      Q.   And before they come, you would've negotiated

9  with them via e-mail, over the phone, things like that?

10     A.   Well, yeah, they usually fly in, stay a day or

11  two, look at the facility, look at -- you know, look at

12  -- you know, talk about what they -- like any interview,

13  why they're going to be different and how great they're

14  going to be and negotiate their contract.

15     Q.   The durable medical equipment, was Henry

16  Schein your only supplier of those?

17     A.   No.  I -- I don't even know.  It was such a

18  small part of the business.  We did such little of it,

19  but particularly when I got there because there was no

20  doctors, so we weren't even using any.  You know, for a

21  period of time when I was there, we didn't even have to

22  order any.  So we really didn't rekindle those

23  relationships until after all these other surgical and

24  orthopedic care physicians came on board.

25     Q.   Now you mentioned drugs or injectables.  Where



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 would those have been purchased from?

2     A.  I don't know. It could be Henry Schein for

3 some of it, I believe. But there could be other places

4 as well.

5     Q.  Do you -- do you know the companies that

6 would've manufactured these drugs?

7     A.  No.

8     Q.  Is it safe to say that they are presumably

9 located outside the State of Florida, the manufacturer

10 of these drugs?

11     A.  I don't like to speculate. I don't have any

12 idea where they're made. They could be made in China for

13 all I know. I don't know.

14     Q.  There's a patient portal through Aetna --

15 Athenahealth. Are you familiar with the patient portal?

16     A.  Yeah. Athenahealth is our electronic medical

17 record and billing system.

18     Q.  Okay. Do you know where Athenahealth is

19 located?

20     A.  I do not.

21     Q.  And this was a -- an online service they

22 provided?

23     A.  Well, they do billing and collections, and

24 they do maintain electronic medical records.

25     Q.  And where were the records stored?



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

```
 1      A.   On Athena's servers, I -- and our own servers.
 2      Q.   And you accepted credit card transactions,
 3  correct?
 4      A.   Yes. I don't know if we accept them any
 5  longer.  Well, I just don't -- I don't know that we
 6  accept them any longer.
 7      Q.   And --
 8      A.   But we did at that time.
 9      Q.   Yeah. And we're really focused on what
10  occurred in late '21, all year '22. I understand things
11  have changed since then, but we're trying to focus on
12  what was happening at that time. And at that time, you
13  were providing services to patients and --
14      A.   Yes.
15      Q.   -- presumably collecting payments?
16      A.   Uh-huh.
17      Q.   And many of those payments, the majority of
18  them presumably came via credit cards for the patient
19  portion and then through billing of the insurance
20  companies for the other portion, right?
21      A.   That's correct.
22      Q.   Did the -- did the defendants have credit
23  cards themselves, the companies?
24      A.   Not that I'm aware of.  Not since I've been
25  there.
```



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   Would you have had a card to make purchases of

2    certain items like supplies?

3    A.   I might have been on a debit card, but

4    generally speaking, I -- I -- I left them in the office

5    somewhere.  Like, I don't use them, but yeah, they have

6    -- they have a -- to my knowledge, you know, if they

7    needed a ream of paper, if they needed to buy a few

8    thousand dollars, at the time, of supplies, they might

9    have used one of the debit cards from an account.

10    Q.   Okay.  Did any of the employees travel for

11    their work such as any of the physicians going to CLEs,

12    or I guess not CLEs -- CLMs?

13    A.   I think we sent some of the --

14    Q.   CMEs?

15    A.   I think we sent just, you know, physicians and

16    certain people, we paid for to get certified in certain

17    areas.  And we -- we -- we -- in their contracts, they

18    got paid for CLE and things like that.

19    Q.   Okay.

20    A.   I don't know which ones or not, but, you know,

21    we did that with physical therapists. For example, we

22    were told we would get more referrals if we had somebody

23    on staff for lymphedema -- lymphedema. And so we sent

24    somebody to Orlando. In my case, the company might

25    reimburse me for spending four days in New York with



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1   investment bankers at the time and things like that,

 2   so --

 3       Q.   And I was going to ask about your travel.

 4   Presumably, you traveled throughout the country

 5   discussing investments with --

 6       A.   No.

 7       Q.   -- banks or investors?

 8       A.   No, I -- I -- I -- I do that mainly on phones,

 9   and I haven't had to expend resources to do that

10   because, you know, money was tight.  So you know, phones

11   work too, and I've had very limited travel, very.

12       Q.   Okay.  So your travel was, like I said,

13   limited, and this would've been during a post-COVID.

14       A.   Uh-huh.

15       Q.   So you would've utilized the phone lines, Zoom

16   meetings?

17       A.   I hate --

18       Q.   Is that right?

19       A.   I hate Zoom, but yeah, if I have to, I -- I

20   use Zoom.

21       Q.   Okay.  The subsidiaries, do they have their

22   own independent capital?

23       A.   No.

24       Q.   And they generated revenues, but the revenues

25   went up to the parent, First Choice, right?
```



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1        A.   I don't make -- I don't make those decisions,
 2   I guess, what needs to be paid.  And -- and this, I'm
 3   not talking about today, in general.  I don't know that
 4   they move the revenues anywhere.  So you know, if the
 5   money's coming into FCMG, right, Medical Group of
 6   Brevard, if there's ten employees historically at FCID
 7   during this period in time, they would move money to
 8   FCID to pay those employees.  If there's some
 9   administrative or some other people that need to get
10   paid at -- at First Choice Healthcare Solutions, they
11   move money there.  But -- but, you know, for all intent
12   and purpose, there is no revenue.  Or -- or, like,
13   Marina Towers, Marina Towers would collect the rent when
14   it actually had rent.  And they wouldn't transfer
15   anything because they had $112,000 rental payment due,
16   which they were always short on at that time.  So if you
17   could think about you showed me a financial statement
18   where they collected 260,000, you know, it was a million
19   dollars a year of rent.  So there was an $800,000
20   shortfall.  So money might get transferred over there.
21        Q.   The -- if there was a shortfall from one
22   company, money would be transferred from another company
23   to make up for that shortfall?
24        A.   I would -- I would -- yeah.  To, you know --
25   to, you know -- to be able to not be evicted at -- at
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 some point in time.

2     Q.   Sure.  And along those same lines we discussed

3 earlier, there's joint tax returns that were filed,

4 right?

5     A.   Uh-huh.  Consolidated tax returns, yes.

6     Q.   And based on the leadership page we looked at,

7 it looks like each of the entities had joint leadership.

8 You were the CEO of all the corporations, manager of the

9 LLCs?

10     A.   Uh-huh.

11     Q.   You and Phil led all of the companies, right?

12     A.   Along with the board, yeah, the direction at

13 the board.  We served at the direction of the board.  We

14 went -- we had 8:00 in the morning calls virtually every

15 day for a couple of years during the bankruptcy.

16     Q.   And each of these subsidiaries, excluding, of

17 course, Marina Towers -- Marina Towers, their purpose

18 was to rent and sublease property, right?

19     A.   And provide space for First Choice Healthcare

20 Solutions and its subsidiaries to operate.

21     Q.   Yeah.  But the other companies, FCID --

22     A.   Yeah, that's correct.

23     Q.   -- the Medical Group, and First Choice itself,

24 the primary business purpose is to provide medical

25 services to patients, right?



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

```
 1        A.   That's correct.

 2        Q.   They all -- they all have the exact same

 3   purpose --

 4        A.   Yes.

 5        Q.   It's just doing its -- in -- through different

 6   corporate structures, right?

 7        A.   Yes.

 8             MR. HENDERSON:  Object to form.

 9             BY MR. WOOD:

10        Q.   We talked about the employee contracts, and I

11   don't mean a written contract.  I mean, an employment

12   agreement, you know, that they would work for a hourly

13   rates, and there was other benefits involved.  We talked

14   about health insurance, PTO, paid days off.  Were there

15   any other benefits that the employees might have had?

16        A.   Not that I'm aware of.

17        Q.   Okay.  The PTO, do you know how that was

18   accumulated?

19        A.   According to the company policy that had been

20   in effect for many years.  I -- I -- I'm not sure the

21   exact -- how many -- how -- how long you had to serve to

22   get certain amount of weeks off or days off.  I -- I --

23   I don't know that, per se.

24        Q.   The PTO that was accumulated by these

25   employees, that is reflected on their paychecks, right?
```



**MILESTONE** | **REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

 1      A.   I believe it is, yes.

 2      Q.   And is it the policy that -- that would be

 3  paid out upon the termination of these employees?

 4      A.   I believe it is, so long as they gave whatever

 5  the notice is under their employment -- acceptance of

 6  employment, which was generally my understanding, like a

 7  letter or some sort that you're going to return your

 8  materials, return your laptop, you know, all that,

 9  you're going to give X amount of days notice and things

10  like that.

11      Q.   Now, in the situation we have here where you

12  have a number of employees who weren't being paid any

13  wages, despite the fact that they were working weeks on

14  end at times, are -- would you take the position that

15  they still had to give you two weeks' notice despite the

16  fact that they'd been working for weeks not being paid?

17      A.   Well, not -- I -- I don't have any position

18  other than that's -- that's something I guess that'll

19  get litigated.  It's an issue.  And it might be -- I

20  don't know if it's contract issue, a statutory issue,

21  but someone's going to litigate it, I -- I suppose.

22      Q.   These letters that you referenced, do you have

23  you reviewed these letters?

24      A.   Well, most of the people, they were in effect

25  long before I was there, but I have -- I've seen one or



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1   two over a period of time.

2        Q.   Have you produced them to your attorney?

3        A.   I believe they did, and I don't know that

4   everybody has them.

5        Q.   Okay.

6        A.   I -- I -- I -- I -- I -- well, I would assume

7   they did.

8        Q.   But you don't know for sure?

9        A.   I don't know for sure because I -- I haven't

10  seen all the discovery assembled at Counsel.

11       Q.   And this presumably would've been within a

12  personnel file?

13       A.   Yes.

14            MR. WOOD:  I'm going to show you what we'll

15     mark as Plaintiff's 12.

16            (EXHIBIT 12 MARKED FOR IDENTIFICATION)

17            BY MR. WOOD:

18       Q.   And this was a document that was produced

19  during discovery.  It's a Florida Blue.  It's says,

20  "Large Group Employer Application," seven pages long. Do

21  you recognize this document?

22       A.   No, not particularly, no.

23       Q.   Do you know what it was for?

24       A.   Well, it says, "large group employer

25  application."  We were seeking health insurance at



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  Florida Blue.

2      Q.   And it says here, you know, you've got Florida

3  -- First Choice Medical Group --

4      A.   Uh-huh.

5      Q.   -- 26 employees.  First Choice Health

6  Solutions, Incorporated, as the parent of three and

7  FCID, it also was 26.  In fact, it lists the same tax ID

8  number.  Can you explain that?

9      A.   No, I cannot.  Although I know probably at

10  that time, we -- we -- we -- we had more than 29

11  employees. So you know, as I mentioned, I thought at all

12  times applicable, and we -- we probably had anywhere

13  from 45 to 60 people at that time in '21.  And so I just

14  don't -- I didn't prepare this, so I don't know.

15      Q.   Okay.  When you were under this group plan --

16      A.   Uh-huh.

17      Q.   -- who was responsible for the COBRA notices?

18      A.   It would be someone in HR, so it might be Ruby

19  Rosado or Gillian Lee.

20      Q.   And is the same true for the United plan?

21      A.   I would say yes, other than at the time that

22  was brought in by TriNet, TriNet would've been

23  responsible.  But post-TriNet, I think, as I mentioned,

24  we were trying to negotiate a continuation with United

25  that never came to fruition.



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1    Q.   And do you have a contract with TriNet that's

2 laid out all these responsibilities?

3    A.   I believe we do.

4    Q.   And I'm going to ask that you provide that

5 contract to your attorney so they can produce it to the

6 -- to us.

7         THE WITNESS:  Mr. Henderson, will you just make

8    a note of that and send that to myself and --

9         MR. HENDERSON:  I have a note of it.

10        THE WITNESS:  Thank you.

11         BY MR. WOOD:

12    Q.   And I'm showing you the United plan

13 application that we received through discovery.  And do

14 you recognize this document?

15    A.   No.

16        MR. WOOD:  Okay.  And this is Plaintiff's 13.

17    I'm not sure if I said that or not.

18         (EXHIBIT 13 MARKED FOR IDENTIFICATION)

19         BY MR. WOOD:

20    Q.   Here the First Choice Medical Group of Brevard

21 is listed as the business.  Is that --

22    A.   Uh-huh.

23    Q.   -- what you recall being the sponsor of this

24 group?

25    A.   No.  Well, it is the largest employer in the



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1   subsidiaries and parent company, but I -- I -- I was not

2   aware -- I was not aware that they applied for it by

3   itself.

4       Q.   Okay.  And here we've listed 45 eligible

5   employees, which is, you know, those working more

6            than ---

7       A.   Yeah.  So --

8       Q.   -- 30 hours a week.

9       A.   -- we were on the downside now, so we went

10  from 54 to 45.

11      Q.   And this would've included employees

12  throughout the organization, including --

13      A.   That's right.

14      Q.   -- the Medical Group, the parent company, the

15  subsidiaries.

16      A.   That's correct.

17      Q.   And this group plan was intended to cover all

18  of them together, right?

19      A.   Yes.

20      Q.   And you mentioned Rubilinda Rosado.  She was

21  in HR, correct?

22      A.   She was in HR and worked with Gillian Lee in

23  -- in that -- in human resources --

24      Q.   And --

25      A.   -- together.



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1    Q.  -- the -- Gillian Lee and Ruby, they provided

2 HR services to all of the entities, correct?

3    A.  That's correct.

4    Q.  Now this plan, the UnitedHealthcare plan, we

5 don't need to go through the entire contract, but it was

6 canceled?

7    A.  Yes.

8    Q.  And I believe it was -- it was supposed to be

9 in effect for the month of April of '22.  Is that your

10 recollection?

11    A.  Yes.

12    Q.  Are you aware if there was an employee who

13 went on medical leave during the month of April due to a

14 seizure, Ms. Evelyn Bonilla?

15    A.  No.

16    Q.  Are you aware of that?

17    A.  No.

18    Q.  Okay.  Do you know what happened with her

19 healthcare coverage?

20    A.  No.

21    Q.  Do you know if she received a COBRA notice?

22    A.  No.

23    Q.  Do you know if the defendants have a policy of

24 providing COBRA notices when an employee goes on leave

25 as opposed to a final termination?



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1     A.   The company endeavors to be compliant with

2  laws.  If Ms. Bonilla was due a COBRA notice, and there

3  was available COBRA, I would assume they sent it to her,

4  or in this case, if United, as you say -- we got United

5  again through TriNet.  TriNet terminated us within weeks

6  because of the rapid decline of financial capability.  I

7  don't know the position of United Healthcare and TriNet

8  as it relates to what you are describing to me, that

9  United was never effectively in place.  And therefore, I

10  don't know the technicality around if the policy was

11  retroactively canceled in full, whether United would

12  issue a COBRA for it.  So I don't know the answer to any

13  of that, but that's a possibility.

14     Q.   Okay.

15     A.   I -- I just don't recollect those -- those

16  facts other than I recollect how quickly TriNet pulled

17  the plug on us.

18     Q.   And do you know if there was a plan that was

19  the -- documents that someone could go through to look

20  to see what their options were to dispute?

21     A.   Well, we're going to provide you the TriNet

22  agreement.  I -- I don't know -- I don't -- I haven't

23  seen and I haven't reviewed any correspondence from

24  United Healthcare related to that.

25     Q.   Okay.  Show you what's marked as Plaintiffs'



**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1  14. This is 12 pages of e-mails between Ms. Penny

2  Raverish (phonetic) and Ms. Lee and others at the

3  company, including yourself and Mr. Keller. Are you

4  familiar with the communications between Ms. Raverish

5  and yourself at the end of 2022 and beginning of 2023?

6      (EXHIBIT 14 MARKED FOR IDENTIFICATION)

7      A.   Yeah, I can read them.

8      BY MR. WOOD:

9      Q.   Okay.

10     A.   Refresh myself. I'm not familiar with who

11 Penny Raverish is, but that wouldn't be unlike, you

12 know, unusual.

13     Q.   Let me see. Here, I'm on page 10, this is a

14 contractor offer letter. Do you recall or do you

15 recognize this letter?

16     A.   No. But we were going to all contractors only

17 because everybody was essentially terminated, because

18 all the physicians left, and one physician was willing,

19 was going on his own and willing to sort of JV with us,

20 which is Dr. Zaidi, who's no -- no longer with us at

21 all. And so I know that -- that was obviously going on,

22 but I -- I'm not aware of the letter.

23     Q.   The signature at the bottom of the letter, is

24 that your signature?

25     A.   It's an electronic signature, yeah.



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   Now I'm looking at the -- you know, when I

2    talk about electronic signatures, typically it's, you

3    know, typed maybe a slash --

4    A.   It's a copy of my signature.

5    Q.   Okay.

6    A.   Tell me what she's doing.  I knew we were

7    offering 1099 for anybody who wanted to work hourly, if

8    they want.  And I said, fine.  But you asked me

9    specifically if I drafted or I reviewed or approved this

10   letter, and the answer is no.

11   Q.   Who would've drafted this and put your

12   signature on it?

13   A.   Probably Gillian, maybe Phil looked at it.

14   Q.   And this was sent on January 6, 2023.  Do you

15   recall directing it to be sent?

16   A.   No.  I could read this.

17   Q.   Sure.

18   A.   "Nothing would change.  We're trying to raise

19   capital make payments so no corporate mandate to treat

20   anyone differently than other employees past or present.

21   We keep talking to investors.  I understand, but there's

22   no change in what we're trying to accomplish."  True

23   statement.

24   Q.   Now, this was an e-mail from you, right?

25   A.   Uh-huh.



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1     Q.   That's a yes?

2     A.   Which one?  The one that I just read.  Yes.

3     Q.   Yes.  Okay.  This is -- it says, "sent from my

4   iPhone."  You maintain your e-mail address or e-mail

5   account on your iPhone?

6     A.   Yes.

7     Q.   And you sent this in response to an e-mail

8   from Ms. Raverish, right?

9     A.   I don't know.  I'd have to look and see.  I

10  thought she sent me a -- a direct e-mail.  I don't think

11  that came to me.  I think she asked me if there was a

12  status change above what's going on, and I said,

13  "nothing has changed."  The -- I don't know who she sent

14  the good afternoon piece to.  No, she -- she might have

15  sent it to me, but I -- I don't recall it.

16    Q.   If there was an e-mail that -- or she e-mailed

17  it to you, or your e-mail address is on there, we could

18  assume that you received it, right?

19    A.   Yeah.  Yes.

20    Q.   That the -- was sent to you?

21    A.   Yes.

22    Q.   Okay.  And this 1099 contract agreement, that

23  was terminating a W-2 employment and turning her into a

24  1099 contractor, right?

25    A.   Well, yeah.  I mean, the reality was there was



**MILESTONE** | **REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  no full-time employment for anybody because we had

2  diminished services.  And in fact, our last physician,

3  Dr. Zaidi, as I mentioned, went to his own practice and

4  we were going to lease him some space and do some

5  revenue sharing as legally allowed under, you know,

6  certain laws, like Stark laws.  And that if somebody

7  wanted to be employed with Dr. Zaidi, we were able to

8  offer hourly employment in our revenue sharing agreement

9  and things like that.  So that's why it was offered.

10      Q.   Right.  Going back to the offer letter, it

11  does state here, dated January 8, 2023, "Your employment

12  with First Choice Medical Group of Brevard LLC d/b/a

13  Emerge Healthcare Group, LLC is terminated."  And then

14  effective the following day, there's an offer for a 10

15  -- 1099 independent contractor agreement?

16      A.   Yes, I could read that.  Yeah.

17      Q.   And this was being offered -- this is signed

18  by you, First Choice Healthcare Solutions and its

19  subsidiaries, right?

20      A.   This was, you know, what we discussed as a go

21  for -- forward plan for the company with limited

22  operations.  And this accurately depicts what we were

23  offering employees at the time when we were essentially

24  ceasing medical service operations on a full-time basis.

25      Q.   Her job didn't change at all, though, right?



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  The job duties, what she was expecting.

2      A.  I don't know what her job duties are, but they

3  would be whatever was being offered to her was to -- on

4  a part-time basis, as needed, when she's available.  Not

5  -- it's not exclusive, she can agree to work for, in

6  this case I'm just assuming it's Dr. Zaidi, as a medical

7  assistant.

8      Q.  Moving on to Plaintiffs' 15, I think.  This is

9  a picture of a chart that's been provided as part of our

10  ongoing communications on all of these cases.  This was

11  sent over to your attorneys in -- back in May.  Have you

12  had a chance to review this chart or something similar?

13          (EXHIBIT 15 MARKED FOR IDENTIFICATION)

14      A.  I've seen the chart.  You know, this is more

15  than wages.  This, you know, some of this, I think had

16  to do with some punitive damage being sought and, you

17  know, other things related to bills maybe that might not

18  have been covered by insurance in addition to

19  reimbursement for premiums that were deducted.

20          BY MR. WOOD:

21      Q.  Sure.

22      A.  But I have not seen any of the backup and I've

23  not done any calculations myself, no.

24      Q.  Well, I wanted to go through because it is

25  itemized for instance, one column is minimum wage.  The



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    other is minimum wage liquidated damages.

2         A.   Right.

3         Q.   Do you dispute that these employees are owed

4    minimum wage?

5              MR. HENDERSON:  Objection.  Form.

6         A.   I don't dispute that they're owed their hourly

7    wages.  So -- but I have not done the investigation

8    research to know if these numbers are accurate.

9              BY MR. WOOD:

10        Q.   Okay.

11        A.   And I don't know if there's been any crediting

12   from DOL.

13        Q.   There's -- I can tell you, can represent to

14   you a few things.  One, that these figures come from

15   your own records.  And when I say, "your own," I mean,

16   the records produced.

17        A.   I'm -- I'm sure Phil -- Phil and -- and his

18   finance team put together accurate -- accurate numbers.

19        Q.   Okay.  And the DOL is not included in here

20   because the DOL is holding onto those funds.

21        A.   Okay.

22        Q.   My understanding is that the Treasury may or

23   may not have them and they're going back to Emerge.

24        A.   We have not received them.

25        Q.   Now we've received time records as part of



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  this process.  We've received payroll records as part of

2  this process.  And those time records show that time was

3  worked by these employees, and the pay records show that

4  there's not been payment for those.  I don't think

5  that's disputed by you, is it?

6      A.  Can you just repeat that question one more

7  time?

8      Q.  Sure.  As part of the process, you've produced

9  time records, right?

10      A.  Yep.

11      Q.  And you've also produced pay records, correct?

12      A.  Yep.

13      Q.  And those pay records show, when you look at

14  them with the time records, that there's time that's

15  been worked by these employees that they were not

16  compensated for; would you agree?

17      A.  Yes.

18      Q.  Okay.  And so you don't dispute that there's

19  hours worked by the employees that they were not paid

20  for, correct?

21      A.  Yes.  Subject to whatever funds would be

22  applied and being held by the DOL, yes.

23      Q.  Right.  You've talked about punitives, and I

24  have a feeling, and I'm guessing that when you are

25  talking about that, you're referring to maybe the

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1  liquidated damages; is that right?

 2       A.   Well, I can't see what totals other than the

 3  COBRA notice damage.  I can't see in Bonilla and --

 4       Q.   Sure.

 5       A.   -- some of the other people, what the far

 6  right column there, because the little boxes are in the

 7  way.

 8       Q.   I can get -- I can if you can't, I'm -- James,

 9  are you seeing everything or --

10            MR. HENDERSON:  I'm seeing --

11       A.   I think there's one more column.  Is there a

12  column after COBRA notice?

13            BY MR. WOOD:

14       Q.   There's a -- there's a COBRA notice damage and

15  then denied benefits is the far right.

16       A.   Yeah, I don't see the denied benefits.

17       Q.   Okay.  That might be an issue on your end,

18  James, do you see it?

19            MR. HENDERSON:  I have it on mine.

20       A.   Let me see if I can -- I can hide, I can hide.

21  Okay, now I can.

22            BY MR. WOOD:

23       Q.   Okay.

24       A.   Okay.

25       Q.   So -- and the far right chart says,
```



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  "deductions, COBRA notice, damages, denied benefits."

2  The deductions, those are referring to the deductions

3  from the paychecks during a time frame where there was

4  no insurance.  You don't dispute the deductions were

5  made and there was no insurance during a certain time

6  frame, right?

7       A.   No.

8       Q.   Okay.  And I'm sure you would want to check

9  for yourself, but these figures here, they've been

10 calculated for the amount of money deducted when there

11 was no insurance.  Do you dispute or have reason to

12 believe that these figures are inaccurate in any way?

13         MR. HENDERSON:  Object to form.

14      A.   No, I would not have any reason to feel that

15 these are inaccurate.

16         BY MR. WOOD:

17      Q.   Okay.  The far right side are denied benefits.

18 And those damages would've been when an employee went to

19 receive care and it was billed against their insurance,

20 but it turns out that there was no coverage during the

21 time period.

22      A.   Yep.

23      Q.   Okay.  These figures here are calculated with

24 figures with the documents that we do have in our

25 possession.  We could produce them to you if you want,

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  but you have no reason to believe that employees didn't

2  go get care that were denied because --

3      A.   No, we have no reason to believe that.  What

4  we do know is that, you know, these numbers are the

5  billed numbers, which are generally four times higher

6  than Medicare.  And during mediation, we felt that well,

7  we -- we would take the affirmative action.

8      Q.   Lance, I just want to stop you.  In terms of

9  discussions that were taking place in mediation

10 involving your attorney or even with the other side,

11 they could follow --

12     A.   With the other side, yeah.

13     Q.   -- certain privileges regarding statements

14 made during mediation.

15     A.   So I would -- I would just say that those

16 typically are four times as high as the -- the

17 collectible number.

18     Q.   Okay.  And I will represent to you that the

19 $35-36,000 figure for Ms. Pineiro (phonetic), that is a

20 total amount billed.  And we've been -- we've been made

21 it very clear that the out-of-pocket expense is a

22 different figure.  The issue, of course, is that

23 Medicare became the primary insurer as opposed to the

24 secondary insurer.  And we include the full amount

25 because that is an issue.



**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  A. I'm just disputing that those numbers, we --

2  nobody today until somebody takes an affirmative action.

3  My only point is that those are accurate.

4  Q. Okay. And at the very bottom, Ms. Bonilla

5  (phonetic), it's $121,000, the largest figure of them

6  all, that pertains to a brain surgery that was done in

7  Orlando, along with a few other items, but that is the

8  amount that she's being charged out of her pocket. I

9  understand what you're saying. You know, you bill 400,

10  you collect a 100, but this is the amount that's

11  actually being charged to these patients.

12  A. I -- I -- I --

13  MR. HENDERSON: Object to form.

14  BY MR. WOOD:

15  Q. Okay. The COBRA notice damages, that is a

16  calculation based off of a statute, I think it's $110 a

17  day multiplied by the number of days between when the

18  notice should have occurred and when it did -- and did

19  time this was generated. That I imagine that we would

20  need to see the notice to see when damages are cut off.

21  And I would ask that you, after the deposition, go back

22  to your team and try to find that notice and show that

23  it was transmitted to Ms. Bonilla or any others, okay?

24  A. Okay.

25  Q. Throughout your e-mails to the employees, do



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1   you recall stating that you would pay for any bank

2   charges as a result of not making payroll?

3      A.   I think that was something that Gillian had

4   told people or Julie.

5      Q.   Okay.

6      A.   And it might have been included in one of the

7   memos to employees.

8      Q.   Okay.  And in fact of the employees that I do

9   represent, there is a single person who had a $210 bank

10  charge as a result of not getting paid.  You're not

11  disputing that you'll pay that, correct?

12       MR. HENDERSON:  Object to form.

13      A.   Subject to verification, I'm not disputing

14  that your client may have incurred an overdraft fee of

15  210.

16       BY MR. WOOD:

17      Q.   Okay.  And provided that we have a document

18  that shows the bank charged this $210, then you would

19  not dispute that amount?

20       MR. HENDERSON:  Object to form.

21      A.   It's not that I won't dispute it, I would -- I

22  would agree that during periods of time during the --

23  the payroll difficulties, there were times we paid fees

24  for employees that came to us that incurred overdraft

25  fees.  Whether we would dispute that in litigation now

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

1  or not, that would be something that the company would

2  -- and its -- its personnel, existing officers now,

3  would have to discuss with Counsel.

4          BY MR. WOOD:

5      Q.   In late 2022, many of the employees had

6  already left.  But you still had a few working for you

7  and there were payroll payments made at that time; is

8  that right?  Some?

9      A.   There might have been some pay -- payroll

10 payments being made.  I can't tell you with any

11 specificity who or what, but --

12     Q.   And the money that was paid, who made the

13 determination who to pay and how much?

14     A.   Well, I assume nobody.  It -- it would be

15 probably our CFO Phil Keller and his finance team.  I

16 don't know if it was on an hourly contract basis that we

17 went to or it was something else.  I don't -- I don't

18 know.

19          MR. WOOD:  Right.  I need a few minutes.  Let's

20     say come back at 1:30.

21          THE WITNESS:  Okay.

22          MR. HENDERSON:  Good.  Because if you -- well,

23     I'll ask you when you get off the record.

24          MR. WOOD:  Okay.

25          THE REPORTER:  I'll get us off real quick.



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
1      Hold on.
2             (OFF THE RECORD)
3             THE REPORTER:  Okay.  Back on record.
4             BY MR. WOOD:
5      Q.   All right.  We are back and I got a few more
6  things just to clarify.  The bank accounts of the
7  companies, they have persons who are designated as
8  having authority to sign on behalf of the company.  As
9  CEO, you were a signer for the company's bank accounts,
10 right?
11     A.   For a period of time I -- I wasn't on TD until
12 later on, but on Regions, when we opened the Regions,
13 the answer is yes.  And I think we opened another one
14 locally now because Regions has closed our accounts or
15 is in the process of closing them, and I think only Phil
16 is a signer on those.  I have I haven't been to
17 Melbourne in probably eight months.
18     Q.   The TD Bank, that would've been opened during
19 the bankruptcy proceedings, right?
20     A.   That's correct.  We closed after.
21     Q.   Okay.  So after the plan was confirmed, you
22 went to Regions?
23     A.   No.  Well, we wanted to try to open at TD, but
24 they really didn't want to have us.  So we went to
25 Regions, yes.
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

```
 1      Q.   Okay.  And so for the timeframe of say
 2  November of '21 through 2022, you were at Regions and
 3  you were a signer?
 4      A.   To Regions I was, yes.
 5      Q.   Okay.
 6      A.   Along with, you know, several other people.
 7      Q.   And we had discussed you personally
 8  guaranteeing debt of the companies, did Phil guarantee
 9  any debt of the company?
10      A.   He has no -- he had no capability.  He didn't
11  have the relationships.
12      Q.   Okay.  Were you the only one personally
13  guaranteeing the debts?
14      A.   At that time.  I'm indemnified by the company
15  and so I felt comfortable in the long run to do it.
16      Q.   And when you hired physicians, I think you
17  testified earlier that you were the one that would be
18  making those hiring decisions and actually hiring them?
19      A.   No -- no.  So the way it worked was, they were
20  recruited through a recruiter, they came in for
21  interviews.  We interviewed them as groups.  We
22  discussed their capabilities and what people thought.
23  And we kind of had our hands up on yes, no, maybe yes.
24  And then we would give them a standard employment
25  agreement.  So we -- we generally judged whether we were
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1  going to offer somebody employment based on a, at that

 2  time, a consensus of sort of my leadership team, if you

 3  will, when we were operating.

 4       Q.   And you put together that leadership team,

 5  right?

 6       A.   No.  I walked into the company.  I didn't know

 7  anything.  It was a -- a leadership team from before

 8  myself.

 9       Q.   Okay.

10       A.   I just -- I was the new guy walking into it.

11       Q.   Did the team change over time?

12       A.   Only when it was no longer needed and went to

13  zero.

14       Q.   When was that?

15       A.   Probably towards the end of 20 -- you know,

16  third quarter of '22, when operations were being

17  shuttered in most instances and we were cutting down the

18  workforce for lack of capital.

19       Q.   Earlier you had stated that you can contested

20  the answer that you made the decision to not pay wages.

21  Who made the decision?

22       A.   Paychex and the PEO.  TriNet.

23       Q.   And as far as I can understand, you're saying

24  that they did not pay it because they didn't -- you

25  didn't you didn't have the money to pay the employees,
```

MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  right?

2      A.   Well, it has nothing to do with me. The

3  company did not have the money.

4      Q.   Okay.

5      A.   Okay.

6      Q.   Presumably, you were aware of the finances of

7  the company and saw that, you know, hey, we -- we're

8  going to miss payroll this next pay period, right?

9      A.   Typically, what happened is we went into

10 meetings with doctors since, you know, these physicians

11 were burning the capital and they -- to see what was

12 going on and whether we can collect.  We talk with

13 investors.  Sometimes we got money, other times they

14 were like, "Let's file the S1," and are these doctors

15 that were going to turn things around?  Then we began

16 the cutting process of terminating these physicians.

17 Some of them left voluntarily because they didn't want

18 to have recapture of funds based on their contracts. And

19 essentially at that time, if we lost a particular doctor

20 through termination or resignation, there's three or

21 four people around them that are no longer necessary.

22 Those people, you know, would be terminated or some --

23 in some cases they would say, "Is there something else I

24 can do?"  And in some cases, you know, they -- they were

25 given part-time or something to do.  Most cases they

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1   left and -- for lack of work.  But everybody knew.  I

2   think we were very transparent.  Everybody knew the

3   financial circumstances.  Even before I got there, I

4   mean, they were working for a company that had -- had

5   been in the throes right away of being converted to a

6   Chapter 7 liquidation, but either had no jobs to go to

7   and had hoped that it could be saved or not.  And we

8   managed to save it through bankruptcy, but the business,

9   whether it was lack of reputation and reputational

10  damage from what took place from Mr. -- Mr. Romandetti's

11  conduct or whatever.  Dominance of the other players,

12  after losing all the revenue and all the support, you

13  know, Stewart was a big shareholder, and not getting

14  referrals anymore from Stewart and things like that. The

15  business was unable to continue as an orthopedic

16  business.  But nobody made decisions like, "Oh, let's

17  not pay employees and do something else."  So it was --

18  it was just a -- a collapse of business.

19      Q.   But the employees were allowed to continue to

20  work, even though the company knew that it --

21      A.   On -- on a -- on a voluntary basis.  On the

22  understanding that there were no funds to pay.  Not to

23  say that we weren't accruing or in two weeks when money

24  came in, pay payroll.  But everybody was very aware of

25  the financial circumstances.  We had in-person,

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  impromptu meetings and things like that to know exactly

2  where we sit.  Everybody knew the business plan cannot

3  proceed without audits, which they knew we had to fire

4  auditors.  It was difficulties in the audits.  And

5  without the acquisition that you mentioned in our

6  PowerPoint, Coastal Pain, the business would be

7  liquidated unless there was a radical change in business

8  plan and new auditors and some new investment.  And --

9  and everybody knew that.

10       MR. WOOD:  I have nothing further at the

11    moment.  Obviously, we've discussed that there's

12    documents I don't have that I would like to go

13    through probably to authenticate, if necessary.  And

14    so we could restart the deposition at a future date

15    after that's done.  But at the moment, unless you

16    have anything to ask James, I'm finished.

17       MR. HENDERSON:  I'm not going to be asking any

18    questions.

19       MR. WOOD:  Okay.  We will order.

20       THE REPORTER:  Okay.

21       MR. HENDERSON:  And we'll read.

22       THE REPORTER:  Would you like me to send the

23    read through you, Mr. Henderson?

24       MR. HENDERSON:  Yes, please.  My office.

25       THE REPORTER:  Okay.  Do you want to order a



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      copy as well?

2            MR. HENDERSON:  Yes.

3            THE WITNESS:  Hey, Jim?  Yes.  I sent you a --

4      a note.  I don't know if you had my number.

5            THE REPORTER:  I'm taking this off record. Hold

6      on one second.

7            (DEPOSITION CONCLUDED AT 1:39 P.M.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900            www.MILESTONEREPORTING.com            Toll Free 855-MYDEPOS

```
 1                    CERTIFICATE OF OATH

 2

 3   STATE OF FLORIDA

 4   COUNTY OF ORANGE

 5

 6       I, the undersigned, certify that the witness in the

 7   foregoing transcript personally appeared before me and

 8   was duly sworn.

 9

10   Identification:  Produced Identification

11

12

13

14

15              _____

16              Jessica Ethridge

17              Court Reporter, Notary Public

18              State of Florida

19              Commission Expires: 09/21/2026

20              Commission Number:  #HH 314140

21

22

23

24

25
```



**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

```
 1                C E R T I F I C A T E

 2

 3  STATE OF FLORIDA)

 4  COUNTY OF ORANGE)

 5

 6       I, Jessica Ethridge, Court Reporter and Notary

 7  Public for the State of Florida at Large, do hereby

 8  certify that I was authorized to and did report the

 9  foregoing proceeding, and that said transcript is a true

10  record of the said proceeding.

11

12       I FURTHER CERTIFY that I am not of counsel for,

13  related to, or employed by any of the parties or

14  attorneys involved herein, nor am I financially

15  interested in said action.

16

17  Submitted on: June 26, 2023.

18

19

20

21

22       _____

23       Jessica Ethridge

24            Court Reporter, Notary Public

25
```



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1                          ERRATA

 2

 3  PAGE      LINE                   CHANGE      REASON

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16  I have read the entire transcript of my deposition taken

17  in the captioned matter or the same has been read to

18  me.I request that the following changes be entered upon

19  the record for the reasons indicated. I have signed my

20  name to the Errata Sheet and authorize you to attach the

21  changes to the original transcript.

22

23

24  _____    _____

25  Date                       NAME
```

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

**407.423.9900**
**Fax 407.841.2779**
**Toll Free 855-MYDEPOS**

June 26, 2023

**James Henderson**
Frese Whitehead & Anderson, P.A.,
2200 Front Street
Suite 301
Melbourne, FL 32901

RE:     Deposition of **LANCE FRIEDMAN** taken on **6/13/2023**
        J. Decarlo; M. Pineiro; K. Goude; et al v. Emerge Healthcare Group, LLC; et al

Dear Mr. **Henderson,**

### IMPORTANT NOTICE FOR DEPOSITION TRANSCRIPT READ AND SIGN
It is suggested that the review of this transcript be completed within 30 days of your receipt of this letter,
as considered reasonable under Federal Rules*.

 _x_     **Attorney - Copy of Transcript Enclosed:**  Signature of the Deponent is required.  Please have the deponent make any corrections/changes necessary on the Errata Sheet ONLY, sign name on the form where indicated.  Please return ONLY the original signed Errata Sheet to our offices within 30 days from the date of this memorandum.  If you have any questions, please call our offices.

___     **Attorney - No Copy Ordered:**  Since you did not request a copy of the transcript, it will be necessary for the Deponent to call our offices to arrange for an appointment to read and sign the transcript of the Deposition within 30 days of this memorandum.

___     **Deponent:**   At the time of your deposition, you did not waive your right to read and sign the transcript of your testimony, therefore, attached please find a copy of the transcript and Errata Sheet.  Please read the transcript, make any corrections necessary on the Errata Sheet ONLY, sign the bottom of the Errata Sheet, and return it within 30 days from the date of this memorandum.  Please call our offices if you have any questions.

___     **Deponent:**   At the time of your deposition, you did not waive your right to read and sign the transcript of your testimony, therefore, it is necessary for you to come to our offices to read and sign same.  Please call Milestone Reporting Company to arrange for an appointment at your earliest convenience.

___     The attached executed copies of the Errata Sheet(s) are sent to you for your files.  If you have any questions, please call our offices.

Thank you for your attention to this matter.

No. 272342


Waiver:
I, **LANCE FRIEDMAN,** hereby waive the reading and signing of my deposition transcript.

_____                    _____

Deponent Signature                                                   Date

*Federal Civil Procedure Rule 30 (e) / Florida Civil Procedure Role 1.310 (e)