407.423.9900
Fax 407.841.2779
Toll Free 855-MYDEPOS

MILESTONE I REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

**ORIGINAL**

```
 1   UNITED STATES DISTRICT COURT
     MIDDLE DISTRICT OF FLORIDA
 2   ORLANDO DIVISION
     Cause No. 22-CV-1596-RMN
 3
     JEAN DECARLO 22-CV-1596-RMN
 4   MYRNA PINEIRO 22-CV-1574-RMN
     KIMBERLY GOUDE 22-CV-1511-RMN
 5   KEITH NYBERG 22-CV-1567-RMN
     YOLANDA BERTSCHY 22-CV-1658-RMN
 6   MICHELLE CIOFFI 22-CV-2317-RMN
     THERESA DAVIDSON 22-CV-2361-RMN
 7   BETTY BORGOS 23-CV-00475-RMN
     PENELOPE ROBERGE 23-CV-00458-RMN
 8   PLAINTIFFS,

 9   V.

10   EMERGE HEALTHCARE GROUP, LLC,
     FCID MEDICAL, INC.,
11   FIRST CHOICE MEDICAL GROUP OF BREVARD, LLC,
     FIRST CHOICE HEALTHCARE SOLUTIONS, INC. AND
12   LANCE FRIEDMAN, INDIVIDUALLY.
     DEFENDANTS.
13   _____/
     VIDEOCONFERENCE DEPOSITION OF GILLEAN LEE
14   DATE:     JULY 17, 2023
     REPORTER:  KAITLYN HARRIS
15   PLACE:    ALL PARTIES APPEARED VIA VIDEOCONFERENCE

16

17

18

19

20

21

22

23

24

25
```

400 North Ashley Drive, Suite 2600      100 East Pine Street, Suite 308      4651 Salisbury Road, 4th Floor
TAMPA, FL 33602                         ORLANDO, FL 32801                    JACKSONVILLE, FL 32256
                                        CORPORATE

```
 1                        APPEARANCES

 2

 3  ON BEHALF OF THE PLAINTIFFS, JEAN DECARLO, ET AL.:

 4  Joseph C. Wood, Esquire

 5  Arcadier, Biggie & Wood, PLLC

 6  2815 West New Haven, Suite 304

 7  Melbourne, Florida 32904

 8  Telephone No.: (321) 953-5998

 9  E-mail: wood@abwlegal.com

10   (Appeared via videoconference)

11

12  ON BEHALF OF THE DEFENDANT,

13  EMERGE HEALTHCARE GROUP, ET AL.:

14  James Henderson, Esquire

15  Frese Whitehead

16  2200 Front Street

17  Suite 301

18  Melbourne, Florida 32901

19  Telephone No.: (321)-984-3300

20  E-mail: jhenderson@fresewhitehead.com

21   (Appeared via videoconference)

22

23  Also Present:

24  Henrietta Wegener, Law Intern

25
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

```
 1                        INDEX

 2                                          Page

 3  PROCEEDINGS                              5

 4  DIRECT EXAMINATION BY MR. WOOD           6

 5

 6                      EXHIBITS

 7  Exhibit                                  Page

 8   1 - 9.16.22 Payroll                     27

 9   2 - 9.27.22 Storm Bonus                 27

10   3 - FL BCBS Contract                    48

11   4 - Employee Insurance Refunds          57

12   5 - Re: Group B8027 Reinstatement       57

13   6 - Florida Blue Reinstatement Update   58

14   7 - Re: Group B8027 FCMG - Reinstatement

15       Option                              60

16   8 - United Healthcare Level Funder

17       Employer Packet                     62

18   9 - Re: UHC Has Been Cancelled Back

19       to 4/30/22                          64

20  10 - 11.22.22 Update                     73

21  11 - 1.6.23 E-mail Checking on Back Pay  75

22  12 - 1.6.23 E-mail With 1099 Docs        77

23  13 - 1099 Termination and Offer          78

24

25
```



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1                        STIPULATION

 2

 3   The videoconference deposition of Gillean Lee taken

 4   remotely on Monday the 17th day of July 2023 at

 5   approximately 9:59 a.m.; said deposition was taken

 6   pursuant to the Florida Rules of Civil Procedure.

 7

 8   It is agreed that Kaitlyn Harris, being a Notary Public

 9   and Court Reporter for the State of Florida, may swear

10   the witness and that the reading and signing of the

11   completed transcript by the witness is not waived.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
1                  PROCEEDINGS
2         THE REPORTER:  All right.  Will all parties
3    except for the witness, please state your
4    appearance, how you are attending and your location?
5         MR. WOOD:  Joseph Wood on behalf of the
6    plaintiffs in, I think there's nine or ten cases
7    that are probably noticed for today.
8         MR. HENDERSON:  James Henderson here on behalf
9    of the defendants.  I'm located in Melbourne,
10   Florida. I'm at my office.
11        THE REPORTER:  Okay.  Ms. Lee, can you state
12   your full name for the record and then show your ID
13   as well?
14        THE WITNESS:  Hold on, let me -- I just put it
15   away.  Let me get it out.
16        THE REPORTER:  It's okay.
17        THE WITNESS:  All right.  I'm Gillean Katie
18   Lee.
19        THE REPORTER:  Okay.
20        THE WITNESS:  Being depositioned today.
21        THE REPORTER:  Okay.  Can you just show it all
22   the way up to the -- just so we can zoom in so we
23   can see it?  All the way to the camera.  Yes.
24   Perfect. Thank you.  All right, do all parties agree
25   that the witness is, in fact, Gillean Lee?
```

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

 1          MR. WOOD:  Appears that way.

 2          MR. HENDERSON:  Yes.

 3          THE REPORTER:  Okay.  All right.  All right.

 4     Ms. Lee, will you please raise your right hand?  Do

 5     you solemnly swear or affirm that the testimony that

 6     you are about to give will be the truth, the whole

 7     truth, and nothing but the truth?

 8          THE WITNESS:  Yes, I do.

 9          THE REPORTER:  Okay.  We are good to begin.

10     Thank you.

11          MR. WOOD:  All right, thank you.

12               DIRECT EXAMINATION

13          BY MR. WOOD:

14     Q.   Good morning, Ms. Lee.  My name is Joseph

15  Wood. I am an attorney representing a number of former

16  employees of the Emerge Healthcare Group, and they have

17  sued for a few different things pertaining to wages,

18  health insurance issues.  And we are going through the

19  discovery process, and exchanging documents and taking

20  depositions, which is why you're here today.  Have you

21  had your deposition taken in the past?

22     A.   One other time.

23     Q.   Okay.  So I'm going to ask you some questions,

24  find out what you know about the facts that give rise to

25  the lawsuit, issues pertaining to the lawsuit.  If you

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1  don't hear a question from me, let me know and I'll try
 2  to repeat it.  If you don't understand the question that
 3  I've asked, let me know and I'll try to rephrase it so
 4  that we can be on the same page.  If you need a break to
 5  use the restroom, whatever, let me know.  I don't know
 6  how long we'll go today, but I try to take a break about
 7  every hour.  I just ask that if there's a question
 8  pending, you answer it.  And typically we try to get
 9  through documents before we go on break, if possible. If
10  -- please try to let me finish my question before you
11  answer, and I will try to do the best to let you finish
12  your answer before I begin.  We need a clean record. The
13  court reporter's taking down everything that's being
14  said.  It's very difficult for her to take down two
15  lines of speech at the same time.  On those same lines,
16  we also need verbal answers, yes or no, or appropriate.
17  Head shakes won't work, uh-huhs, uh-uhs really don't
18  show up well on a transcript.  So if, and it happens,
19  you might use an answer that's maybe not yes or no, I'll
20  maybe prompt you to try to get a verbal, clear answer
21  out of you.
22       A.   Understood.  Understood.
23       Q.   Do you understand the instructions I've given
24  you so far?
25       A.   Yes, I do.
```

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900   www.MILESTONEREPORTING.com   Toll Free 855-MYDEPOS

 1    Q.   Okay.  Now, in the lawsuit we have filed,

 2  there's a number of different companies or entities that

 3  we've filed.  First Choice Healthcare Solutions, FCID,

 4  FC Medical, Emerge Healthcare Group of Brevard, I

 5  believe, and we're going to be talking about really all

 6  of them.  And during the course of today's deposition,

 7  I'm really probably going to be referring to it as

 8  Emerge.  So do you do you understand who the Emerge

 9  families are?

10    A.   Yes, I do.

11    Q.   Okay.  And you worked for Emerge as --

12  correct?

13    A.   Yes, sir.

14    Q.   Do you still work there?

15    A.   I work for them as a contract employee, a

16  1099.

17    Q.   Okay.  And sitting here today, how much time

18  do you put in by week for the companies?

19    A.   20 to 30 hours.

20    Q.   Okay.  So you consider yourself part-time now?

21    A.   Yes, sir.

22    Q.   Okay.  And the time frame we're really looking

23  at is '21, '22, '23 primarily.  And you worked for

24  Emerge during that time frame, right?

25    A.   Yes, sir.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1      Q.   And what was your role with Emerge?

 2      A.   My role was executive assistant to the CEO and

 3  CFO, and director of HR.  I also had business

 4  development filter up under me, so they reported to me

 5  as well.

 6      Q.   Okay.  So you were the assistant to Lance

 7  Friedman and Phil Keller; is that right?

 8      A.   Yes.

 9      Q.   And then you were the head of HR?

10      A.   Yes, sir.

11      Q.   And as the executive assistant to Mr. Friedman

12  and Keller, what were your job duties?

13      A.   I would do research.  I would draft notices.

14  He -- if either one of them had notices that needed to

15  go out to the employees, we would discuss with bullet

16  points.  I would draft an initial draft, and send it to

17  them to finalize, and then I would send those.  And

18  again, I would do research for him regarding anything he

19  needed research taken on.

20      Q.   And today, do you still hold a role doing the

21  executive assistant duties?

22      A.   Yes, sir.  Yes, sir.

23      Q.   And as the HR director, what were your duties

24  in furtherance of that?

25      A.   I worked with leadership if they were -- if
```



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1 they needed assistance in managing their team.  I worked

 2 with the leadership team in working on progressing the

 3 company.  Standard HR roles.  I worked with the

 4 leadership team on choosing health benefits, and if we

 5 needed -- if we needed to be hiring or firing staff. Any

 6 of those pieces.

 7      Q.   Okay.  And do you still fulfill those duties

 8 today?

 9      A.   Yes.

10      Q.   And as the director of HR, would you fulfill

11 that role for each of the subsidiary companies?

12      A.   Yes.

13      Q.   Okay.  There was -- the companies didn't have

14 their own HR; you were HR over all of them.  Is that

15 fair to say?

16      A.   Correct.

17      Q.   Okay.  Do you yourself, or did you, have the

18 authority to hire or fire employees?

19      A.   When it came to bringing on hourly employees,

20 that decision was made not by just me.  I would work

21 with the leadership that they'd be reporting to.  So it

22 was a multi-person decision.  Same thing with

23 terminations.

24      Q.   And as part of the hiring and firing process,

25 would you consult with Mr. Friedman on those
```



**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  determinations or decisions?

2      A.   Yes.

3      Q.   Okay.  And who would have the ultimate say in

4  hiring an employee?

5      A.   All salaried employees, the ultimate say came

6  from -- the ultimate final decision came from Lance or

7  from Phil, as the executive leadership.  For hourlies,

8  the final decision was the leader over the area.

9      Q.   Okay.  During the course of discovery,

10 something called TriNet has popped up.  Are you familiar

11 with that?

12     A.   Yes.

13     Q.   What is TriNet?

14     A.   It's a -- it's a PPO.  It's a -- it's a plan

15 -- it's a group you hire, and they manage your payroll

16 and your benefits.  And they have usually some type of

17 employee assistance programs, things like that.

18     Q.   Okay.  What's a PPO?

19     A.   Oh, now I've just forgotten.  It's a personnel

20 -- it's basically -- it -- it's a personnel management

21 group.

22     Q.   Okay.

23     A.   And I -- one of the words is personnel, the

24 other one is organization, and I can't remember the

25 third one.  I'm sorry.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

```
 1        Q.    Okay.  Now, TriNet did not employ the
 2   companies that worked for Emerge, right?
 3        A.    What -- I don't understand how you said that?
 4        Q.    Tri -- the employees that worked for Emerge,
 5   they were not employed by TriNet, right?
 6        A.    In the case of TriNet, yes.  That is how their
 7   process works, is they end up taking over your
 8   employees.  But they -- I still made, as HR, we still
 9   made ultimate decisions on -- on the employees.  But the
10   way TriNet works, you become an employee of TriNet.
11        Q.    And their W2s, where would that come from?
12        A.    The W2s were still -- were done -- were
13   processed out of TriNet.
14        Q.    And the employer listed on the W2 would be
15   who?
16        A.    I'm sorry.  The employer?
17        Q.    The employer on the W2.
18        A.    It would depend on what company they worked
19   for.
20        Q.    It would not say TriNet on the W2.
21        A.    No.
22        Q.    Okay.
23        A.    No.
24        Q.    So TriNet would process the W2s and make sure
25   that they're in compliance with the deadlines and the
```

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1    law; is that right?

 2         A.   Yes.  Yes.

 3         Q.   The wages that these employees would earn,

 4    they were not funded by TriNet; is that right?

 5         A.   Correct.

 6         Q.   The wages would be paid from Emerge?

 7         A.   Correct.

 8         Q.   And the benefits that these employees would

 9    have would be benefits that Emerge provided, not TriNet;

10    is that right?

11         A.   When you say provided, I don't know what you

12    mean.

13         Q.   Okay.  So I guess, and we're going to go over

14    the two health insurance plans later, but the benefits

15    were not paid for by TriNet.  They were paid for by

16    Emerge, right?

17         A.   Correct.

18         Q.   And the, for instance healthcare, those were

19    healthcare plans -- those were Emerge healthcare plans,

20    not TriNet healthcare plans, right?

21         A.   They were Tri -- they -- they were healthcare

22    plans brought forward by TriNet for the company to

23    participate in.  Does that make sense?

24         Q.   Are you saying that TriNet proposed these

25    plans to Emerge?
```



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1        A.    Correct.

 2        Q.    Okay.  And then ultimately Emerge took out the

 3   group plan, signed the documents in furtherance of that,

 4   right?

 5        A.    Correct.

 6        Q.    Okay.  Now, some of the plaintiffs received

 7   paychecks from FCID until around April of '22.  And

 8   after April of '22, I think it was April 3rd, they

 9   started receiving paychecks from FC Medical Group.  Do

10   you -- are you familiar with that?

11        A.    Yes.

12        Q.    And why was there a change of where the

13   paychecks came from for these employees?

14        A.    The way the company is structured, the

15   employees who were in administrative roles worked for

16   FCID as a company.  Those who were under medical roles,

17   worked for FCMG, First Choice Medical Group, as a

18   company, and/or Emerge as well.  And both of those fall

19   under -- Emerge is the cap on those.  When we switched

20   over to TriNet, the decision was made by Lance and Phil

21   that everyone would fall under FCMG.

22        Q.    Okay.  Were the employees informed of this

23   change when it happened, that they were -- their

24   employer was now going to be FCMG as opposed to FCID?

25        A.    No, because it would've had no bearing on
```



**MILESTONE** | **REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

```
 1  them.
 2       Q.   Okay.
 3       A.   There was no -- they -- they were still
 4  working for the same company.
 5       Q.   There was -- there was no difference between
 6  working for FCID or FC Medical Group, so the -- it was a
 7  seamless transition?
 8       A.   Correct.
 9       Q.   Their job duties did not change, correct?
10       A.   Correct.
11       Q.   And their pay did not change either?
12       A.   Correct.
13       Q.   Now, the transition to TriNet, did that align
14  with the transition to UnitedHealthcare also?
15       A.   Yes, it did.
16       Q.   And I'm sure you're aware that some employees
17  have not been paid all of their wages from Emerge,
18  right?
19       A.   Yes.
20       Q.   Based on what I've seen, Emerge seems to have
21  stopped paying payroll to everyone for the time period
22  June 13-22 through approximately -- well, the end of
23  their tenures.  Is that -- is that fair to say?
24       A.   Yes.
25       Q.   Okay.  In your role as HR director, have you
```



**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1   calculated how much each employee is owed in back wages?

2        A.   That was not my specific role.  I have seen

3   documentation of it.  That was something that would be

4   -- that would've been managed by our payroll

5   administrator and CFO.

6        Q.   Who was the payroll administrator?

7        A.   Ruby Rodriguez.  Or no, I'm sorry.  Ruby

8   Rosado.

9        Q.   Yeah.  I think it was both at one time.

10  Rodriguez and -- yeah.  So Ruby put together a

11  calculation that you reviewed.  Is that what you're

12  saying?

13       A.   At the -- at the direction of Phil, and

14  possibly our controller, we -- there was calculations

15  put together so that it was tracked what was going on

16  with people's payroll, if that was your question.

17       Q.   And that -- the controller, that's Julie

18  Hardesty, right?

19       A.   Correct.

20       Q.   Okay.  Do you know if some employees have been

21  paid since that June time frame?

22       A.   I am aware that there were some employees paid

23  since that June time frame, yes.

24       Q.   Okay.  Do you know if Lance has been paid

25  since then?

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

```
 1        A.   Not to my knowledge.

 2        Q.   Do you know if Phil has?

 3        A.   Not to my knowledge.

 4        Q.   And sitting here today, does -- are you owed

 5   anything from Emerge?

 6        A.   I am currently still owed -- owed money from

 7   Emerge.  Yes.

 8        Q.   And I guess I need to clarify.  From your time

 9   as an employee as opposed to a contractor, are you owed

10   money?

11        A.   There are -- there are still funds due to me,

12   yes.

13        Q.   Okay.  Do you know the reason why employees

14   were not paid their wages?

15        A.   The company did not have enough funds to be

16   able to produce the compensation.

17        Q.   And despite this, the employees continued to

18   work, correct?

19        A.   Correct.

20        Q.   Whose decision was it to allow the continue --

21   the employees to continue to work without being paid

22   their wages?

23        A.   Ultimately, the decision came down from the

24   leadership of the company, so Lance and Phil.

25        Q.   Okay.  Do you recall having any specific
```



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1    conversations about that issue?
 2         A.   It was a concern, and there was an ongoing --
 3    it was ongoing that we were trying to raise capital. And
 4    there was concern because the medical practice was not
 5    bringing in enough funding to cover payroll.
 6         Q.   Do you know if one of the issues was the
 7    compensation of the doctors?  The -- their compensation
 8    was high, whereas their revenues, their intake was low?
 9         A.   Yes.  That is a true statement.
10         Q.   Okay.  Now, the company went through a DOL,
11    Department of Labor investigation, correct?
12         A.   Correct.
13         Q.   Were you in involved in that investigation at
14    all?
15         A.   Yes, sir.
16         Q.   And what was your involvement in the DOL
17    investigation?
18         A.   I was the -- the contact, along with Phil.
19         Q.   And do you recall what they were looking into?
20         A.   Do you mean -- can you -- can you say that
21    again?
22         Q.   So the DOL did an investigation.  Do you
23    recall specifically what they were investigating?
24         A.   Yes.  They were investigating the period of
25    time that employees had not received pay --
```

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

```
 1        Q.    Okay.

 2        A.    From July and the first week of August.

 3        Q.    Okay.  Are you aware of the outcome of the

 4   investigation?

 5        A.    Yes.

 6        Q.    And what was the outcome?

 7        A.    We have resolved with the Department of Labor.

 8   We have funded the Department of Labor the amount of

 9   funds that they said were due based on hourly wages. And

10   to the best of my knowledge, they have distributed those

11   funds, or in -- or are in the process of distributing

12   those funds to those employees.

13        Q.    Do you know if there was a written

14   determination from the DOL, or a written agreement

15   between Emerge and the DOL?  Let me -- let me go back.

16   You said that the DOL made a determination as to what

17   was owed; is that right?

18        A.    Yes.

19        Q.    Do you know if that determination was a -- was

20   relayed to Emerge in a written communication?

21        A.    Yes.

22        Q.    And you -- have you reviewed that before?

23        A.    I have seen it, yes.

24        Q.    Okay.  Where would that communication be

25   maintained at Emerge?
```



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1     A.   It's -- it's held in our -- our files as a --

2  under Department of Labor Investigations.  I have a copy

3  of it.  Phil has a copy of the whole file.

4     Q.   Okay.  And within that file, would there be

5  communications back and forth between you, or Emerge,

6  and the DOL as part of this investigation?

7     A.   Anything that they had questioned us about, or

8  anything that I needed to respond to, yes.

9     Q.   Okay.  Now, I spoke to an investigator with

10 the DOL, I think a few months ago now.  And they

11 indicated that there was issues with obtaining

12 information or documents from Emerge.  Specifically, I

13 believe, information pertaining to the lawsuits that

14 have been filed against Emerge.  Are you aware of the

15 DOL requesting that information from Emerge?

16        MR. HENDERSON:  Objection.  Form.

17     A.    I provided all of the lawsuit information to

18 the Department of Labor.  They have received everything

19 that they needed to, to make their notation and manage

20 that in their -- however they manage it.

21        BY MR. WOOD:

22     Q.   I think that the issue might have been that

23 there was a list or a spreadsheet, but not the actual

24 complaints.  Do you recall sending the complaints to

25 DOL, or just a list of the names?  I think we might be

---

**MILESTONE** | **REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          Toll Free 855-MYDEPOS

Case 6:23-cv-00881-RMN   Document 50-17   Filed 06/10/24   Page 21 of 90 PageID 1492
Case 6:23-cv-00881-RMN   Document 50-17   Filed 06/10/24   Page 21 of 90 PageID 1492
262.15 Gus Gilbeau  07-19-2023  Page 21

```
 1   frozen.

 2           MR. HENDERSON:  Yeah.

 3       A.   I sent them (audio cuts out).

 4           MR. HENDERSON:  Oh.

 5           MR. WOOD:  Oh, you're back.  Okay.

 6           MR. HENDERSON:  You were frozen there for a

 7       second.

 8           BY MR. WOOD:

 9       Q.   So we didn't get an answer at all.  So my

10   question was, do you recall sending the complaints or

11   just a list to the DOL?

12       A.   I sent a copy of the complaints.

13       Q.   Okay.  Now, as part of these lawsuits, we've

14   also exchanged a lot of documents, a lot of e-mails. And

15   we're going to go over some e-mails later on today. A

16   lot of the e-mails from your e-mail address appear to be

17   messages from Lance.  And I guess I'm assuming as part

18   of your role as the executive assistant, would you relay

19   the messages from Lance to the employees?

20       A.   Yes.  So that was done actually as the

21   director of HR for him.

22       Q.   Okay.

23       A.   But I also relayed messages as the executive

24   assistant.  But in that case, any of those messages were

25   coming from -- from -- sent from HR, based on his
```

**MILESTONE** | **REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1   direction.
 2        Q.   Can you recall any incidents where you
 3   would've sent something from your e-mail account that
 4   was not approved, or reviewed, or signed off on by Lance
 5   before it was sent out by you?
 6        A.   No, I would not have done that.
 7        Q.   Okay. And we might look at it today, I'm not
 8   sure. I've even seen an e-mail where an e-mail came from
 9   your e-mail address but had Lance's signature at the
10   bottom of the e-mail, like a signature block. Would that
11   have been you just copying and pasting an e-mail from
12   Lance, and pasting it into a new e-mail to send out?
13        A.   Upon his direction, yes.
14        Q.   Yes.
15        A.   Or directive.  Yes.
16        Q.   While we're on the topic of signatures, do you
17   have a -- an electronic copy of Mr. Friedman's signature
18   for you to use?
19        A.   Yes, I do.
20        Q.   And would you ever use that without his
21   approval?
22        A.   No, sir.
23        Q.   Okay.  So if a contract were signed with Mr.
24   Friedman's name on it, that would've been reviewed and
25   approved by him, even if it's not his wet signature.  Is
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1  that fair to say?
 2          MR. HENDERSON:  Objection.  Form.
 3      A.   Yes.
 4          BY MR. WOOD:
 5      Q.   What was the reason why Lance wouldn't send
 6  some of these out on his own?
 7          MR. HENDERSON:  Objection.  Form.
 8          BY MR. WOOD:
 9      Q.   Are you -- let me -- let me clean that up.
10  Are you aware of the reason why Mr. Friedman wouldn't
11  send these e-mails on his own behalf?
12      A.   I -- that was just part of my role in this --
13  in this particular case.
14      Q.   Okay.
15      A.   Is -- is sending those messages out.  He's
16  also -- he was extremely busy.
17      Q.   Okay.  One thing we didn't cover in the very
18  beginning is objections.  And throughout today, you'll
19  hear objections from Mr. Henderson.  Oftentimes just
20  like a form objection, is what we call it.  And those
21  are just for preservation of the objection on the
22  record.  However, if an objection is made, you're still
23  required to answer.  The only time that wouldn't be
24  appropriate would be if Mr. Henderson directs you to not
25  respond to the question, which I don't foresee happening
```

**MILESTONE | REPORTING COMPANY**
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

 1  today.  But I just want to make sure that you're aware

 2  of, you're going to hear objections.  It's fine.  If you

 3  need to me to repeat the question after an objection is

 4  made, just let me know, but you're still required to

 5  answer them.  So I appreciate you answering so far.  And

 6  let's move on to, I think, our first document.  So I'm

 7  going to share my screen with you and go over some e-

 8  mails.  I think I have some PDFs also.  So let me open

 9  up the first one first.  And we're only a half hour in,

10  but if you need a break, let me know.

11      A.   Okay.  Thank you.

12      Q.   Okay.  So I am sharing an e-mail.  It's a one-

13  page PDF.  This e-mail is dated September 16, 2022, and

14  it's signed by you from your e-mail address.  Take a

15  minute to review it.  Let me know if you recognize this.

16      A.   Uh-huh, I recognize it.

17      Q.   And this is an e-mail from your e-mail

18  account, right?

19      A.   Yes.

20      Q.   Do you recall the time frame when you

21  transitioned from an employee to a contractor at Emerge?

22      A.   January of 2023.

23      Q.   Okay.

24      A.   I believe it was effective the 9th.

25      Q.   That would've taken place after the DOL

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1   investigation, right?
 2        A.   Correct.
 3        Q.   And so this e-mail here, you were still an
 4   employee of the companies?
 5        A.   Yes, sir.
 6        Q.   Let me ask you this: do you know where your
 7   paychecks came from, which company?
 8        A.   I'm sorry -- I'm sorry.  You cut out.
 9        Q.   My question was, do you remember where your
10   paychecks came from, which entity?
11        A.   Yes.
12        Q.   Which one?
13        A.   I'm an -- I was an employee of First Choice
14   Healthcare Solutions.
15        Q.   Was that the parent company?
16        A.   Yes.
17        Q.   Okay.  And you -- your job as HR was for all
18   of the subsidiaries; is that right?
19        A.   Yes, sir.  Yes.
20        Q.   And did that include -- I think it was a -- it
21   was a holding company for the building, Marina Towers, I
22   think?
23        A.   When it was in existence, yes.
24        Q.   Okay.
25        A.   But it had no employees.
```



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1        Q.   Okay.  So back to the e-mail, here you
 2   mentioned that money had come in for back pay, correct?
 3        A.   Uh-huh.
 4        Q.   And was this money used to pay everybody their
 5   back pay?
 6        A.   It was used to pay current employees.
 7        Q.   Okay.  So no former employees would've been
 8   paid with these funds?
 9        A.   Correct.
10        Q.   At the time in September of '22, do you recall
11   how many employees -- current employees you had?
12        A.   I'm sorry, you cut out on the month.
13        Q.   In September of '22, do you recall how many
14   current employees you had?
15        A.   I think it was 18 or 20.
16        Q.   Why were the funds not used to pay former
17   employees who had back wages owed to them?
18        A.   That was the decision made by the executive
19   leadership.
20        Q.   Which would've been Lance and Phil; is that
21   right?
22        A.   Correct.
23        Q.   Were you involved in the discussion to not pay
24   former employees?
25        A.   I was told that that's what the -- that's what
```

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  we were going to do.  I was told that current employees

2  were the first priority and if they could do anything

3  additional, then they would.

4      Q.   And who told you these things?

5      A.   Bill and Lance.

6      Q.   Okay.  Other than payroll, do you know if the

7  money was used to pay for anything else?

8      A.   I -- not that I could answer with knowledge.

9      Q.   Okay.

10     A.   With accurate knowledge.

11         MR. WOOD:  So we're going to mark this one as

12     Plaintiff's 1.

13             (EXHIBIT 1 MARKED FOR IDENTIFICATION)

14         MR. WOOD:  And I'll move on to another.  This

15     will be Plaintiff's 2.

16             (EXHIBIT 2 MARKED FOR IDENTIFICATION)

17         BY MR. WOOD:

18     Q.   This is -- it appears an e-mail from September

19 27 of '22 from you to a Ms. Penny Roberge.  Take a

20 second to review it and let me know if you recognize

21 this document.

22     A.   Uh-huh.  I do.

23     Q.   Okay.  And the first page is the e-mail, the

24 second page appears to be evidence of a wire transfer

25 for $500 that I believe was included on the e-mail.  Do

**MILESTONE** | **REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**         **www.MILESTONEREPORTING.com**         **Toll Free 855-MYDEPOS**

```
 1  you recall sending this e-mail to Ms. Roberge?
 2        A.    Yes.
 3        Q.    And what was the purpose of this e-mail?
 4        A.    Everyone received a $500 bonus to assist with
 5  preparing for the hurricane that was coming at that
 6  point in time.
 7        Q.    And this went to current employees, right?
 8        A.    Correct.
 9        Q.    And the funds we had just talked about in the
10  September 16th e-mail, were those funds used to pay for
11  these bonuses?
12        A.    I don't know.
13        Q.    Okay.  You state here -- you state here that,
14  "I ask that you remain judicious in discussing this as
15  we are limited in our availability for distribution of
16  this bonus."  What was the reason you relayed this to
17  Ms. Roberge?
18        A.    I was -- I was told to make sure that -- that
19  we just keep the information within the current
20  employees.
21        Q.    Okay.
22        A.    And that was how the sentence was crafted for
23  me to deliver.
24        Q.    Okay.  Did you put together that sentence or
25  did someone else help draft it?
```

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    A.   Bill and Lance reviewed it, I don't know

2  specifically who wrote it.  I might have -- I -- what I

3  would do is I would write a letter, I would send it to

4  them, they would edit it how they felt appropriate, and

5  then I would send out their edited version.

6    Q.   Okay.  So I won't say all of your e-mails, but

7  most of the e-mails when you're communicating with the

8  employees, would they be reviewed and approved by Lance?

9    A.   Yes.  Anything pertaining to something like

10 this or a message from Lance were always approved by

11 him.

12   Q.   Okay.  So the September 16 e-mail, the

13 Plaintiffs 1, was that reviewed and approved by Lance? I

14 can go back to it if you need to look at it.

15   A.   I just want to see what the topic is, but I

16 believe I -- I believe the answer is yes.

17   Q.   Sure.  And I'm showing you the first document.

18   A.   Yeah.  Yeah.  That I would've -- I would've

19 done a draft based on bullets or -- or things he asked

20 me to make sure were highlighted in it.  Done a draft,

21 sent it to him, and then he and Phil reviewed it, and

22 then sent me back any notes they had.

23   Q.   Okay.  So can you tell me Mr. Friedman's

24 involvement in or with the Emerge companies?  How

25 involved was he?



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1              MR. HENDERSON:  Objection.  Form.
 2       A.   I don't understand what you're asking.
 3              BY MR. WOOD:
 4       Q.   Okay.  On a -- on a typical day, what would be
 5  Mr. Friedman's role within the company?  What would he
 6  do?
 7              MR. HENDERSON:  Objection.  Form.
 8       A.   As a CEO, he was the ultimate decision maker
 9  of the company.  His primary responsibilities were --
10  were bringing in capital to the company, investors and
11  fundraising.  But then he would also be a final decision
12  maker.
13              BY MR. WOOD:
14       Q.   Okay.  When an employee was terminated, and
15  this might depend on what class of employee, but was he
16  involved in the decision-making to terminate the
17  employee?
18       A.   Yes.
19       Q.   When the employees were informed of the
20  decision, who would communicate that to the employees?
21       A.   You mean they're -- if they're being
22  terminated?
23       Q.   If they're being fired, who tells them?
24       A.   It would -- it could be one of a few different
25  people.  It could be me; it could be Ruby and me, it was
```

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1   -- there was never just one of us delivering the

 2   message.  If it was someone who had a direct leadership

 3   string, then that leader would inform them, and either

 4   Ruby or I would sit in the room with them and bear

 5   witness.  That was the protocol.

 6        Q.   Okay.  As part of his role in getting the

 7   investors, do you know what Lance would do?

 8        A.   I just know that he had contacts.  He worked

 9   with various people to bring investors to the table, and

10   sales and negotiation are his strength.

11        Q.   Okay.  And would he travel to meet these

12   people?

13        A.   At times, yes.

14        Q.   Do you know if he would travel outside the

15   state of Florida to meet these people?

16        A.   My understanding is yes.

17        Q.   And as part of his role in communicating with

18   these investors or potential investors, is it safe to

19   say he spoke with them on the phone?

20        A.   Yes.

21        Q.   And do you know if he would speak to these

22   people that were located outside the state of Florida?

23        A.   I -- I would have to say yes.

24        Q.   Okay.  Can you think of a specific person

25   that's -- was outside the state of Florida that you're
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1  -- that you're thinking of?  An investor, or person, or
 2  company?
 3       A.   I believe the majority of our investors were
 4  outside of the state of Florida.
 5       Q.   Okay.  And do you know where the funds in that
 6  September 16th e-mail, that you referenced in the e-
 7  mail, do you know where they came from?
 8       A.   I can't remember off the top of my head, no.
 9       Q.   Okay.  There were issues with the company.
10  And do you recall where offices were moved from one
11  location to another?
12       A.   Yes.
13       Q.   And who was responsible for those operational
14  decisions of moving a unit or employees from one
15  location to another location?
16       A.   Ultimately, Lance.  The decision was discussed
17  with the leadership team, but Lance made the ultimate
18  decision.
19       Q.   Okay.  And the space that these employees
20  worked at, was it leased from another entity, a non-
21  Emerge entity?
22       A.   Just so you know, you just froze.  So I think
23  I missed part of that question.
24       Q.   Okay.  So I hope that I'm clear now.  How many
25  offices did Emerge have, how many different locations,
```

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1  do you know?
 2       A.    At what point in time?
 3       Q.    2021.
 4       A.    Hold on a second, I'm counting in my head.  I
 5  believe six.
 6       Q.    Okay.  Were any of those on, I think it's
 7  Bulldog Ave -- Avenue, the Bulldog location?
 8       A.    Not in 2021.
 9       Q.    Okay.  So in 2022 operations did move to that
10  location; is that right?
11       A.    Yes.
12       Q.    And the office space, was that leased from
13  another entity?  Do you know?
14       A.    Yes.
15       Q.    Who was the landlord?
16       A.    Of which building?  Of which office?
17       Q.    The I'm still talking about the Bulldog, I'm
18  not sure if there's multiple buildings in there.
19       A.    Okay.  So 95 Bulldog, which is where currently
20  the corporate -- where at that point in time I should
21  say, the corporate office sat.  It was Sheridan
22  Professional Center.
23       Q.    Okay.  And who was responsible for obtaining
24  that lease?
25       A.    Lance.
```



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   Okay.  Previously there was space rented from

2  Marina Towers, which was an Emerge company, right?

3    A.   I -- I don't know.  Can you rephrase your

4  question because I'm not sure what you're asking me, I'm

5  sorry.

6    Q.   Maybe.  The building on US 1 on the water,

7  that's where Marina Towers was located, right?

8    A.   Yes.  That building was Marina Towers.

9    Q.   Okay.  And there were offices within that

10 building, right?

11   A.   Correct.

12   Q.   Did any Emerge entities have ownership in that

13 building?

14   A.   Emerge?  No.  I mean, well, ownership?  No, we

15 -- we rented.

16   Q.   Okay.  So was -- did Marina Towers -- did they

17 lease the space and then they sublet to the Emerge or

18 First Choice entities?

19   A.   I know the First Choice entities rented space

20 in the building.  I can't recall the structure of that,

21 but I can -- I -- I recall that FCMG and FCHS rented

22 space in that building.

23   Q.   Okay.  And do you know who made the decision

24 to leave that building?

25   A.   That would've been Lance.  Ultimately, yes.



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1        Q.   Okay.  And the decision to transition

 2   employees from FCID to FCMG Medical Group, would that

 3   have also been ultimately Lance's decision?

 4        A.   Yes.

 5        Q.   Did he have -- did Lance also have control

 6   over the financials of the companies?

 7             MR. HENDERSON:  Objection.  Form.

 8        A.   And what do you mean by control?

 9             BY MR. WOOD:

10        Q.   Well, did he have the authority to sign

11   checks?

12        A.   Yes.

13        Q.   And did he have the authority to bind the

14   company in financial decisions?

15             MR. HENDERSON:  Objection.  Form.

16        A.   Yes.

17             BY MR. WOOD:

18        Q.   Do you know if he took out any loans on behalf

19   of any of the companies?

20        A.   To the best of my knowledge, he did.

21        Q.   Okay.  Were you ever involved in any of the

22   agreements between any of the Emerge companies and any

23   of these investors?

24        A.   I would assist Lance in drafting them, and e-

25   mailing them, or DocuSigning them to the investors.
```

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1        Q.   Okay.
 2        A.   I was not part of the decision-making on it, I
 3   only acted as admin.
 4        Q.   Okay.  And those agreements between the
 5   investors and Emerge, they would be between the Emerge
 6   one of the entities and this investor directly, correct?
 7        A.   The -- the investors were not -- it was not
 8   Emerge.  It was First Choice Healthcare Solutions.
 9        Q.   Okay.
10        A.   So I don't want to misspeak on that.
11        Q.   So -- and it is a bit difficult because the
12   company obviously transitioned from First Choice
13   Healthcare Solutions Medical Group, whatever.  And at
14   some point decided to rebrand as Emerge, Emerge
15   Healthcare Group sometime after the bankruptcy
16   proceeding, right?
17        A.   Correct.  It's -- it's only FCMG that's doing
18   business as Emerge.  The other companies are not Emerge.
19        Q.   Now FCID, they transitioned all of their
20   employees to FCMG in April, right?
21        A.   Correct.
22        Q.   Do you know if FCID is doing anything right
23   now?
24        A.   It has no employees, but I know it's an
25   existing company.  It still exists.
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1        Q.   Do you know what it does right now?

 2        A.   I don't know.

 3        Q.   Okay.  And I just want to go through the

 4   entity.  So Emerge Healthcare Group, LLC, are you

 5   familiar with that entity?

 6        A.   The -- yes.

 7        Q.   And it seems as though that it's been treated

 8   as a DBA, is that fair to say?

 9        A.   Correct.  That is correct.

10        Q.   Okay.  So First Choice Medical Group of

11   Brevard, LLC does business as Emerge Healthcare Group,

12   LLC, right?

13        A.   Correct.

14        Q.   First Choice Healthcare Solutions Incorporated

15   is the parent corporation, correct?

16        A.   Correct.

17        Q.   And at least previously they've been publicly

18   traded, a publicly traded stock, right?

19        A.   Yes.

20        Q.   Okay.

21        A.   Correct.

22        Q.   Other than being a DBA, do you know if Emerge

23   Healthcare Group, LLC does anything?

24        A.   No.

25        Q.   Okay.  So sitting here today, the operations
```

**MILESTONE** | **REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    of the -- of Emerge are done under First Choice Medical

2    Group of Brevard, LLC, right?

3        A.   Yes.  To the best of my knowledge, yes.

4        Q.   And that is a subsidiary of First Choice

5    Healthcare Solutions Incorporated?

6        A.   Correct.

7        Q.   Okay.  Are there any other entities that are

8    operating under First Choice Healthcare Solutions

9    Incorporated to the parent?

10       A.   No.

11       Q.   And of all of these entities that we've talked

12   about, Mr. Friedman is the CEO or managing member; is

13   that right?

14       A.   Both of them, yes.

15       Q.   And he's the ultimate decision maker for any

16   of the entities?

17           MR. HENDERSON:  Objection to form.

18       A.   Correct.

19           BY MR. WOOD:

20       Q.   Okay.  So let's transition to the employees

21   that worked there.  I -- there was admin, you said, and

22   then medical, and those are treated separately is --

23       A.   Correct.

24       Q.   Now, when they merged, when all of the admin

25   merged into FCMG, other than the transition from one

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1 entity writing the paychecks to another, was there any

2 other change?

3    A.   No.

4    Q.   Okay.  The employees that worked, and I'm

5 going to -- I -- I'm going to call it Emerge, that's

6 what I've been calling.  It -- I guess it truly is,

7 we're talking about '21 and '22 and sometimes in '23,

8 there was somewhat of a transition from First Choice to

9 Emerge. But I hope when I say Emerge, you understand I'm

10 meaning this company, this business operation, okay?

11    A.   Sure.

12    Q.   The employees that worked there, they used

13 computers; is that fair to say?

14    A.   Yes.

15    Q.   And e-mails, they sent e-mails?

16    A.   Yes.

17    Q.   Would each employee have their own e-mail

18 address?

19    A.   Yes, they did.

20    Q.   And those e-mails would be sent both within

21 the company and outside of the companies?

22    A.   They had the ability to.

23    Q.   Okay.  The company ran a medical practice, and

24 as part of running a medical practice, you are receiving

25 funds for your services, right?

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

```
 1        A.    Yes.

 2        Q.    Ideally.

 3        A.    Ideally, yes.

 4        Q.    Typically, healthcare is either paid by the

 5   patient directly through their insurer, maybe through a

 6   government entity.  The employ -- the patients that you

 7   would see, do you know if they were ever from out of

 8   state?

 9        A.    I -- I -- I don't know.

10        Q.    Okay.

11        A.    I can't speak to that on the medical side.

12        Q.    The payers, so we're talking about healthcare

13   companies and maybe Medicaid, Medicare or other, I think

14   veterans benefits also.  The healthcare companies, what

15   healthcare companies would you or would Emerge accept?

16        A.    I don't recall all of them.

17        Q.    Okay.

18        A.    But it was -- it was all of the major -- major

19   companies.  And I don't recall because it -- it wasn't

20   that part of my role to deal with them on a day-to-day

21   basis.

22        Q.    Okay.

23        A.    I just know from collateral I put together

24   that it was at least 40 of them.

25        Q.    Okay.
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1        A.    That's the minimum.

 2        Q.    Do you know if any of those insurance

 3   companies are outside of the state of Florida?

 4        A.    I don't.  I -- I don't know.

 5        Q.    Would Emerge accept Medicare or Medicaid?

 6        A.    I always get them mixed up.  Yes.

 7        Q.    Okay.

 8        A.    In 2021, we started accepting Medicaid.

 9   Again, I didn't deal with it on a regular basis, I just

10   remember conversations about it.

11        Q.    Sure.  Are you familiar with a patient portal

12   through I think Athena Health?

13        A.    Yes.

14        Q.    Have you ever used that yourself?

15        A.    When I was a patient, yes.

16        Q.    Okay.  And can you describe what that is?

17        A.    It is a -- a place where patients or

18   prospective patients, like someone with an appointment

19   can go in, sign in, do their paperwork in advance of

20   coming into the clinic.  They can then come back to it

21   at -- at different points in time, and I believe

22   reference their medical information.

23        Q.    Okay.

24        A.    I've never done that myself, but I believe

25   that is the purpose of it.
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

```
 1        Q.   So typically when you walk into a doctor's

 2   office, they give you a bunch of forms to fill out and

 3   you sit down with a clipboard, put all your information

 4   in there.  The patient portal would allow you to

 5   electronically do that ahead of time and upload it over

 6   the internet to the provider before your appointment; is

 7   that fair to say?

 8        A.   In theory, yes.

 9        Q.   Okay.  Did Emerge accept credit cards as a

10   form of payment?

11        A.   Yes.

12        Q.   And I'm assuming all major credit cards would

13   be accepted?

14        A.   MasterCard, Visa, I don't believe we took

15   American Express and Discover, just because I don't ever

16   recall seeing anything about them.

17        Q.   Okay.  As part of dealing with billing, do you

18   know if any of the employees of Emerge would need to

19   call up insurance companies?

20        A.   The -- I did not have a lot of purview to the

21   billing team, so I -- I don't know that I can answer

22   that --

23        Q.   Okay.

24        A.   -- with knowledge.

25        Q.   Who was the billing team; do you remember?
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1        A.   Do you mean specifics or who did they report
 2   to?
 3        Q.   I guess let's start at the top and then try to
 4   work our way down.  Who -- who's the head of the billing
 5   team?
 6        A.   The billing team reported to our director of
 7   finance, and I would help with any HR or -- or, you
 8   know, soft skill needs.  Anything pertaining to their
 9   job went through him.  And then we had, depending on
10   what year you're talking about, we had anywhere from
11   eight to two people doing billing.
12        Q.   Okay.  When you say director of finance, are
13   you referring to Phil?
14        A.   No.
15        Q.   Okay.  Who is the director of finance?
16        A.   Scott Friedman.
17        Q.   Any relation to Lance Friedman?
18        A.   Yes.
19        Q.   Is it a brother?
20        A.   It is brother.
21        Q.   Okay.  Do you know if he still works there?
22        A.   He is a 1099 employee.
23        Q.   Have --
24        A.   But I don't -- I don't know how much work he's
25   doing.
```



**MILESTONE** | **REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1        Q.   Have all employees of FCMG been transitioned
 2   from W2 to 1099?
 3        A.   There are still two employees of the company,
 4   everyone else has been transitioned.
 5        Q.   Okay.  I -- and you broke up a bit.  I think
 6   you're still freezing.  I'm going to wait until you come
 7   back.
 8        A.   Can you hear me now?
 9        Q.   Yes.  Okay.  So I think you might be frozen
10   again.  You said there's two employees.  Who are those
11   two employees?
12        MR. WOOD:  We're frozen.  We're at an hour.  I
13     mean, I don't know if she can hear me or not, but
14     why don't we take a -- take a break?  Maybe have her
15     log out and come back in.
16        THE REPORTER:  Okay.
17        MR. HENDERSON:  Okay.
18        MR. WOOD:  Okay.
19        MR. HENDERSON:  All right.
20         BY MR. WOOD:
21        Q.   Basically, we are going to take a -- well, let
22   me ask you the question before we go.  So I don't
23   forget.  You said there was two employees still.  Who
24   are they?
25        A.   The two employees of the company are Lance and
```

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Phil.
2           MR. WOOD:  Okay.  So we are going to go on a
3       break, maybe log out and log back in.
4           THE WITNESS:  Okay.
5           MR. WOOD:  Because you keep on breaking up.  So
6       I'm showing 10:56.  Let's come back at 11:05.
7           MR. HENDERSON:  All right.  That works.
8           MR. WOOD:  Okay.
9           THE WITNESS:  All right, thank you.
10          MR. WOOD:  All right, thanks.
11           (OFF THE RECORD)
12          THE REPORTER:  All right.  We're back on the
13      record.  Go ahead.
14           BY MR. WOOD:
15      Q.   All right.  Ms. Lee, we are back, you're still
16   under oath.  We were going over some items with
17   pertaining to the employees of Emerge Group, all of
18   them.  We had just talked about the transition of
19   employees to 1099s.  Before we went on break, you
20   indicated that the only two employees left are the CEO,
21   Lance Friedman, and the CFO, Phil Keller; is that right?
22      A.   That is correct.
23      Q.   Okay.  Now, other employees in the '21 to say
24   January '23 time frame, before everyone transitioned to
25   1099.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1        A.   Okay.

 2        Q.   Do you know who would be in charge of ordering

 3   supplies for the business?

 4        A.   (audio cuts out)

 5        Q.   You are breaking --

 6        A.   People had different responsibilities.  So --

 7   sorry about that.  Am I still frozen?

 8        Q.   You're coming back.

 9        A.   Okay.  Sorry.  That's -- it's strange.  I'm in

10   an office and we've got good Wi-Fi, so it's odd. (audio

11   cuts out)

12        Q.   Okay.  And you're gone.

13        A.   So I'm sorry, your question was about

14   supplies?

15        Q.   My question was who was in charge of ordering

16   supplies for the business -- medical supplies, any type

17   of supplies.

18        A.   There were different people with different

19   responsibilities.  So I did some supply ordering.  Ruby

20   -- Ruby Rosado would order supplies.  In the  (audio

21   cuts out) we had an -- a few people who were also

22   responsible.

23        Q.   Okay.  So you broke up a bit.  I did hear you

24   did some ordering and Ruby did some ordering, and then

25   you broke up.  But let's talk about what ordering you
```



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1  did.  What kind of ordering did you do?
 2      A.   Okay.  Primarily administrative supplies, you
 3  know, things you would need for day-to-day operations in
 4  an office.
 5      Q.   And where would you order these things?
 6      A.   We had -- we ordered from Amazon, and there
 7  might have been other vendors, but for something like
 8  office supplies, it was predominantly Amazon.
 9  Occasionally -- yeah, I would say from there,
10  predominantly.
11      Q.   Okay.  Now, are you familiar with Henry
12  Schein?
13      A.   I'm familiar with the company, yes.
14      Q.   Okay.  And do you know if employees would do
15  ordering through Henry Schein?
16      A.   Yes.
17      Q.   And those would be medical supplies, right?
18      A.   Correct.
19      Q.   Who would be primarily in charge of getting
20  things from Henry Schein?
21      A.   In that -- in the period of time from January
22  of '21 through the end of '22 --
23      Q.   Sure.
24      A.   -- it would vary.  But Ruby, again, a couple
25  of people in the -- in the clinic possibly had access.
```

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1   I did not have access.  I did not order from Henry
 2   Schein.
 3        Q.   Okay.
 4        A.   The -- the person who was operations over the
 5   clinic would have had access.
 6        Q.   Okay.  Are you familiar with any other
 7   supplier companies that you, or that Emerge would use to
 8   obtain supplies for the business?
 9        A.   Nothing I -- no one I recall off the top of my
10   head.  And again, I wasn't involved in the medical
11   supply ordering, so --
12        Q.   Sure.
13        A.   -- I'm sure there's companies there I do not
14   know about.
15        Q.   And I'm just asking what you're aware of, so
16   that's fine.
17        A.   Yeah.
18             MR. WOOD:  I'm trying to pull the documents to
19        review real quick.  And I'll share my screen.  We'll
20        mark this as Plaintiff's 3.
21             (EXHIBIT 3 MARKED FOR IDENTIFICATION)
22             BY MR. WOOD:
23        Q.   This is a Florida Blue employer application
24   for health insurance.  This was for '21, and I believe
25   it was to go through July of '22.  So it's seven pages.
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1   I can go to the first -- I can go through all of it if
 2   you want.
 3       A.   Nope.  I -- I can see that's the application.
 4   Okay.
 5       Q.   Okay.  So you're familiar with this document?
 6       A.   I'm -- I am not, but I have -- I heard about
 7   the application, but I was not part of completing it.
 8       Q.   Okay.  And it looks like it was signed by
 9   Julie Hardesty.  That's the controller, right?
10       A.   Correct.
11       Q.   Okay.  And -- okay.  Do you know what this
12   application was for?  I can blow it up a little bit, if
13   you want.
14       A.   I would -- I would say for a health insurance
15   plan for the company through Florida Blue.
16       Q.   For the employees, right?
17       A.   Correct.
18       Q.   Now, this was -- this specific plan was to run
19   through July of '22; is that right?
20       A.   That is what you have said.  Based on it,
21   again, I don't know.
22       Q.   Okay.  Are you familiar with a Florida Blue
23   plan that was provided to employees that ended sooner
24   than its end -- anticipated end date?
25       A.   I am aware that happened, yes.
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1        Q.   Okay.  And that happened in 2021; am I right?

 2        A.   Yes, as I recall.

 3        Q.   And I think it was November of 2021 is when

 4   the issues began to happen?

 5        A.   Yes.  I believe it was November 30th is the

 6   date that I kept hearing.

 7        Q.   I -- that's what I have in my notes, so we'll

 8   go with that.  Do you know why it was canceled?

 9        A.   Again, I -- I don't.  Lack of payment, but I

10   never received any of those notifications.

11        Q.   Okay.  Now, employees had deductions from

12   their paychecks to pay their portion of the premiums for

13   this plan, correct?

14        A.   Correct.

15        Q.   And after November 30th of '21, are you aware

16   of whether or not the deductions from the paychecks

17   stopped or continued to be deducted from the paychecks?

18        A.   They continued to be deducted from the

19   paychecks.

20        Q.   Okay.  Do you know why they continued to be

21   deducted if the plan had stopped or been canceled?

22        A.   What we were told is, our lawyers were

23   negotiating with Florida Blue to get us reinstated.

24        Q.   Okay.  Now, at that time, the -- in November

25   30 of 2021, the policy was canceled.  You said there was
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1  negotiations.  But at the time the employees did not

 2  have health insurance coverage; is that fair to say?

 3       A.   I -- yeah, I would believe so.  And I was part

 4  of those people.

 5       Q.   Okay.  So you also lost insurance during this

 6  time frame?

 7       A.   Yes, sir.

 8       Q.   Are you familiar with COBRA, and COBRA

 9  notices?

10       A.   I am -- I am familiar with how COBRA works.

11       Q.   Okay.  And I -- how did it work at Emerge in

12  this time frame, '21, '22, '23?

13            MR. HENDERSON:  Objection to form.

14       A.   It worked in the -- in the standard format

15  that COBRA works.  When an employee left the company,

16  they -- they would have an option to sign on to COBRA.

17  That documentation was not provided by us, that was

18  provided by COBRA.  We just provided them with the

19  information that they would be being reached out to.

20  And then they could choose from that point forward if

21  they participated or not.

22            BY MR. WOOD:

23       Q.   Okay.  Now, is it your understanding that

24  COBRA applies when an employee leaves the entity?

25       A.   Yes.
```



**MILESTONE** | **REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

```
 1       Q.   Do you know if it applies when an employee

 2   loses healthcare coverage?

 3       A.   I do not know.

 4       Q.   Okay.  In November -- on -- well, after the

 5   November 30th cancellation, do you know if any employees

 6   received COBRA notice at that time?

 7       A.   Not unless they would -- not unless they left

 8   the company.

 9       Q.   Okay.  Who was in charge of providing notice

10   on behalf of the company?

11       A.   For COBRA?

12       Q.   Yes.

13       A.   So the -- when the employee left the company,

14   they would have been informed that COBRA was available

15   to them.  And then the company that we dealt with at the

16   time, which I believe was TASC, T-A-S-C, would send them

17   information.  And after that, once I verbalized that to

18   them, it was up to TASC to -- to work with them.

19            MR. WOOD:  Okay.  Off record.

20            (OFF THE RECORD)

21            BY MR. WOOD:

22       Q.   Okay.  Back from a brief technical break to

23   get you on the phone.  Let's -- I'm going to share my

24   screen again in just a second.  Okay.  Okay.  So this is

25   an e- mail, it's in the Outlook format.  And this is not
```

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1   an e-mail that you sent, this is an e-mail that you

2   were CC'd on.  Do you recognize this e-mail?

3        A.   Yes.

4        Q.   Okay.  So this is an e-mail from Julie

5   Hardesty.  It says, "See attached, per our

6   conversation."  And it says -- the document is an Excel

7   spreadsheet.  It's, "2022 employee insurance refunds

8   due."  Do you remember getting this e-mail?

9        A.   I don't specifically remember it, but I

10  remember there was a -- I remember a document being put

11  together, yes.

12       Q.   Okay.  The e-mail looks like it's dated April

13  of 2023, so just a few months ago.  Do you --

14       A.   I -- again, I -- I -- I'm on there --

15       Q.   Yeah.

16       A.   -- so I -- but do I remember specifically?

17  I'm not going to say yes, because I -- I don't.  But I

18  know --

19       Q.   Okay.

20       A.   -- I know I received it.

21       Q.   Now, the e-mail is Julie to Phil and you.  It

22  says, "Per our conversation."  Do you recall having a

23  conversation with Julie and Phil about insurance refunds

24  to the employees?

25       A.   Yes.

**MILESTONE** | **REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.   And was that a recent conversation within the

2    last six, seven months?

3    A.   I know we have discussed it a -- a couple of

4    different times.  I can't give you specific dates.  So I

5    would imagine this is in reference to one of the times

6    we discussed it.

7    Q.   Okay.  And I'm going to open up the

8    attachment, I hope.  There it -- no, that's not it.

9    That's not it. Where is it?  Here, this is it.  All

10   right.  This is the attachment, "2022 employee insurance

11   refunds due."  Do you recall going through the

12   spreadsheet at all?

13   A.   I'm familiar with the spreadsheet.

14   Q.   Okay.  What was -- what is this spreadsheet?

15   A.   It's a spreadsheet of current insurance

16   premiums that are due to employees that paid in to that

17   the intention of the company is to reimburse them for.

18   Q.   Okay.  And it looks -- there's different tabs

19   on here, FCHS, that's First Choice Healthcare Solutions.

20   You're -- actually you're on there.

21   A.   Uh-huh.

22   Q.   FCID is also listed.  FCMG is listed.  Do you

23   know what this -- is it QuickBooks?  It says QB PR

24   detail at the bottom.

25   A.   That's payroll.



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
1        Q.    Okay.

2        A.    QuickBooks Payroll Detail.

3        Q.    So QuickBooks Payroll Detail.  And then we

4   also have Florida Blue and United.  Starting with the

5   United tab, do you know what this tab is telling us?

6        A.    This would be premiums from UnitedHealthcare.

7        Q.    And these were --

8        A.    I don't know.

9        Q.    -- what was due, right?

10       A.    I'm -- I -- I -- that is not a question for

11  me.

12       Q.    It's a question for Julie?

13       A.    Yeah.

14       Q.    Okay.  And then this is Florida Blue.  Do you

15  know what this is telling us?

16       A.    It would be the same thing.  This looks like

17  her tracking of statements that were received.

18       Q.    Okay.  So it looks like this is saying Florida

19  Blue is owed 103, if I'm reading this correctly.

20       A.    Okay.

21       Q.    103,000.  Okay.  And then then the

22  reimbursements, this is, I'm assuming what the three of

23  you discussed about calculating the amounts that are

24  owed to employees for the insurance that they didn't

25  get; is that right?
```

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONE**REPORTING.com          Toll Free 855-MYDEPOS

```
 1        A.   Yes.  Sorry, I just had to think about what
 2   you just said.  Yes.
 3        Q.   Yeah.  And it looks like it's broken up with
 4   active employee refunds.  And then there's another
 5   column says, "Total insurance refunds due."  So it looks
 6   like you took the -- what everyone's owed and then what
 7   active employees are owed; is that fair to say?
 8        A.   That's how it appears, yes.
 9        Q.   Okay.  Were you involved in this calculation,
10   or was this something that Julie put together that you,
11   Julie, and Phil discussed?
12        A.   Julie put this together because she is the
13   controller.  That's part of her job.
14        Q.   Okay.  Do you know if you had a discussion
15   about claims that would have been made by these
16   employees during the time frame, whether or not the
17   companies would reimburse for those claims as opposed to
18   just the deductions from payroll?
19             MR. HENDERSON:  Objection.  Form.
20        A.   When we had discussions about this, it was a
21   -- always a general thing.  I can't say that we -- we
22   ever specifically focused on if there were claims made
23   or not.
24             BY MR. WOOD:
25        Q.   Okay.  Was Lance included in this discussion
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1   at all?

 2        A.   Lance has been part of these discussions.

 3        Q.   Okay.  He just wasn't part of this e-mail, but

 4   he was still part of the overall discussion of refunding

 5   the insurance to the employees?

 6        A.   Correct.

 7             MR. WOOD:  Okay.  And I'll mark the e-mail and

 8        the spreadsheet.  I don't remember which number

 9        we're on.  Let me see if I can --

10             THE REPORTER:  4.

11             MR. WOOD:  4.  Okay.  So the e-mail and

12        spreadsheet will be Plaintiff's 4.

13             (EXHIBIT 4 MARKED FOR IDENTIFICATION)

14             MR. WOOD:  This next document is an e-mail.  It

15        says, "Group B8027 reinstatement."  That's

16        Plaintiff's 5.

17             (EXHIBIT 5 MARKED FOR IDENTIFICATION)

18             BY MR. WOOD:

19        Q.   And I'm sharing my screen with you so you can

20   see the e-mail going down to the bottom.  Just seeing

21   what you were included on.  It looks like you were not

22   included on the first e-mail to Phil.  And then there's

23   an e-mail from you on this chain.  And it looks like

24   you've been included on the e-mails about this ever

25   since.  Do you recognize this e-mail chain?
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1        A.   I recognize the names.  I don't remember this
 2   particular e-mail, but I do recognize the names and the
 3   -- and the conversation, like the dialogue, the topic.
 4        Q.   Okay.  And this was in, it says March 10 on
 5   the top.  Going down to the bottom, the e-mail that you
 6   weren't on, it says -- this is to Phil.  It says, "Your
 7   group has been denied for reinstatement."  Can you
 8   explain what was happening in this -- in these e-mails?
 9        A.   Based on my response to Grace, we were
10   directed to see what Grace and that team could do to
11   assist us with reinstatement.
12        Q.   And who's Grace?
13        A.   Somebody who works with OneDigital.
14        Q.   And who is OneDigital?
15        A.   OneDigital was the group that was assisting us
16   with healthcare insurance policies after TriNet, after
17   we left TriNet.  Yes, after we left TriNet.
18        Q.   Okay.  Do you know where OneDigital was
19   located?
20        A.   Not off the top of my head, no.
21        MR. WOOD:  Okay.  I'm going to show you another
22     e-mail dated March 24th, '22.  This is going to be
23     Plaintiff's 6.
24            (EXHIBIT 6 MARKED FOR IDENTIFICATION)
25            BY MR. WOOD:
```

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1        Q.   This is an e-mail from you to Lance.

 2        A.   Uh-huh.

 3        Q.   Do you recognize this?

 4        A.   This would have been an example of a draft

 5   that I sent him.  To the best of my knowledge it's -- I

 6   don't remember the -- I don't remember the e-mail

 7   specifically, but obviously it's -- it's part -- it's --

 8   it's discussing our Florida Blue plan.

 9        Q.   And really that's what it appears to me.  It

10   looks like you're sending an e-mail to him to review.

11   And that's your recollection of this e-mail, too, right?

12        A.   Correct.

13        Q.   Do you know if it got revised or sent out?

14        A.   I don't recall.

15        Q.   Okay.  Do you know if Blue Cross Blue Shield

16   actually reinstated the policy?

17        A.   Blue Cross Blue Shield did not.  We had a

18   legal team working with them.  And they were willing to

19   reinstate us, but we had to come up with funding.

20        Q.   And I think we're going to get to that next.

21   There was a plan, I think it was like $25,000 a month.

22   And the company was not able to do that; is that fair to

23   say?

24        A.   Correct.

25             MR. WOOD:  Okay.  So that might be here in this
```



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1        e-mail.  We're going to mark this Plaintiff's 7.

 2              (EXHIBIT 7 MARKED FOR IDENTIFICATION)

 3              BY MR. WOOD:

 4        Q.   And just updating my notes.  All right, so

 5   this is an e-mail from June of '22.  And I'm scrolling

 6   down. First e-mail is not including you.  It looks like

 7   an -- e-mails between attorneys.  This was then

 8   forwarded from Lance to you, Phil, Julie, Scott.  And it

 9   looks like it was relaying the terms of reinstatement of

10   the Blue Cross Blue Shield plan.  Which down here,

11   weekly payments of 25,000 until it's due, and then it'll

12   be reinstated.  Do you remember getting this e-mail?

13        A.   Not specifically.

14        Q.   Okay.

15        A.   But I know -- but I remember those -- I

16   remember those terms, so --

17        Q.   Okay.  And -- so you remember the terms and

18   you're saying that Emerge was unable to fulfill those

19   terms; is that right?

20        A.   Correct.

21        Q.   Do you know who made the final decision to not

22   move forward with the reinstatement?

23        A.   The decision was made by the fact that the --

24   there was minimal income coming in from the providers

25   performing at the clinic and we were pending investor
```

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  funding.  Ultimately it would have been Lance who made

2  the decision.  But it is -- but that was -- that was

3  ultimately why, we didn't have any funding.

4      Q.   You didn't have -- the company didn't have the

5  money?

6      A.   Correct.

7      Q.   And Lance made the decision to not go further

8  in debt, if even possible, because they would not be

9  able to fulfill the terms of the reinstatement; is that

10  right?

11          MR. HENDERSON:  Objection.  Form.

12          MR. WOOD:  Now she's dropped off.

13      A.   I -- I don't -- am I gone.  I can still hear

14  you.

15          BY MR. WOOD:

16      Q.   Yeah.  Yeah.  If you can get back onto --

17      A.   Let me --

18      Q.   -- the video, I --

19      A.   Yep, it's connecting now.

20      Q.   Okay.

21      A.   I don't know why this is having so many

22  problems.  I apologize. Normally we don't have this.

23      Q.   You know, we can hear you now. We've got you,

24  so that's good. We need to go over some documents,

25  but --

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1          THE REPORTER:  Okay, I have the screen back, so

2     I can let her back in for a second.

3          MR. WOOD:  Okay.

4          THE REPORTER:  If you don't mind.  Okay.  I

5     think you have to let me back because you -- let me

6     see.

7          MR. WOOD:  Oh.  Sorry, you need me to stop

8     sharing.

9          THE REPORTER:  Yes.  I'm like, I'm trying to do

10    it on my end, but it keeps telling me --

11         MR. WOOD:  Sorry.

12         THE REPORTER:  It's okay.  It doesn't show her

13    in there.

14         MR. WOOD:  There she is.

15         THE REPORTER:  Oh, there we go.  Okay.  Now

16    she's back.

17         THE WITNESS:  Moving to maybe where there's a

18    more stable connection, so excuse the background.

19         MR. WOOD:  Okay.

20         THE REPORTER:  No your fine.  Okay.

21         MR. WOOD:  Okay.

22         THE REPORTER:  Okay.  Go ahead.

23         MR. WOOD:  All right.  I'm going to share my

24    screen again.  We are on Plaintiff's 8, I think.

25              (EXHIBIT 8 MARKED FOR IDENTIFICATION)



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

1          BY MR. WOOD:

2      Q.   And I'm showing you a document that's titled,

3   "UnitedHealthcare Level Funded Plan Sponsor

4   Application."  Do you -- it's 20 pages.  I won't go

5   through all unless you want me to.  Do you recognize

6   this?

7      A.   I -- I can't say I recognize the application

8   itself, but I -- I know we participated in it.

9      Q.   Okay.  So this appears to me to be the

10  application to initiate the UnitedHealthcare plan that

11  went into effect in April of '22; is that right?

12     A.   That would be the correct timing, yes.

13     Q.   Okay.

14     A.   I'm -- I'm going to close the door in the room

15  I'm in. I will be right back on screen in just a moment.

16     Q.   Okay.

17     A.   But I can hear you.

18     Q.   Okay.  Do you know what happened with this --

19  with the UnitedHealthcare plan policy?

20     A.   Can you be more specific?

21     Q.   Do you know if it ever went into effect?

22     A.   I believe it went into effect, but then the

23  plan ended up ultimately getting canceled.  So I believe

24  it took it back to the initiation date.

25     Q.   Okay.  And I know there was issues with

**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1  payments, so I think we'll probably cover that in a few
 2  e-mails here.  But I guess there's been some confusion,
 3  maybe on my end, on whether or not this was active for
 4  the month of April or not.  And I think you just said
 5  that, ultimately they went back to the very initiation
 6  and canceled everything.  Is that your memory of this?
 7       A.   That is my -- that is my understanding, yes.
 8       Q.   Okay.  And that was because they weren't paid,
 9  right?
10       A.   Yes, sir.
11            MR. WOOD:  Okay.  So going on to mark
12       Plaintiff's 9.
13            (EXHIBIT 9 MARKED FOR IDENTIFICATION)
14            BY MR. WOOD:
15       Q.   This is an e-mail chain.  I'm going to go to
16  the bottom.
17       A.   Okay.  Just so you know, I --
18       Q.   You dropped out.
19       A.   It looks like I dropped out again.
20       Q.   Yeah.  So while we're getting you back.
21       A.   There you go.
22       Q.   There you are.
23       A.   I'm back.
24       Q.   The -- this is an e-mail from you on July 6th
25  of '22 to Phil and Lance, CCing Julie.  Says, "Ruby just
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    called me.  She was told at the clinic she has no UHC

2    coverage, and it dates back to 4-30-22.  So what I saw

3    this a.m. is accurate.  We need to do some type of

4    messaging, so the team doesn't find out on their own,

5    which is -- was the bigger problem when they found out

6    about BCBS."  Do you remember sending this e-mail?

7        A.   I remember the conversation.

8        Q.   Okay.  So the e-mail or the conversation with

9    Ruby, can you describe that a bit?

10        A.   I don't remember Ruby's specific call, but I

11    do know that, when she was at a medical appointment they

12    said she didn't have her coverage.  So I told her we

13    would check on it.  And then I believe I had received a

14    notification in my mail, because I was also part of the

15    healthcare plan.  I -- I don't -- I believe I received a

16    notification in my mail saying that there was no

17    coverage.

18        Q.   Okay.

19        A.   But that -- and that coincided with the timing

20    of her appointment.

21        Q.   Okay.  So when you -- when you said I -- what

22    you saw this morning is accurate, you're referring to a

23    letter that you received in the mail yourself?

24        A.   Again, I -- I can't remember.  I know I

25    ultimately received a letter that said that.  I cannot

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1   remember if somebody came to me and said, I received

2   this, or if it was my own letter.  So I can't recall

3   which way I found out.  But that is what it is

4   referencing.  I had found out while she was at this

5   doctor's appointment that that had happened.  And I had

6   reported that to Julie and Phil and Lance.

7       Q.   Okay.

8       A.   That there was a concern.

9       Q.   And I'm just seeing if you sent any of these

10  other e-mails.  It looks like you were included.  But

11  let's look at this one from Julie.  It says, "We paid

12  the first 25k.  But they took 50k, so the whole amount

13  was refunded, then returned again.  And now with the

14  payments to Phil and Lance today, we do not even have

15  the original 25k to pay April again.  We have

16  essentially paid them nothing."  So were you involved in

17  communications about the payment of these policies?

18      A.   I -- I was not responsible for them, but I had

19  heard that from Julie.  Exactly what she said transpired

20  in this e-mail --

21      Q.   Okay.

22      A.   -- is what she had verbalized to me.

23      Q.   So they made payments, but then it was

24  refunded.  And so now they've essentially paid

25  UnitedHealthcare $0; is that a fair summary?

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

 1      A.   Yes.

 2      Q.   Okay.  Now there's a line here, it says, "Now

 3 with the payments to Phil and Lance today."  Do you know

 4 what she's referring to there?

 5      A.   Not specifically.

 6      Q.   Are you aware of any payments to Phil and

 7 Lance that would prevent the company from paying its

 8 debts to third party entities?

 9      A.   Nothing that would have prevented us from

10 making payments to -- to them.  There were times we did

11 expense reimbursement, but I don't know specifically

12 what this references.

13      Q.   Okay.  So I'm going to go back to your e-mail

14 at the beginning.  You talk about messaging.  I guess

15 you put your HR hat on at this point and said, "You need

16 to tell the employees that they don't have coverage." Is

17 that fair to say?

18      A.   Yes.

19      Q.   You want to make sure they don't find out on

20 their own, and you say here that it was a bigger problem

21 with the Blue Cross Blue Shield when they found out on

22 their own; is that right?

23      A.   The -- yes.  The employees found out about the

24 Blue Cross Blue Shield coverage being canceled before

25 the company had a chance to let them know there was an



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1   issue.
 2       Q.   Okay.  And at this time, do you know if any
 3   COBRA notices were mailed out to anyone?
 4       A.   They were not.
 5       Q.   Okay.  Sitting here today, do you know if
 6   anybody was covered in April under the United Healthcare
 7   plan?
 8       A.   I -- I don't know.
 9       Q.   Okay.
10       A.   I -- I would not want to misspeak.
11       Q.   Okay.  When you enter into these plans,
12   there's typically plan documents.  Is that your
13   understanding?
14       A.   Yes.
15       Q.   Would Emerge, or subsidiaries, whoever,
16   maintain those plan documents somewhere?
17       A.   Yes.
18       Q.   And do you know if Emerge has the plan
19   documents for the United Healthcare plan?
20       A.   Those would be, I believe, in Julie's files,
21   and I believe Ruby kept a copy of them in her files as
22   well.
23       Q.   Okay.  Are you --
24       A.   I did not.
25       Q.   Are you familiar with an employee, Emmaline
```



**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1  Bonilla?

 2       A.   Yes.

 3       Q.   I -- our firm represents Ms. Bonilla also, and

 4  she went on leave in April of '22.  Are you familiar

 5  with her situation at that time?

 6       A.   Yes.

 7       Q.   And she had a brain surgery later on in that

 8  month, and her claims were denied for that surgery.  Was

 9  she not covered because Emerge didn't pay

10  UnitedHealthcare for health coverage during that time

11  frame?

12            MR. HENDERSON:  Objection.  Form.

13       A.   It would appear so.  I don't know

14  specifically.

15            BY MR. WOOD:

16       Q.   My understanding is that she did not stop

17  becoming an employee.  She wasn't fired or leave until

18  well later in the year.  I think she went on some kind

19  of a medical leave.  Is that your understanding of --

20       A.   Correct.

21       Q.   Okay.

22       A.   Yes.  She was on a medical leave of absence.

23       Q.   What is involved with a medical leave of

24  absence?

25            MR. HENDERSON:  Objection.  Form.
```



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1      A.   Can you clarify what you're asking me?

2           BY MR. WOOD:

3      Q.   Okay, so while she's on a medical leave of

4 absence, does she receive a wage?

5      A.   Okay.  No, if -- if an employee is on a -- and

6 I'm speaking -- generally speaking.

7      Q.   Yes.

8      A.   If an employee goes on a medical leave of

9 absence, if they have PTO, paid time off available, they

10 can use that for -- for financial support.  They -- if

11 -- if it is something that is in -- or is appropriate to

12 FMLA, then they can use -- also use -- again, it's any

13 funding they might have available in their banks, but

14 they could also qualify for FMLA, which secures their

15 position upon return.  Otherwise, if they have no PTO

16 bank, then they're just taking a medical leave, and that

17 means the company is approving them being out of the

18 office on medical leave for whatever duration of time is

19 needed and recommended by their physician.

20      Q.   If the employee has PTO banked, would they be

21 able to use that PTO to cover the employee portion of

22 their healthcare deductions?

23      A.   Yes.

24      Q.   Before the first payroll check would be

25 processed on someone on leave like this, would you have



**MILESTONE** | **REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

```
 1  a discussion with the employee or their family,
 2  depending on the circumstances, as to how to address
 3  their pay moving forward?
 4      A.   Yes.  So again, I'm not referencing this
 5  particular case, because I don't remember all of the
 6  nuances of this particular case, but if someone was
 7  going on a medical leave of absence and they wanted to
 8  maintain their health insurance, we would have a
 9  conversation with them saying, "This is how much your
10  premium is, and we can either -- if you're using PTO, we
11  can -- we can pay it as -- as you would normally," and
12  if somebody said they wanted to just pay us in one lump
13  sum, then they could pay that themselves.
14      Q.   Okay.
15      A.   But I don't remember the circumstances
16  surrounding Emmaline specifically.  That's just
17  generally how it works.
18      Q.   Okay.  Do you know if Emmaline ever received a
19  COBRA notice, whether it be in April or whether it be
20  towards the end of the year, when her employment did
21  cease from the Emerge Group?
22      A.   I -- I don't know.
23      Q.   Okay.  Moving on to a different employee, who
24  we talked about briefly earlier, was Ms. Roberge, Penny
25  Roberge.
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1        A.    Uh-huh.

 2        Q.    Are you familiar with Ms. Roberge?

 3        A.    Yes, I am.

 4        Q.    Okay.  Do you recall receiving e-mails from

 5   her complaining about not getting paid at the end of

 6   2022?

 7        A.    Yes.

 8        Q.    And can you summarize your understanding of

 9   what she was complaining about?

10        A.    She had concerns that she was working and not

11   getting paid.

12        Q.    Did you receive concerns like this from other

13   employees, too?

14        A.    Not -- not specifically the way she did it.

15   People would ask when we thought funding would come

16   through so that we could be issuing payroll.

17        Q.    Okay.  And how did you think that she did it?

18        A.    Well, she would send me e-mails.

19        Q.    Okay.

20        A.    And I believe she verbalized her concern to

21   Ruby, but I don't know that that's through a

22   conversation that Ruby and I had together, but I know

23   I've specifically received, I think, at least -- at

24   least one, possibly two e-mails from her with her

25   concerns.
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1            MR. WOOD:  Okay.  So I'm going to share my

 2       screen again.  I've got some e-mails that we can

 3       review. This will be Plaintiff's 10.

 4            (EXHIBIT 10 MARKED FOR IDENTIFICATION)

 5            BY MR. WOOD:

 6       Q.   And -- so this is four pages, emails going

 7  back into November of '22 and into December, and as I

 8  scroll through this, do you recognize these

 9  conversations?

10       A.   Uh-huh, yes.

11       Q.   Okay.  What was your reaction to her e-mails

12  to you in this chain, in the November-December time

13  frame?

14       A.   I had the same concerns -- concerns for her

15  that I did for everyone who was not getting paid.

16       Q.   All right.  Down here in -- on December 1st,

17  you know, she's obviously frustrated.  She says, "It's

18  absurd on how you want people to continue working their

19  asses off and not get any money.  For God's sake, it's

20  the damn holidays."  Do you remember receiving this?

21       A.   Uh-huh.

22       Q.   Did you have a conversation with Lance or Phil

23  about this e-mail?

24       A.   I -- yeah, I let them know that we had

25  received it.
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1      Q.   Okay.  And it looks like Lance, on his own,
 2   responded pretty quickly, saying it's not your fault,
 3   which -- if we -- if we scroll down, Penny seems to say,
 4   "I didn't blame Gillean."  But she continues to complain
 5   about not getting paid, and looks like you're on this e-
 6   mail, too.  Was this a common feeling within the
 7   company, that employees were very frustrated that they
 8   weren't getting paid?
 9           MR. HENDERSON:  Objection.  Form.
10      A.   I -- I can't speak to other people's thoughts
11   on it, so I can only go based on what we're looking at
12   right here in front of me.  Obviously, Penny is
13   frustrated, and I recall her frustrations.  Any other
14   answer would be me surmising people's reactions to it.
15           BY MR. WOOD:
16      Q.   Okay.  Did you discuss this with her after
17   this e-mail here, looking at December 1st at 4:53?
18      A.   I did not discuss it with her.  I -- I did not
19   discuss it with her, and I -- I can't remember who
20   might've, so I don't want to misspeak.
21      Q.   Okay.  And looks like she CC-ed a Dr. Zaidi on
22   there.  Was --
23      A.   Yes.
24      Q.   -- that someone that she worked with directly?
25      A.   Yes.
```

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1     Q.   Okay.  Is he still providing services to

2  Emerge?

3          MR. WOOD:  Okay.  We're going to move on to

4     Plaintiff's 11.

5          (EXHIBIT 11 MARKED FOR IDENTIFICATION)

6          BY MR. WOOD:

7     Q.   And this is an e-mail from January 6th of '23

8  at 11:46 a.m. from Penny to Lance, Phil, and you. Short,

9  says, "I'm looking for updates you have on any of our

10 back pay, haven't heard from you -- anyone since the

11 meeting we had about three weeks ago."  Do you remember

12 getting this e-mail?

13    A.   I -- I believe so.  I'm --

14    Q.   Okay.  She mentions a meeting three weeks ago

15 or so.  It's sent to the three of you.  Do you remember

16 if you took part in a meeting with her in December,

17 probably between December 1st and the end of the year,

18 about back pay?

19    A.   I -- if -- if I am recalling correctly, we had

20 a call, an all call -- an all-team call, because people

21 were in different locations.  So basically, we had a

22 team meeting, and there were some people in person and

23 there's some people on a call, where Lance gave everyone

24 an update.  I believe that is the meeting she is

25 referencing.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1        Q.    And this would've been the end of 2022?

 2        A.    Yeah.  It would've -- it was mid-December.

 3        Q.    And is it fair to say that Lance said

 4   something along the lines of, "We've got investors lined

 5   up," or, "We're -- it's coming, we're hoping," giving

 6   promises that basically, "Hold on, the money will be

 7   here"?

 8        A.    I -- I would say yes, that's -- because that

 9   is what -- what the -- the ongoing concern was, was

10   getting investors to finalize.

11        Q.    And the consistent communication that was sent

12   to the employees was somewhat along those lines, saying

13   that there's investors coming, it's a slow process,

14   "Hold out, we'll get you paid"?

15        A.    Yes.

16        Q.    Okay.

17        A.    Yes.

18        Q.    I don't know that I have it in any of these e-

19   mails, but I believe that there was also e-mails that

20   informed employees that if they had any bank charges,

21   because of the not paying the payroll, that the company

22   would reimburse those bank charges.  Do you remember any

23   communication about that?

24        A.    The bank charges were specific to if an

25   employee had received a paycheck and that paycheck
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    didn't clear, and they were subject to bank fees because

2    they expected funds to be there that weren't there,

3    and/or they were charged a bank fee for the bounced

4    check that the company would reimburse them.  We would

5    not reimburse just random bank fees.  It was all

6    associated to anticipated funds in the -- in -- in the

7    form of a payroll check not clearing.

8         Q.   So this would've been more of a concern back

9    in the first quarter of '22, the -- or second, I guess.

10        A.   For the first half of the year.

11        Q.   Yeah, the first half of the year.

12        A.   The first half of the year, '22.

13             MR. WOOD:  Okay.  Now, this e-mail was on this

14        page, it was this one page, 20, the e-mail from

15        Penny to the three of you at 11:46.  We're going to

16        mark this as Plaintiff's 12.

17             (EXHIBIT 12 MARKED FOR IDENTIFICATION)

18             BY MR. WOOD:

19        Q.   Wait.  Very nice.  This is two pages.  On the

20   first page is an e-mail from you to Penny, January 6th,

21   same day, at 4:47 p.m., and it says, "Attached is a 1099

22   Contractor Agreement."  If you go to the second page, it

23   looks like there's two PDFs that were attached to this

24   e-mail.  Do you recall this e-mail?

25        A.   Yes.

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1       Q.   Okay.  You state here that, "Please be
 2  advised, the pay period for December 26th through
 3  January 8th will be processed as standard -- as a
 4  standard period." Do you know if that payroll was ever
 5  processed?
 6       A.   Yes.
 7       Q.   Okay.
 8       A.   I don't know if it was distributed, but it was
 9  processed.
10            MR. WOOD:  Okay.  Now I'm going to open up the
11       letter that was attached.  We can mark this as
12       Plaintiff's 13.
13               (EXHIBIT 13 MARKED FOR IDENTIFICATION)
14            BY MR. WOOD:
15       Q.   This is three pages.  I can scroll through the
16  other -- well, the last page is nothing.  Second page is
17  a signature.  But here -- the first page is where the
18  bulk of it --
19       A.   Uh-huh.
20       Q.   There's a signature at the bottom, Lance's
21  signature.  Do you know if that was a wet signature or
22  if you put that signature on there?
23       A.   That was not wet.
24       Q.   Okay.
25       A.   I put that on there.
```

**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1    Q.    Did Lance have the opportunity to review and

2 approve this contractor offer letter before it was

3 transmitted to Penny?

4    A.    Yes.

5    Q.    Okay.

6    A.    And the e-mail -- the body of the e-mail also

7 was approved by Lance and by Phil.

8    Q.    Okay.  And so this was in response to her e-

9 mail that morning asking for an update, right?

10    A.    I would not say it was in response to it.

11 That was the -- the coincidence of timing with this,

12 because everyone who was currently an employee at that

13 point in time received their own version of this.

14    Q.    Okay.  Did anyone ever respond -- do you know

15 if anyone responded to that e-mail that she sent out in

16 the morning asking for an update on back pay?

17    A.    I don't recall.

18    Q.    Okay.  So here, it says that her employment

19 with First Choice Medical Group of Brevard, LLC, d/b/a

20 Emerge Healthcare Group, LLC, is terminated.  So she

21 ceased being an employee at that time, right?

22    A.    Correct.

23    Q.    Do you know the reason why she was to stop

24 being an employee at that time?

25    A.    All employees were sort of given the same

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1   notification.  The only two employees the company was

 2   keeping were Phil and Lance.

 3       Q.   Sure, but what was the reason behind this?  Do

 4   you know?

 5       A.   The company wanted to switch everyone over to

 6   1099s.

 7       Q.   Do you know why they wanted to switch from W-2

 8   to 1099?

 9       A.   I don't know specifics.  I know I was told

10   that that was the -- the decision and that's what we

11   were going to do, so everyone, with the exception of

12   Phil and Lance, was given the opportunity to become a

13   1099 employee.  If they chose not to do this, then they

14   would not have been working for the company any longer.

15       Q.   Okay.  So the option here was work as a 1099

16   or don't work at all?

17       A.   Correct.

18       Q.   Do you know if the terms here for Penny were

19   any different than the terms she had as a W-2 employee?

20       A.   Her rate of pay is higher than her standard

21   pay.

22       Q.   Okay.  Was that the only change, is the rate

23   of pay?

24       A.   Yep.

25       Q.   Okay.  Her duties didn't change at all, right?
```



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1        A.   No.  Her supervisor's the same, all of her
 2   duties would be the same.
 3        Q.   Okay.  Do you know who came up with the idea
 4   to transition all of the W-2s, with the exception of
 5   Phil and Lance, to 1099s?
 6        A.    I don't know specifically who.  I know there
 7   was conversation between Phil, Lance, Julie, and I,
 8   which is where I found this is what we were doing.
 9        Q.   This -- those conversations about the
10   transition, those would've taken place after the DOL
11   investigation, correct?
12        A.   It -- this was all -- that investigation was
13   ongoing throughout this.
14        Q.   Okay.  And it also would've taken place after
15   or during the time frame where employees were filing
16   lawsuits against the company for back wages and
17   benefits; is that right?
18        A.   Yes, this is after that period of time.
19        Q.   Okay.  Do you know if it was discussed that
20   this would be the strategy to limit the exposure of the
21   company and the officers?
22             MR. HENDERSON:  Objection.  Form.
23        A.   I don't know.
24             BY MR. WOOD:
25        Q.   Do you know of any contractors who accepted
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  this agreement -- and this agreement, we're talking

2  about the offer, which is, I'm assuming, similar, with

3  the exception of the -- you know, the title, the rate of

4  pay, it's the same for everyone, right?

5      A.   Correct.

6      Q.   Do you know if any contractors have been paid

7  under this new agreement?

8      A.   There have been some of -- some invoices have

9  been able to be paid to these contractors.

10     Q.   Yeah.  Okay.  Penny did not accept it; is that

11 right?

12     A.   Penny did not accept it.

13     Q.   Do you recall why?

14     A.   Penny basically gave us one day's notice and

15 stopped working at the company.

16     Q.   The company still owed her back wages at that

17 time, right?  At the time of the letter -- the offer

18 letter was sent.

19     A.   Yes.

20     Q.   And the company did not bring her current on

21 those back wages before she was going to enter into this

22 new agreement, correct?

23     A.   Correct.

24     Q.   Do you recall her being concerned with the

25 fact that the company still owed her back wages and now

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  she's going to enter into a contractor agreement with no

2  guarantee she was going to be paid?

3      A.   I never had that conversation with her.

4      Q.   Okay.  Other than what we've discussed today

5  with regard to Ms. Roberge, do you remember

6  communications between yourself and Lance, Phil, any of

7  the higher-ups, about terminating Ms. Roberge or

8  providing her with this offer?

9      A.   We -- we never entered a conversation

10 regarding terminating her.  She worked well with Dr.

11 Zaidi, and the two of them were a good team, so we would

12 not have -- we would not have considered that.

13     Q.   But the very first sentence of this letter

14 does say that, doesn't it?

15     A.   It says that -- everyone's letter says that,

16 and that is part of what we need to do to end an

17 employee working for a company as opposed to becoming a

18 1099 contract employee, so that they -- we were very

19 clear in the verbiage so that they would understand that

20 they were no longer employees of the company, they are

21 now 1099 contract employees.

22     Q.   So just to be clear, at this time, January

23 6th, Emerge had owed Penny back wages for working, and

24 it decided that it was going to enter into a contract at

25 a higher rate of pay with Penny, even though it couldn't



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  pay its back -- the back wages to her?

2          MR. HENDERSON:  Objection.  Form.

3      A.   That was the decision that was made.

4          BY MR. WOOD:

5      Q.   By?

6      A.   Ultimately, Lance and Phil, as the leaders of

7  the company.

8      Q.   Okay.  And bear with me, I'm going to see if I

9  can find an old paycheck of hers, just to make sure.

10 Okay.

11         MR. WOOD:  Okay.  I don't think I have anything

12     else.  James, do you have anything?

13         MR. HENDERSON:  No questions.

14         MR. WOOD:  Okay.  We're going to order.  Ms.

15     Lee, you'll have the opportunity or option to read

16     the transcript when it's available, to do an errata

17     sheet, which will be to clarify -- correct the --

18     your answers if they were taken down incorrectly.

19         THE WITNESS:  Okay.

20         MR. WOOD:  You can waive that.  I know that --

21     I think, James, you kind of helped coordinate this.

22     I don't know if you were going to coordinate that

23     process also or not.

24         MR. HENDERSON:  Yeah, that'd be fine.  Our

25     office would be happy to coordinate it if she wants


**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1        to read.
 2            MR. WOOD:  Okay.  So it's up to you, she -- the
 3        court reporter probably wants it on the record
 4        whether or not you want to read the transcript or if
 5        you'll waive that.
 6            THE WITNESS:  Could I have the opportunity to
 7        talk Attorney Henderson separately, or do I have to
 8        give an answer right now?
 9            MR. WOOD:  Okay.
10            MR. HENDERSON:  Why don't we just say that
11        she'll go ahead and read?
12            MR. WOOD:  Yeah, okay.
13            THE WITNESS:  Okay.
14            MR. WOOD:  That's safer.  You can --
15            MR. HENDERSON:  Play it safe.
16            MR. WOOD:  You can waive it later.
17            MR. HENDERSON:  Yeah, yeah.
18            THE WITNESS:  No problem.
19            MR. HENDERSON:  You also don't want to read it;
20        you don't have to.
21            MR. WOOD:  Yes.  Okay, so that --
22            THE REPORTER:  You want a copy?  Just need to
23        make sure.
24            MR. HENDERSON:  Not as of this time.
25            THE REPORTER:  Okay.
```



**MILESTONE** | **REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1              MR. HENDERSON:  Yeah.

 2              MR. WOOD:  So that's all I've got for today.

 3       Kaitlyn, I will try to get all these documents

 4       prepared for you in an e-mail.

 5              THE REPORTER:  Perfect.

 6              MR. WOOD:  Along with this afternoon's.  Ms.

 7       Lee, thank you so much.  We had a bit of technical

 8       issues, but you're very cooperative.  I appreciate

 9       that.

10              THE WITNESS:  Thank you.  I'm sorry if it was

11       coming from my end, so --

12              MR. HENDERSON:  Thanks, Ms. Lee.

13              MR. WOOD:  It's all right.  Well, thank you

14       very much.

15              (DEPOSITION CONCLUDED AT 2:41 P.M.)

16

17

18

19

20

21

22

23

24

25
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     **www.MILESTONEREPORTING.com**     **Toll Free 855-MYDEPOS**

```
 1  CERTIFICATE OF OATH

 2

 3  STATE OF FLORIDA

 4  COUNTY OF ORANGE

 5

 6      I, the undersigned, certify that the witness in the

 7  foregoing transcript personally appeared before me and

 8  was duly sworn.

 9

10  Identification:  Produced Identification

11

12

13

14                  _____

15                  KAITLYN HARRIS

16                  Court Reporter, Notary Public

17                  State of Florida

18                  Commission Expires: 06/06/2027

19                  Commission No.: HH 407171

20

21

22

23

24

25
```

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1

2                C E R T I F I C A T E

3

4   STATE OF FLORIDA)

5   COUNTY OF ORANGE)

6

7        I, KAITLYN HARRIS, Court Reporter and Notary Public

8   for the State of Florida at Large, do hereby certify

9   that I was authorized to and did report the foregoing

10  proceeding, and that said transcript is a true record of

11  the said proceeding.

12

13       I FURTHER CERTIFY that I am not of counsel for,

14  related to, or employed by any of the parties or

15  attorneys involved herein, nor am I financially

16  interested in said action.

17

18  Submitted on: July 27, 2023.

19

20

21

22  _____

23               KAITLYN HARRIS

24               Court Reporter, Notary Public

25



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

```
 1                              ERRATA

 2

 3   PAGE      LINE                    CHANGE      REASON

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16   I have read the entire transcript of my deposition taken

17   in the captioned matter or the same has been read to

18   me.I request that the following changes be entered upon

19   the record for the reasons indicated. I have signed my

20   name to the Errata Sheet and authorize you to attach the

21   changes to the original transcript.

22

23

24   _____    _____

25   Date                       NAME
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

MILESTONE **|** REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

407.423.9900
Fax 407.841.2779
Toll Free 855-MYDEPOS

**July 27, 2023**

**Gillian Lee**
jhenderson@fresewhitehead.com

RE:   Deposition of **Gillian Lee** taken on 7/17/2023
       **Jean Decarlo et al. v. Emerge Healthcare Group et al.**

Dear Gillian Lee,

## IMPORTANT NOTICE FOR DEPOSITION TRANSCRIPT READ AND SIGN
It is suggested that the review of this transcript be completed within 30 days of your receipt of this letter, as considered reasonable under Federal Rules*.

___    **Attorney - Copy of Transcript Enclosed:**  Signature of the Deponent is required.  Please have the deponent make any corrections/changes necessary on the Errata Sheet ONLY, sign name on the form where indicated.  Please return ONLY the original signed Errata Sheet to our offices within 30 days from the date of this memorandum.  If you have any questions, please call our offices.

 x    **Attorney - No Copy Ordered:**  Since you did not request a copy of the transcript, it will be necessary for the Deponent to call our offices to arrange for an appointment to read and sign the transcript of the Deposition within 30 days of this memorandum.

___    **Deponent:**   At the time of your deposition, you did not waive your right to read and sign the transcript of your testimony, therefore, attached please find a copy of the transcript and Errata Sheet.  Please read the transcript, make any corrections necessary on the Errata Sheet ONLY, sign the bottom of the Errata Sheet, and return it within 30 days from the date of this memorandum.  Please call our offices if you have any questions.

___    **Deponent:**   At the time of your deposition, you did not waive your right to read and sign the transcript of your testimony, therefore, it is necessary for you to come to our offices to read and sign same.  Please call Milestone Reporting Company to arrange for an appointment at your earliest convenience.

___    The attached executed copies of the Errata Sheet(s) are sent to you for your files.  If you have any questions, please call our offices.

Thank you for your attention to this matter.

No. 276219

cc:

Waiver:
I, Gillian Lee, hereby waive the reading and signing of my deposition transcript.

_____          – – – – – – – – – – – – – – – – – –
Deponent Signature                                                    Date

*Federal Civil Procedure Rule 30 (e) / Florida Civil Procedure Role 1.310 (e)

400 North Ashley Drive, Suite 2600          315 East Robinson Street , Suite 510          4651 Salisbury Road, 4th Floor
**TAMPA, FL 33602**                                          **ORLANDO, FL 32801**                          **JACKSONVILLE, FL 32256**
                                                                    **CORPORATE**
                                                    **WWW.MILESTONEREPORTINGCOMPANY.COM**